1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                   NORTHERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )
4           Plaintiff,             )
        vs.                        )
5                                  ) CRIMINAL NO.:
    JESUS CHAIDEZ-MEZA,            ) 1:19-cr-00165-RDB-1
6                                  )
            Defendant.             )   **VOLUME IV**
7   _____)

8
                                   Baltimore, Maryland
9                                  October 24, 2019

10
                    TRANSCRIPT OF PROCEEDINGS
11                         **JURY TRIAL**
            Before The Honorable Richard D. Bennett
12                       Courtroom 5D

13
    For the Plaintiff:
14
        James G. Warwick, Esquire
15      Jeffrey J. Izant, Esquire
          Assistant U.S. Attorneys
16

17  For the Defendant:

18      Thomas J. Maronick, Jr., Esquire

19
    Also Present:  Interpreters - Marta Goldstein, Victoria Dopazo
20                 Special Agent Brian High, DEA

21
        Proceedings recorded by mechanical stenography,
22  transcript produced by computer.

23  _____

24                  Patricia G. Mitchell, RMR, CRR
                    Federal Official Court Reporter
25                  101 W. Lombard Street, 4th Floor
                      Baltimore, Maryland 21201

1                    P R O C E E D I N G S

2        (9:39 a.m.)

3            THE COURT:  Good morning, everyone.  We are ready to

4    proceed with cross-examination of Detective Rodriguez and

5    bring the jury in.  Government ready?

6            MR. WARWICK:  Should I have the witness come up?

7            THE COURT:  Come on up, thank you.

8            MR. MARONICK:  Defense is ready, Your Honor.

9            THE COURT:  Good morning, Detective Rodriguez.

10           THE WITNESS:  Good morning, sir.

11       (Jury entered the courtroom at 9:40 a.m.)

12           THE COURT:  Good morning to all of you.  Almost on

13   time, as close as we get around here.  With that, we're ready

14   to proceed with -- Detective Rodriguez, we'll have you sworn

15   again for today's testimony.

16           THE CLERK:  Good morning.  Please raise your right

17   hand.

18       **ANTONIO RODRIGUEZ, GOVERNMENT'S WITNESS, SWORN**

19           THE CLERK:  Thank you.  You can have a seat.  Please

20   restate your first and last name for the record.

21           THE WITNESS:  First name is Antonio, last name is

22   Rodriguez.

23           THE COURT:  With that, we're ready to proceed with

24   cross-examination of Detective Rodriguez.  Mr. Maronick.

25           MR. MARONICK:  Thank you, Your Honor.

1                        **CROSS-EXAMINATION**

2   **BY MR. MARONICK:**

3   Q    Good morning, Detective Rodriguez.

4   A    Good morning, sir.

5   Q    You've been a police officer how long?

6   A    About 20, 20 1/2 years.

7   Q    But you had only worked with HIDTA, the High Intensity

8   Drug Enforcement Agency, since March of 2016?

9   A    Yes, that's when I was reassigned back to HIDTA.

10  Q    This interview was conducted on what day, sir, the

11  interview of Mr. Chaidez-Meza?

12  A    I remember it was May 3 -- May 1st.

13  Q    May 1st of?

14  A    2019, this year.

15  Q    Okay.  So how long had you been investigating the alleged

16  drug conspiracy involving or alleged to have been involving

17  Mr. Chaidez-Meza before this interview?

18  A    Mr. Chaidez-Meza was, I think was -- I would say about

19  November, November 2016.  November, December of 2016.

20  Q    As part of that investigation, you were in direct contact

21  with the DEA; is that right?

22  A    Yes, with agents from Baltimore.

23  Q    And, in fact, you work essentially for or with the DEA;

24  is that correct?

25  A    Yes, my duties are dual status, DEA task force officer,

```
 1    so I have duties to also investigate federal trafficking

 2    laws.

 3    Q    Okay.  So it's safe to say you had a very thorough

 4    understanding of the entire case against Mr. Chaidez-Meza

 5    before this interview, right?

 6    A    Yes.

 7    Q    You knew the facts pretty much -- or the alleged facts

 8    anyway, up and down?

 9    A    As much as I could remember them, yes.

10    Q    In other words, when you went to interview

11    Mr. Chaidez-Meza, you already knew, sir, what you were looking

12    for, right?

13    A    I knew the facts and I knew all the activities that he

14    had participated in in Baltimore.  I had read all those

15    reports.  Obviously, me and Detective Brian High were going

16    back and forth and sharing information on our cases.

17    Q    Now when you had conducted the interview, right before

18    that, you had been involved in the arrest of Mr. Chaidez-Meza,

19    correct?

20    A    I didn't detain him myself, but I was the agent, the

21    detective that coordinated the takedown.

22    Q    Now how far away was the place where Mr. Chaidez-Meza was

23    arrested versus where the interview is conducted?  How far

24    away was that?

25    A    So we're in the downtown alley of Los Angeles, right off
```

1    of like 6th and probably by the 110 Freeway and 6th Street.

2    Approximate drive time from there to Sylmar, I would say 30,

3    45 minutes without any traffic.  With traffic it could be

4    hours because it's San --

5    Q    What time of day was this?

6    A    It was in the morning when we arrested him.

7    Q    So there is going to be some traffic?

8    A    There is going to be a lot of traffic coming back

9    downtown --

10           THE INTERPRETER:  Excuse me, Your Honor.

11   Interpreters would like to interfere for a moment.  The

12   gentleman says he's not hearing us.

13           THE COURT:  All right, take your time.  Everyone

14   stop for a minute.  Thank you, Ms. Goldstein.

15       (Pause.)

16           THE INTERPRETER:  Thank you, Your Honor.  We're all

17   set.

18           THE COURT:  Thank you, Ms. Goldstein.  We take

19   you-all for granted down there.  Thank you, Ms. Dopazo and

20   Ms. Goldstein.  It goes without saying we're very grateful for

21   all your work here this week.

22           THE INTERPRETER:  Thank you, Your Honor.

23           THE COURT:  With that, you may continue,

24   Mr. Maronick.

25   BY MR. MARONICK:

1    Q    Given your investigation, you were aware that firearms

2    were used, not fired but pointed at Mr. Chaidez-Meza

3    originally; is that correct?

4    A    No, I believe the traffic stop was -- he was seen leaving

5    the house.  He drove --

6    Q    But he was nevertheless handcuffed?

7    A    He was handcuffed, yes.

8    Q    He was put in the back of a police car; is that

9    correct?

10   A    He was.

11   Q    You just said the drive from downtown LA to Sylmar was,

12   as you said, in the morning could be hours, so is it safe to

13   say it was at least an hour drive when he was handcuffed?

14   A    I would say yes.

15   Q    Do you know if he was handcuffed on his hands and feet or

16   just hands during that drive?

17   A    Just his hands.  Our policy as LAPD officers is just to

18   handcuff the suspect with his hands behind his back.

19   Q    Was Mr. Chaidez-Meza provided any access to a lawyer

20   during that time?

21   A    No.

22   Q    Was he offered any access to a lawyer during that time

23   following his arrest?

24   A    No, he never asked for a lawyer.

25   Q    But did anyone advise him during the time of his arrest

1   and transport over to the facility that he had a right to a

2   lawyer?

3   A     That I don't know.  I didn't have any conversation with

4   Mr. Chaidez until I interviewed him and made contact with him

5   at our office.

6   Q     From your knowledge of the investigation, how many police

7   and law enforcement were involved in the arrest of

8   Mr. Chaidez-Meza?

9   A     Our HIDTA team is composed probably -- I'm going to

10  estimate -- about seven to nine agents.  I don't think all of

11  our officers responded because when we located his vehicle, it

12  was really early in the morning.  So it was one of those where

13  the phone call came out, and whoever was able to respond went

14  out quick.  I would say maybe six of our guys approximately

15  responded, plus then we requested a -- I don't recall what

16  division it is in that area, but a black-and-white unit,

17  uniform unit that was utilized to do the investigatory traffic

18  stop.

19  Q     Were there at least two people in that unit, the black

20  and white?

21  A     Yes.

22  Q     So it's safe to say there were at least eight officers

23  involved in the stop and arrest of Mr. Chaidez-Meza?

24  A     Yeah, I would guess maybe, to be safe side, eight to ten

25  officers.

1   Q    Okay, so up to ten.  Were the officers all in uniform or

2   a mixture?

3   A    The only officers in full LAPD uniform would be the

4   black-and-white officers.  Then and all of us are in plain

5   clothes, but we always wear our body gear, tactical vest that

6   says police, our badges, so we're clearly...

7   Q    So if you're walking down the street, people are going to

8   see you in that tactical gear and have no doubt that you're

9   involved in some form of military or law enforcement; is that

10  essentially what you're wearing?

11  A    Yeah, we're law enforcement conducting some type of

12  investigation.

13  Q    And, again, about ten different members of law

14  enforcement involved in this, correct?

15  A    Yes.

16  Q    Were all officers armed or how many of the ten, to your

17  knowledge?

18  A    All of us.  We all carry a primary duty weapon.

19  Q    Did all of you have badges, I would assume?

20  A    Yes.

21  Q    Okay.  So ten officers involved in the stop, and

22  Mr. Chaidez-Meza was put in the back of which vehicle?

23  A    No, not the ten officers involved in the stop.

24  Q    But were in the team involved.  I understand, the stop

25  itself --

1    A    The stop could have been, if I guess, the black-and-white

2    officers, maybe two, and the rest were watching the house that

3    he came out of.

4    Q    I understand.  What vehicle was Mr. Chaidez-Meza put in

5    on his way to Sylmar?

6    A    That I don't remember.  I know that the black and white

7    stopped the pick-up truck that he was the passenger in.  They

8    approached, they took him out of the car, and they put him in

9    the black and white temporarily.  Then he was transported back

10   to the house, what I remember correctly.  He was taken out of

11   the black and white while we -- he was kept in the black and

12   white until we, the unit, our team did a search warrant at the

13   residence that he came out from.

14        Once that was secured, we took him -- somebody took him

15   out of the black and white, and we sat him down outside by the

16   driveway in the chair to make him wait there while we did our

17   search and recover whatever we could find in the house.

18   Q    Was he shackled during that time?

19   A    Not shackled, he was handcuffed.

20   Q    He was handcuffed, all right.  So he's driven about an

21   hour.  When he's brought into the police station, was he

22   handcuffed with both handcuffs and feet cuffs?

23   A    No, just handcuffs to the small of his back.

24   Q    Okay.  Was he taken directly to the interview room?

25   A    I wasn't there when he was brought in, but normal

1    procedures is the HIDTA, we only have two -- it's a small

2    interview room.  It's a room that has two cells, but at the

3    same time, that room is inventory or evidence room that has a

4    little room where we do interviews.  Our procedure is when

5    they take them in there, they take the cuffs off, they put

6    them in the --

7    Q    That wasn't my question --

8            MR. WARWICK:  I'm sorry, can we have the witness

9    finish his answer?

10           THE COURT:  Yes, sustained.  Let him finish his

11   answer.

12   A    Our procedure is normally when we bring a suspect in, we

13   take the cuffs off, sit them down in one of those detention

14   rooms, be able to relax, they can sit there.  And they just

15   have a little window, 3 by 8, where they can look.  All

16   they're looking at is just locker rooms where we keep

17   evidence.

18   BY MR. MARONICK:

19   Q    So it's safe to say that's a holding cell; is that

20   correct?

21   A    Yeah, there's two holding cells.

22   Q    So he's then taken from the holding cell to the interview

23   room; is that correct?

24   A    Yes.

25   Q    And in the interview room, that is a door that's also

1    locked; is that correct?

2    A    No, that door is always kept open.

3    Q    It's kept open, but there were officers in the interview

4    room with him, correct?

5    A    Just me and my partner, Sal Duarte.

6    Q    You and your partner.  Was Mr. Chaidez-Meza handcuffed at

7    the time he was at the interview room?  Talking about when he

8    first goes in there.

9    A    No, because when I approached Mr. Chaidez-Meza, clearly,

10   like in my interview, I said, "How are you?  Follow me."  I

11   asked him to please put his hands in his pockets.  We brought

12   him into the interview room, and his hands were in his pockets

13   at all time.

14   Q    But are you saying you didn't cuff either his hands or

15   his feet when he was in the interview room?

16   A    No, no.  When I do interviews, every time I do an

17   interview, unless I know there's some kind of history where

18   he's violent or he fought us in the field or he ran from us,

19   then I am going to keep the suspect handcuffed.  That's just

20   for my officer's safety.  His demeanor, his attitude, it was

21   not required.  So we sat him down, he had his hands in his

22   pockets, and then we proceeded with our interview, which at

23   one point our interview clearly shows he asks us if he can

24   take his hands out, and we said okay.

25   Q    I'm going to ask you more about that in a little bit.

```
1   But it's your contention that the entire time he was in there,

2   he was not handcuffed or feet cuffed?

3   A    No.

4   Q    Okay.  Now he's in the interview room with the two of

5   you, you and your partner.  Who is your partner?

6   A    Detective Sal Duarte.

7   Q    Okay.  Now you began by -- there's no video of this,

8   correct?

9   A    No, there's no video.

10  Q    The only recording was that done in Spanish for which the

11  transcript is entered into evidence, correct?

12  A    Correct.

13  Q    Okay.

14       MR. MARONICK:  If we could pull up, Mr. Kerrigan,

15  page 1.

16  Q    You've become -- I'm going to ask you to reread some of

17  this as you did with Mr. Warwick.

18  A    That's fine.

19  Q    For the purposes of this, I will read where it says

20  agent, and you read where it says Mr. Chaidez-Meza.

21  A    Yes, sir.

22  Q    "Okay, sir, I will explain what is here.  Before we talk,

23  I'm going to read you your rights.  You have the right to

24  remain silent.  Anything you say can be used against you in a

25  court of law.  You have the right to have an attorney present
```

1   in any interrogation.  If you cannot afford an attorney, one

2   will be appointed to you, okay?  Do you understand your

3   rights?

4   A    "Yes.

5   Q    "This form here is just to get your basic information,

6   what's your name, your last name, your address, your date of

7   birth.  It's personal information about where you live, okay?

8   We will ask you the questions, if you have children, wife.

9   Are you willing to answer those questions?

10  A    "I have nothing to hide."

11  Q    Okay.  Did Mr. Chaidez-Meza at that time have an

12  understanding what he was being asked questions about, from

13  what you knew at that point?

14  A    Well, he knew, based on those questions, that we were

15  going to ask him his date of birth, personal pedigree

16  questions.

17  Q    I understand that.  But when you asked him if he would

18  answer questions, your next question was about form and his

19  last name and address; isn't that correct?

20  A    Yeah, I had him identify himself, provide his date of

21  birth and all that.

22  Q    Okay.  Did you tell him what the questions were about at

23  that point?

24  A    I explained to him what the form was about.

25  Q    Did you tell him why he was there?

```
 1    A    Not at that specific moment --
 2    Q    So you've read him his rights, and then your next
 3    question is about what goes on a form; isn't that correct?
 4    A    Yeah, we followed up with the questions from the DEA 202
 5    form.
 6    Q    After advising his rights, your question on page 1, you
 7    said, "Do you understand your rights?"  He said, "Yes."  Then
 8    you discussed the form.  You asked, "Are you willing to answer
 9    these questions?"  And what was his answer?
10    A    "I have nothing to hide."
11    Q    Okay.  He had nothing to hide, but did he have any
12    knowledge at that point, based on your questions to him, of
13    what you were asking him about?
14    A    He had knowledge that he was detained because he had an
15    arrest warrant.  That was the only knowledge that was provided
16    to him.  That was given to him in the field after he was
17    arrested.
18    Q    Did he actually say yes, he would answer your
19    questions?
20    A    He answered our questions.  Later on in the interview, we
21    asked him, we went into detail of what he -- his detention was
22    generated from, where it was coming from, and he wanted to
23    know.
24    Q    Are you aware of what education Mr. Chaidez-Meza has?
25    A    No.
```

1    Q     Are you aware of what criminal background, if any, he

2    had?

3    A     Criminal background, yeah, based on what I've researched

4    through our data systems in California, I don't think he had

5    any criminal history.

6    Q     So as far as you knew, he had never been through one of

7    these before; isn't that correct?

8    A     To my knowledge in the United States, no.  I couldn't

9    speak for anything in Mexico.

10   Q     Okay.  So let's turn to the next question after "I have

11   nothing to hide."

12         "Okay.  So what's your name?

13   A     "Jesus Ramone Chaidez.

14   Q     "Jesus, Ramone is your middle name?

15   A     "Yes.

16   Q     "Your last name Meza too?

17   A     "Meza too.

18   Q     "Your date of birth?

19   A     "January 23, 1980."

20   Q     Okay.  So we're so far several minutes in the interview

21   and the only questions you have asked him about are

22   essentially biographical information at that point; isn't that

23   correct?

24   A     Yeah.

25   Q     Okay.

1      MR. MARONICK:  Let's go to page 3, if you would,

2   please, Mr. Kerrigan.

3   Q    You asked him middle of the page, "You lost it?"  You see

4   that there, Detective?  Middle of the page, "You lost it?"  I

5   think that was actually Agent Duarte who said that.

6   A    Okay, I see it.

7        "I don't know where it ended up" --

8             MR. WARWICK:  Objection.  Is there a question here?

9             THE COURT:  He's proceeding in the same fashion as

10  you did, Mr. Warwick.  He's doing exactly what you did

11  yesterday.  There's no objection to it.  You may continue.

12             MR. MARONICK:  Thank you, Your Honor.

13  A    "I don't know where it ended up, so the Green Card was

14  going to expire next January, January coming in 2020.

15  Q    "20."  And he said?

16  A    "So I had all the documents because citizenship to start

17  the process.  Since I lost the Green Card, I lost all those

18  documents.  What I did was request a new Green Card."

19  Q    Okay.  Question, Detective Rodriguez -- Your Honor, I'll

20  try to clarify so there's no confusion.

21       You were now four minutes and 32 seconds, by the time

22  code here.  Four minutes and 32 seconds into the interview,

23  you have still not told him what he's there for; isn't that

24  correct?

25  A    No, we hadn't gone into our specific direct investigative

 1 | questioning.  That was going to come after we finished our

 2 | normal, which is our 202 form that we have to finish.

 3 | Q    Now are you familiar with the Reid technique of

 4 | interviewing?

 5 | A    The what?

 6 | Q    The Reid technique, were you trained in that?

 7 | A    No, I've never heard of that.

 8 | Q    Okay.  Even if you've not been trained in the Reid

 9 | technique, when you're asking questions of a suspect, is it

10 | simply to hear the suspect's answers, or is it something more

11 | than that?

12 |          MR. WARWICK:  Object to the form.

13 |          THE COURT:  Sustained.

14 | BY MR. MARONICK:

15 | Q    What is your goal in asking questions of a suspect in an

16 | interview?

17 | A    To obtain personal -- to obtain the truth.

18 | Q    Are you familiar with different types of questions,

19 | direct and essentially cross-exam questions, like you hear in

20 | court?

21 | A    I'm familiar with different questions could be formatted

22 | in different ways to confuse people, but my tactics has never

23 | been -- my tactics has always been put the facts forward and

24 | get the truth how it comes out.

25 | Q    Okay.  When you say confuse people, what do you mean when

1   you say that?

2   A    I've learned through years of experience that I've seen

3   that different questions could be asked in different ways, and

4   sometimes it confuses people.  That's not my tactic.  My

5   tactic has always been if I have a specific question to ask, I

6   would ask the question, and then I would expect the defendant

7   or the suspect to whatever answer he's going to give me,

8   that's what's going to be taken as true.  Then I would be able

9   to either say I know you're lying to me because based on the

10  facts that we have.

11  Q    But it's safe to say that you had a goal in mind when you

12  were asking questions of Mr. Chaidez-Meza; isn't that

13  correct?

14  A    Our goal during the interview was to see if he would

15  accept his responsibility for all the facts and all the

16  evidence that we had recovered doing this case.

17  Q    When you say acceptance of responsibility, is it safe to

18  say that you made up your mind he was responsible at that

19  point?

20          MR. WARWICK:  Objection.

21          THE COURT:  Sustained, sustained.

22  BY MR. MARONICK:

23  Q    Is it is safe to say that you had certain beliefs --

24          THE COURT:  Approach the bench a minute, Counsel,

25  please.

1      **(Bench conference on the record:**

2              THE COURT:  Mr. Maronick, the reason I sustained

3      that objection is because the beliefs of this officer, either

4      objective or subjective, aren't really an issue.

5              MR. MARONICK:  Okay.

6              THE COURT:  The defendant is arrested on an arrest

7      warrant issued out of this district, correct?

8              MR. WARWICK:  Yes.

9              THE COURT:  So there is a determination by a

10     judicial officer of probable cause --

11             MR. MARONICK:  Okay.

12             THE COURT:  -- with respect to an arrest warrant, so

13     he was arrested on the arrest warrant.  For inquiry as to what

14     this officer is thinking, the simple answer is there's an

15     arrest warrant by a judicial official that has determined

16     probable cause, so he's interviewing this witness.  You're

17     free to inquire in terms of voluntariness, if you contend

18     there are facts that affect the voluntariness of the

19     admissions, coercion.  The matter of what his belief is is

20     really not a relevant inquiry.  There's an arrest warrant, so

21     he's allowed to arrest the man and he's interviewing the man.

22     So I'm not sure where we're going with this.

23             MR. MARONICK:  Thank you, Your Honor.

24             THE COURT:  You can certainly go over voluntariness

25     and what you believe your client's reaction was.  But the

1    matter of what his intent was, there's no improper intent.

2    There's an arrest warrant, so the man was arrested.  Police

3    officer arrested him -- he didn't arrest him on his own

4    whim.

5              MR. MARONICK:  I understand.

6              THE COURT:  As I understand it, the defendant was

7    arrested on an arrest warrant that had been outstanding out of

8    this district for a period of time.

9              MR. WARWICK:  That is correct.

10             THE COURT:  What was the date of that arrest

11   warrant?

12             MR. IZANT:  The arrest warrant was issued pursuant

13   to a grand jury indictment, and that indictment was issued in

14   the last week of April, about a week or so before this took

15   place.

16             THE COURT:  Okay, that's fine.

17             MR. MARONICK:  I can move on, Your Honor.  I

18   understand the Court's ruling.)

19        **(Bench conference concluded.)**

20   BY MR. MARONICK:

21   Q    So we'll go back, Detective, to the interview.

22             MR. MARONICK:  Can we get page 4 on the screen.

23   Q    Without me reading through the whole transcript.  I know

24   probably no one in the courtroom would love for me to do that,

25   but just to be safe, is it safe to say on page 4 where there's

1    questions about passport and his weight, those still as late

2    as 6:13 in the interview, those are essentially still

3    biographical questions, correct?

4    A    Correct.

5    Q    Now on page 5, about 7:12, you ask, "Do you have

6    children?"

7    A    Yes.

8    Q    Now let's go back as if I'm the agent.

9    A    Okay.

10   Q    "Do you have children?

11   A    "I have a daughter.

12   Q    "How old is she?

13   A    "She's eleven.

14   Q    "Does she live here or?

15   A    "In Mexico.

16   Q    "What is her name?

17   A    "Teresa Chaidez."

18   Q    We move on.  You're still asking him things about family.

19   We go to page 6 though.  You asked him at about -- a few

20   seconds after nine minutes, it's not time coded specifically:

21   "What work do you do in Baltimore?"  Do you see that,

22   Detective?

23   A    Oh, yes -- no, is it right before the nine minute?

24   Q    I have it as few minutes after.  It says, "What work did

25   you do in Baltimore?"

1   A    Okay.  "I went to Baltimore because supposedly we were

2   going to work in gardening.  I didn't like it."

3   Q    This is a question for you, Detective Rodriguez.  You

4   didn't follow up to ask if, in fact, he did do work in

5   gardening, did you?

6   A    That specific, no.  But based on the facts that we had of

7   the investigation and the facts that we've been sharing

8   between Agent Brian High and me reading reports, it didn't

9   appear that he did have a job in Baltimore other than what he

10  was sent there for.

11  Q    Is it possible you could have been wrong about that

12  though?

13  A    Yeah, it could be possible because, obviously, you can't

14  follow somebody 24/7 every minute of the day.  It's impossible

15  to do that.

16  Q    Okay.  Again, at this point, you're still asking about

17  biographical information until we get to about -- it's, again,

18  not time coded but it says, "Agent: Who brought you over

19  there?"  Do you see that?

20  A    Yes.

21  Q    "Who brought you over there?  Who brought you?  Who

22  invited you to go over there, talk about your work over there?

23  In other words, who invited you to go over there?

24  A    "Well, it was a friend who lives in Culiacan.  He's

25  already gone back there too.  I came here and they left."

Cross - Rodriguez                       Vol. IV-23

```
1   Q    So essentially at this point as we're now moving into
2   almost ten minutes of questions, you're still asking
3   biographical.  We're only just now starting to get into
4   anything that could be related to the conspiracy that's
5   alleged; is that correct?
6   A    Correct.
7   Q    Is that a normal means of asking questions for you,
8   Detective?
9   A    Yes, I normally will ask questions based on facts that I
10  have --
11  Q    You would agree you still haven't told him anything about
12  what you're asking him questions about, correct?
13  A    Correct.
14  Q    Ten minutes into the interview?
15  A    Correct.
16  Q    Now we don't have a video, so obviously I can't play a
17  video to discuss Mr. Chaidez-Meza's demeanor, but how close
18  were you sitting to him at the table?
19  A    I was at a table approximately about the same length of
20  your table, maybe a little shorter because that's a desk.
21  Q    Are you referring to my table, the defense table?
22  A    Yeah, the same defense table, but I think the table
23  that's in there is smaller -- three --
24  Q    Smaller than the defense table.  You do not mean
25  connected to the interpreters?
```

1    A      No.  I'm talking between width.  Three feet, that was a

2    rough estimate maybe.  So three feet plus a chair maybe, four

3    feet away from him at most.

4    Q      You were sitting three feet from him; is that correct?

5    A      He would be on the opposite side of the table, and it

6    would be on this side of the table.

7    Q      Where was Agent Duarte sitting?

8    A      He was sitting to my right.

9    Q      So the two of you were in there, and, again, it's just

10   the three of you in the room; is that correct?

11   A      Yes.

12   Q      Are you certain that his feet were not shackled?

13   A      I am certain.  It's LAPD policy.  We don't shackle.  I

14   don't, we don't shackle feet.

15   Q      Okay.  I'll move on.  We go to page 7.  We're now at

16   10:04.  I'm not going to ask you to read the whole thing, but

17   I'm going to read truncating from this.

18        10:04.  "This is coming from there.  Well, if you want,

19   this is practically the time to" -- then it states "almost

20   sounds like the recording was stopped, then resumed."

21        Did you stop the recording at that time?

22   A      No, the recording was never stopped.  If you listen to

23   the recording, you could tell that I either moved my

24   investigative folder and it picked up the feedback from it,

25   but the voices still continue.  So there was something that

1    moved.  I don't know if it was a chair, and during that time,

2    it moved the recording device, and it just caught that

3    feedback from it.

4    Q    So you're saying at that point in the transcript where it

5    says "almost sounds like the recording was stopped and then

6    resumed," it was simply because of you moving your chair?

7    A    Either the chair was moved or I keep a detective folder,

8    my folder is pretty big, a binder, and my recording was inside

9    that binder.  So any movement to that, you're going to get the

10   feedback.  When I say moves, on the desk.

11   Q    All right.  Now at this time, you still hadn't told him

12   what you're asking him questions about; isn't that correct?

13   A    We hadn't told him, but like my partner explained to him

14   that this, his arrest or his issue was coming from Baltimore,

15   giving him an idea of what --

16   Q    We're going to go there next.  Agent Duarte then said,

17   "If you want" -- this is on page 7 -- "if you want, because we

18   have an arrest warrant for you from there, from Maryland, from

19   Baltimore.  You know that, look, I already have, that we have

20   white in our beard, tells you that we have" -- I'll use the

21   word, sorry -- "a shitload of time doing this.  We already

22   know how we found you.  Everything I told you over there

23   about -- you know that you had a problem over there, that you

24   came fleeing from there, okay?  Right now I'm giving you the

25   soup.  You want to give us your version, now is the time.

1          "I can call the prosecutor in Baltimore and tell him the

2     gentleman wants to help himself because you know what this is

3     about.  I don't have to explain what we -- this or perfectly.

4     The expression on your face right now, I already know that you

5     know what this is about."

6          You were still in the room with Agent Duarte at that

7     point?

8     A    Yes.

9     Q    You still have not told him what you're asking questions

10    about at 10:20; isn't that correct?

11    A    No, not specific questions, but we're giving him an idea,

12    we're laying the foundation, the ground floor, making him

13    understand that he says this is...

14    Q    Agent Duarte says something about seeing an expression on

15    his face.  What expression, if any, did Mr. Chaidez-Meza have

16    on his face?

17    A    I wouldn't be able to say.  I can't speak for Detective

18    Duarte's interpretation of Mr. Chaidez-Meza's face.  I didn't

19    look -- sometimes -- I might not be able to tell that

20    expression.  Detective Duarte, he's got 28 years on the job.

21    He's been doing these investigations for his whole career so,

22    like he says, he's got a lot of time and experience.

23    Q    Is it safe to say that Mr. Chaidez-Meza could have been

24    nervous at that point?

25    A    Well, he was nervous.  I mean, who wouldn't be nervous in

1    that situation?  If I was arrested, it's normal procedure,

2    it's normal feelings to feel nervous when --

3    Q    It's safe to say that he was scared too, wasn't it?

4    A    Yeah.  I think that's normal for any human being to be

5    scared.

6    Q    All right.  Let's go to page 8.  Again, I'll truncate

7    this as best I can.  This is at 11:24.  This is actually you,

8    Agent -- Detective Rodriguez:

9         "You have an opportunity.  This is the only opportunity

10   you'll get, give your version of what happened in Baltimore.

11   After... if... I recommend you take it.  We are on the verge

12   of calling the federal prosecutor from Baltimore and if he

13   says you want to cooperate, we put you on the phone with the

14   agents from Baltimore on FaceTime so you can see.  So you can

15   see we're not lying because they are going to want to know if

16   you want to cooperate."

17        Did you at that time, in fact, FaceTime any prosecutor?

18   A    We FaceTimed the agent.

19   Q    Which agent?

20   A    Brian High.  During the interview, I did call Agent High

21   on FaceTime.  I don't know if it was specifically right after

22   that question, but he was put on FaceTime, and he was part of

23   the interview.

24   Q    But Agent High was not listed anywhere in the transcript,

25   was he?  Other than mentions perhaps, I'd have to

```
 1   double-check.
 2   A    I think he was mentioned on certain parts of the
 3   transcripts because Agent High asked questions, and we were
 4   relaying them to Mr. Chaidez in Spanish, and you could hear
 5   his voice.
 6   Q    How come in the transcript that's not noted anywhere that
 7   he's asking questions?
 8   A    It should be noted.  I think --
 9   Q    But it isn't.  Can you show me in the transcript anywhere
10   where it says Agent High was on that call?
11   A    Right here specifically this page?
12   Q    Within the entire exhibit, can you show me where it
13   indicates that Agent High was on that call?
14   A    Okay.  Can you give me some time to review the
15   transcript?
16   Q    Take all the time you need to refresh your recollection.
17   A    (Reviewing document).
18        If you go to page 17.
19   Q    Okay.
20   A    One, two, three, four, five -- five blocks down.
21        MR. MARONICK:  Could we get that, Mr. Kerrigan?
22   Page 17.  Okay, so --
23   A    Right after this, Meza answers, "Yes."  Agent Duarte:
24   "English between agents FaceTiming Baltimore agent, Brian
25   High."
```

1    Q    Okay.  But you would agree that's not when you FaceTimed

2    him -- page 17 is not the same as page 8, correct?

3    A    No.  Like I mentioned earlier, Agent High was FaceTimed.

4    He wasn't FaceTimed immediately when we started the interview.

5    He came in maybe at --

6    Q    Nine pages later, right?

7    A    Yeah, about 30 minutes after when the interview started.

8    That would be a guesstimate.

9    Q    All right.  I'll come back to that a little bit later.

10   Let's go back to 11:53, if we could, on page 8.  This is, at

11   this point, Agent Duarte.  He says, "Well, I can't make

12   promises.  But if you say I want to help myself, I will call

13   them right now, if you are interested in helping yourself.

14   But if you want to win your liberty or you want to win

15   something favorable in this, they are not going to give it to

16   you for free.  The prosecutor is not going to give it to you

17   for free.  Do you understand me?

18       "So you know perfectly well what this is about.  This is

19   about the job.  This is about what was happening over there.

20   You weren't a gardener over there or nothing.  You were there

21   working, like they say, delivering bread?

22   A    "No, I wasn't working."

23   Q    We go then to the next page, page 9, and I'll ask you

24   some questions.  At that time still, he's not spoken with the

25   prosecutor in Baltimore; is that correct?

1   A    No.

2   Q    And yet on page 8 when we are back there, this is -- as I

3   just mentioned, around the 11:24 mark of page 8, "We are on

4   the verge of calling the federal prosecutor from Baltimore and

5   if he says you want to cooperate, we put you on the phone,"

6   correct?

7   A    Yes.

8   Q    So we've now gone into the 11-minute mark, and only at

9   this point have you started asking him questions about what

10  this is about, right?

11  A    Yes.

12  Q    And you said he was fearful?  That's what you testified

13  earlier?

14          MR. WARWICK:  Objection to the form.

15          THE COURT:  Overruled.

16  BY MR. MARONICK:

17  Q    You said he was afraid; isn't that correct?

18  A    I didn't say -- I would say that anybody in that specific

19  position, anybody, anybody that gets arrested, even me if I

20  were to be arrested as a law enforcement officer, I would be

21  scared.  I would be nervous.  It's typical, normal reaction as

22  human beings to get nervous.

23  Q    Now on page 10 and I'll go to exactly where.  This is

24  at -- the last time code before this is 14:19, but this states

25  with, "look, the reality"?  Do you see that, Detective?

1    A    Yes, sir.

2    Q    "Look, the reality is that you know this business.

3    Nobody, you understand, saving your neck is on you.  Agent --

4    OV -- of the girl."  Then it follows, "You have a daughter and

5    the reality is the decision is yours.  I cannot force you.

6    You already know that in the apartment, you were up and down

7    with that other moro that came with you.  Now if we arrest

8    him, where is he?  In Mexico?

9    A    "I have" -- it should state "I haven't seen him."

10   Q    Okay.  Why are you mentioning Mr. Chaidez-Meza's daughter

11   at that point?

12   A    That question was given by Agent Duarte.

13   Q    Why are the two of you mentioning it?  You said you

14   worked hand in hand with him; is that correct?

15   A    I was hand in hand in interview, but I can't speak for

16   what was in his mind at the time.  He asked a question.

17   Q    Do you agree that was an appropriate question to ask

18   Mr. Chaidez-Meza?

19   A    Yes, I ask that question a lot of times in my

20   interviews.

21   Q    To ask about his daughter?

22   A    Uh-huh.

23   Q    What does that have to do whatsoever in a conspiracy?

24   A    In these types of cases, sometimes a lot of defendants,

25   when they find themselves in the position of facing heavy

```
 1   charges, they always want to cooperate --

 2   Q    After --

 3   A    Not always necessarily --

 4   Q    -- isn't that --

 5        MR. WARWICK:  I'm sorry, can we have a question and

 6   answer, Your Honor?

 7        THE COURT:  Sustained.  Let him give an answer.

 8   A    Not always but they always -- it's been my experience

 9   they take the opportunity because they don't want to be facing

10   a long time in prison.

11   BY MR. MARONICK:

12   Q    Were you in any position to determine what, if anything,

13   he'd be facing, you personally?

14   A    No.

15   Q    But yet you -- not you specifically, but Agent Duarte

16   brings up his daughter, and you just said that's appropriate

17   based on your experience; right?

18   A    Based on what I've done when I've used it in other

19   interviews.  I cannot speak for why Detective Duarte's state

20   of mind of asking.  He would have to answer that question.

21   Q    You don't believe that's in any way coercive of him to

22   bring up his daughter in an interview?

23   A    No.

24   Q    I'll move on.

25        MR. MARONICK:  We go to page 14, please.  At the top
```

1  of the page on 14, at least on my copy, I don't see a time

2  code but, Mr. Kerrigan, this is where it says on my copy, "We

3  made arrests, you lost merchandise and you lost money.  That's

4  why you left."

5  Q    Do you see that, Detective?

6  A    It says, "No, no."

7  Q    Okay.  I'll start there: "We made arrests, you lost

8  merchandise and you lost money.  That's why you left.

9  A    "No, no.  Were there accidents?"

10 Q    That's still Chaidez-Meza.

11 A    Yes, sir.  So he's asking us if there was accidents.  My

12 years of experience and being part of many types of

13 investigations, a lot of investigations involve wires where

14 we're intercepting calls on other targets -- not this case

15 because this wasn't -- sometimes major targets or drug cartel

16 leaders from Mexico, when they have a question or they lose a

17 load to law enforcement or gets stolen or seized or somebody

18 gets arrested, that's the word they use, "accidentes."  So he

19 was asking us if there were -- if we had seized any drugs or

20 if we had arrested people.

21     Then he says, "No, I didn't know that.  I came to Sinaloa

22 because I came for Christmas.  I came around the 18th of

23 December but I never."

24 Q    On page 12, this was referenced a little bit earlier.

25 This is around the 17:51 mark.

1    "Agent: You were, you had, when I tell you you were

2   involved there and you were part of receiving the merchandise,

3   collecting the money and everything," Chaidez-Meza says

4   what?

5   A    "Can I take my hands out?"

6   Q    Agent responds "Yes."  Where were his hands?

7   A    His hands were in his pockets.

8   Q    Why were his hands in his pockets?

9   A    That's a procedure normally for us to keep the hands in

10  his pockets.  He's sitting in front.  It's common for me to

11  ask him to keep your hands in your pockets for own safety.

12  They're a little bit more -- they're not constrained.  When

13  you're handcuffed sometimes, your wrists get red and they

14  start to hurt, makes people uncomfortable.  So I uncuff him,

15  able to sit, he could put his hands on his -- I would say they

16  were in his pockets or on his knees, and he was just asking us

17  for permission to put them on the desk so he could feel a

18  little bit more --

19  Q    It took until the 17:51 mark before he could even free

20  his hands from that position?

21              MR. WARWICK:  Objection.

22              THE COURT:  Sustained.

23  BY MR. MARONICK:

24  Q    It took until the 17:51 mark before his hands were put in

25  that other position, correct?

1    A    That's when he asked us that he wanted to put his hands

2    on the desk.

3    Q    Okay.  I'm going to move on a bit.  Going to go to

4    page -- let's go to page 17.  You asked him about a number of

5    people, including Chuchi; is that correct?

6    A    Yes, during the interview, he was showing a few pictures

7    of targets that we had identified on this case both in LA and

8    as well as --

9    Q    But you had already identified who they were?  At least

10   in your mind, you already knew who they were, correct?

11   A    Yeah, a lot of them had been identified through the

12   course of the investigation.

13   Q    Now the top of 17, it states Chaidez-Meza, what does he

14   say at the top of 17?

15   A    "Well, that I would drive?  Yes, I would drive."

16   Q    And then right after that, "But you were confirming.  In

17   other words, you're not saying, I didn't know what it was.

18   You knew what you were doing.  Yes or no?  So he can hear.

19   A    "Yes."

20   Q    Were you clear he was even sure what question he was

21   answering at that point?

22   A    We'd have to go back to the other questions because this

23   was leading -- I don't know what other questions we were

24   asking before that.

25   Q    While I do understand that, you don't disagree that's a

1    compound question?  There's several things in there; isn't
2    that correct?
3    A    It's several things but it's a question of a follow-up
4    question that we probably asked earlier.
5    Q    On the next line, it states, "You understand some
6    English, right?"  Then it states, "English conversation
7    between agents."  What were you talking about there?
8    A    That's probably when we -- I'm not sure if that's when we
9    made the call with the agents, but I don't specifically --
10   when we call Brian High.  Because Brian High is only English
11   speaking, so he was asked if he was able to understand when he
12   would speak to us in English.  Because Agent High doesn't
13   speak Spanish, so the conversation we were having with him, he
14   was asked if he would understand English was based would he be
15   able to understand what he was saying.
16   Q    You would agree that was not included in the transcript,
17   is it?
18   A    No, it's not in the transcripts.  I don't know if it was
19   even picked up.  I would have to...
20   Q    Why did you say, "You understand some English, don't
21   you?"  Why did you say that?  Actually the exact phrase was,
22   "You understand some English, right?"
23   A    That was said because we were already on FaceTime with
24   Agent High, and we were asking to see if he was going to be
25   able to understand what Agent High was saying, or and then we

1   would translate it.

2   Q    All right.  I go to -- let's go to page 22.  This is,

3   right before the 34:09 mark.

4        "Agent: That's the business, right?  After that you'd go

5   to the apartment, you help him take the bags up, right?

6   A    "Yes."

7   Q    Now at that point you've told him something, and he's

8   just saying "yes," right?

9   A    Yes.

10  Q    And I can point out other examples, but there's a pattern

11  where you tell him something, and he just says "yes."  Isn't

12  that correct?

13  A    Yeah, but it's -- the question is -- I would have to

14  review the question that's before that, what we're asking him.

15  There's other questions that are presented to him prior to us

16  continuing the questioning and getting an answer from him.

17  Q    But you would agree asking a question in which you just

18  make a statement and ask him to say yes, to say no, that's not

19  the same as him telling you, right?

20            MR. WARWICK:  Objection.

21            THE COURT:  Sustained.

22  BY MR. MARONICK:

23  Q    You would agree a yes-or-no question is not the same as

24  him telling you that, without him allegedly confirming

25  something?  In other words, he's not specifically saying,

1    "Here's what I did."  You're telling him, and he's just saying

2    "yes"; isn't that right?

3    A    No, because he specifically told us what his role was.

4    Q    All right.  We go to page 22.  This is at 34:09:

5         "You would help him take the bags up to the apartment.

6    Then upon entering the apartment, you're saying you'd get into

7    your room, and he would take care of all the accounting.  You

8    never saw the bricks of coke or of" -- it says "OV target" --

9         "No, I never saw anything.

10         "You never saw the packages of money."

11         What was the "OV target" there?

12   A    I think that's over here, means there's like overlap or

13   maybe --

14   Q    Overlap.

15   A    Yeah, so the translator couldn't pick it up --

16   Q    What was Chaidez Meza's response?

17   A    "I only carry the bags to the apartment."

18   Q    So he never saw the bricks of cocaine, from your

19   investigation; correct?

20              MR. WARWICK:  Objection.

21              THE COURT:  Overruled.

22   BY MR. MARONICK:

23   Q    You may answer.

24   A    Repeat the question.

25   Q    He never saw the bricks of cocaine, according to your

1    investigation; correct?

2    A    According to his statement, he's claiming he never saw

3    the cocaine.

4    Q    All right.  We move on.

5         MR. MARONICK:  24, 38:25 time code, please.

6    Q    This is Chaidez-Meza says "one thing."  If you could read

7    that, Detective.

8    A    34:25?

9    Q    38:25, please.

10   A    "One thing, are they going to lock me up?"

11   Q    "We'll... you're going to have to go to Baltimore and

12   face the prosecutor.  He is the only one who can decide."

13   Then there's more questions after that.

14        But in fact, he was already in custody at that time, was

15   he not?

16   A    Yes, because for the arrest warrant from Baltimore.

17   Q    Were you surprised when he says, "Are they going to lock

18   me up?" when you just said he was in custody for the arrest

19   warrant?

20   A    Was I surprised that he asked me that question?

21   Q    "Are they going to lock me up?" when, in fact, he was

22   already in custody for the arrest warrant, according to what

23   you just testified?

24   A    I think his more concern was -- the way I interpret it

25   is, like, am I going to be put in jail for a long time?  So

1  he's concerned about his exposure time to being in prison for
2  the rest of his life.
3  Q    You had no concerns that he didn't understand that he was
4  in custody at that time?
5  A    He understood that he was in custody.  He knew from the
6  point that he was handcuffed in the field that he had an
7  arrest warrant, and he was going to go to jail.  That, he was
8  well aware of that.
9  Q    Let's go to 27, please.  This is around 44, just before
10 44:06.
11 A    27?
12 Q    27, I have it as 27 on my page.  43:51 he states "one
13 day."  If you could read that, Detective.
14 A    "One day we'd arrive and they'd give us bags, and we'll
15 leave.  When we take those bags, they'll give us other bags,
16 when we'll take those bags.
17 Q    "The people that would give you, they'd give you, ah,
18 okay.
19 A    "They give us.
20 Q    "So basically you guys would give the merchandise, and
21 they'd give you the money?
22 A    "Well, yes.
23 Q    "And the money, you'd give it to the truck driver, and
24 he'd bring it back here?
25 A    "When another one would arrive, we'll give it to another

1    one."

2    Q    Okay.  Did you actually see Mr. Chaidez-Meza receiving

3    money in his hand throughout your knowledge of the

4    investigation?

5    A    No, I didn't --

6              MR. WARWICK:  Objection to the form.

7              THE COURT:  Sustained.

8    BY MR. MARONICK:

9    Q    I'm going to ask it this way.  You had knowledge of the

10   total investigation; is that correct?

11   A    Yes.

12   Q    You had knowledge of whether Mr. Chaidez-Meza was

13   actually handed money; is that correct?

14   A    I had knowledge that, based on this investigation, that

15   duffel bags of cocaine were handed off to either Chaidez-Meza

16   or Chuchis, and then they were handing off money to the truck

17   drivers in exchange for the drugs.

18   Q    Did any of your evidence, from your knowledge and your

19   findings in the investigation, did that show that

20   Mr. Chaidez-Meza was actually personally ever handed money?

21             MR. WARWICK:  Objection.

22   A    That personally --

23             THE COURT:  Sustained.  Approach the bench,

24   please.

25             MR. MARONICK:  Yes, Your Honor.

```
 1        (Bench conference on the record:

 2            THE COURT:  The objection as to the form of the

 3   question is sustained with respect to asking him of what he's

 4   aware of in the guise of trying to summarize the whole case.

 5   You can ask him if he had information about the evidence.

 6   You've already asked him whether he's seen, not seen what

 7   Mr. Chaidez-Meza did or didn't receive.  This line of inquiry

 8   is really not in terms of the interview of the defendant --

 9            MR. MARONICK:  I understand, I'll keep moving.)

10        (Bench conference concluded.)

11   BY MR. MARONICK:

12   Q    We'll continue on.

13            MR. MARONICK:  Go to page 29, please.

14   Q    This is at the top with "agent," I'll just read that and

15   we can begin there.  This is around just before the 48:32

16   mark:

17       "They are going to talk to the prosecutor in charge of

18   the case, the United States prosecutor.  He has the ability to

19   give you a break or to say that because, look, of course,

20   you're telling us your participation, but like I told you when

21   we started this interview, it's normal for people to think, to

22   minimize their participation.  That is normal.

23   A    "I'm not minimizing.

24   Q    "But when you tell me I was living there, bags would

25   arrive, and I would help but I never saw it was money?
```

1    A    "No, it's just that supposedly the people that hand it

2    over were trustworthy."

3    Q    Okay.  You believe he's minimizing at that point?

4    A    I think he is minimizing, and the purpose of doing the

5    FaceTime call with Brian High was that he was able to

6    corroborate if Mr. Chaidez-Meza was telling us the truth

7    because Mr. Chaidez-Meza was being surveilled here in

8    Baltimore, and only Agent Brian High would know if he was

9    doing what he claimed he was doing.

10   Q    But earlier he said he only drives, right?

11   A    Correct.

12   Q    Based on your knowledge of the -- strike that.  I won't

13   get into that, that's another part of the investigation.

14        Let's go to page 37.  This is after the one hour,

15   two-minute mark and then further down.  I have it as page 37.

16        "Agent: How much did they pay you for what you were

17   doing?"  Do you see that?

18   A    Which question?  I'm sorry.

19   Q    Begins with -- near the end of the page: "How much did

20   they pay you for what you were doing?  For example" -- do you

21   see that?

22   A    No, I don't.

23        MR. WARWICK:  That's page 38.

24   BY MR. MARONICK:

25   Q    Page 38.

1          MR. WARWICK:  Second sequence.

2          THE WITNESS:  Okay, I get it now.

3   BY MR. MARONICK:

4   Q    "How much did they pay you for what you were doing?  For

5   example, if you received a load and sent money, what did you

6   earn?  How much?

7   A    "How much did I earn?  How much did they give me?  I

8   think 5,000, $5,000 --

9   Q    "Every time you received, every time a mule arrived and

10  UI, the packages, the merchandise, they'd give you $5,000?

11  A    "$5,000.

12  Q    "And when you deliver money, another 5,000?

13  A    "No."

14  Q    Did you ever uncover any money from Mr. Chaidez-Meza

15  personally?

16  A    From him personally, no.  We did seize money that came

17  from the investigation in Baltimore.

18  Q    Did you review his bank accounts?

19  A    I didn't, no.

20  Q    Are you aware if they were reviewed?

21  A    Yes, they were.  I think they were subpoenaed.

22  Q    Okay.  We move on to page 39.  I'm at 1:05, "Agent: In

23  the hotel?"

24  A    "In the Wal-Mart.

25  Q    "In the Wal-Mart?  Who approached?

1    A    "A trailer.

2    Q    "What color?

3    A    "White.

4    Q    "Did it have a trailer, did it have a box or no?

5    A    "No.

6    Q    "Were you the only driver there too?"  Then he says?

7    A    "Yes, that's it.

8    Q    "Chuchis is the one who got out, received, and from there

9    where did you go?

10   A    "To the apartment."

11   Q    We'll stop there.  So you had mentioned Chuchis earlier

12   in the interview?

13   A    Correct.

14   Q    You knew what role -- strike that.  You, from your

15   knowledge in the investigation, suspected what role Chuchis

16   had, correct?

17   A    Not a specific.  Based on reviewing reports and reviewing

18   surveillance photos, I saw that Chuchis was carrying duffel

19   bags.  But his specific role that was given to him when he was

20   sent to Baltimore, those specific facts, I don't know what his

21   role was.

22   Q    All right.  Move on a bit further.  Page 42, this is

23   above the 1:09:47 mark.  Starts with, "What color was the

24   car?"

25   A    Okay.  "I don't remember.

1    Q    "Was it for one passenger, two passengers?"

2    A    Yes, for two passengers, and the space in the back was

3    not very deep.

4    Q    "You didn't see who took it?"  Then he says, "I'm going

5    to show you a photo of what type of vehicle to see if this is

6    the type of vehicle you and Chuchis took back to the

7    apartment."  At this time, which photo did you

8    show Mr. Chaidez-Meza?

9    A    At this time Agent Brian High is the one that knew the

10   specific facts about a transaction that occurred at the hotel

11   because they either witnessed it or had surveillance on it.

12   So at that time we're speaking with Agent High over the phone,

13   and he's providing us facts of the type of vehicle that was

14   used.  That's when I went up on my phone and researched the --

15   it was a red MINI Cooper that was believed to have been handed

16   off to Chuchis and Mr. Chaidez at a hotel.  I brought up a

17   picture of a red MINI Cooper, which I then showed it to

18   Mr. Chaidez during the interview.

19   Q    So that was the reason you didn't show him; is that

20   correct?

21   A    What was that, sir?

22   Q    That was the reason you didn't show him, because Agent

23   High -- Agent Brian High was not there, correct?

24   A    No, no, no.  I'm saying they're the ones that knew the

25   facts of what occurred in that parking lot.  Agent High is the

1   case agent here so he knew what car.  I didn't know what kind

2   of car had been transferred, so Agent High was providing me

3   the facts so I could research it and ask the question to

4   Mr. Chaidez.

5           MR. MARONICK:  May I get Exhibit 10, please, on the

6   screen.

7   Q    You know who this individual is, yes?

8   A    Yes, this is Ediberto Lopez, also who goes by Eddie.

9   Q    And you showed him that picture, correct?

10  A    During the interview, yes.

11          MR. MARONICK:  Could I get Exhibit 8, please.

12  Q    Did you show him this picture?

13  A    No.

14  Q    Do you know who this is?

15  A    I know who this is in our investigation.

16  Q    Who is this?

17  A    He goes by the moniker of Primo.  I know --

18  Q    Go ahead.  Please finish your answer if you have more.

19  A    Based on the facts that I have, which is still ongoing, I

20  believe his name is Marcos Correo.

21          MR. MARONICK:  What about Exhibit 9, please.

22  Q    Did you show Mr. Chaidez-Meza this picture?

23  A    No.

24  Q    Do you know who this is?

25  A    Yes.

```
 1   Q    Who is this?
 2   A    This is, he goes by Huero.  I'm trying to remember his
 3   name because he's got a long name.  I believe his name is
 4   Manuel Manjarrez Lopez.
 5   Q    Is it safe to say all three, from your knowledge, your
 6   personal knowledge of the investigation, are involved in the
 7   drug trade in Mexico?
 8   A    Yes.
 9   Q    All three were mentioned?
10   A    All these three are the first -- the last two pictures
11   you showed me are targets that I were investigating in my side
12   of California, which were the targets that were providing the
13   drugs to the truck drivers.
14   Q    But you only showed him the picture of Eddie Lopez.  Why
15   was that?
16   A    No, during the interview, he was shown many pictures.
17   Q    Of those three, you only showed him Eddie Lopez, right?
18   A    No, I showed him a picture of Daniel Rodriguez, his
19   brother Hilario Rodriguez, Oscar Miranda, and towards the end,
20   he was shown a lot of other pictures.
21   Q    I understand he was shown more pictures, but are you
22   putting Oscar Miranda and Eddie Lopez at the same level?
23             MR. WARWICK:  Objection.
24             THE COURT:  Overruled, overruled.
25   BY MR. MARONICK:
```

1    Q     You may answer.

2    A     Can you rephrase or --

3    Q     Are you putting Oscar Miranda on the same level as Eddie

4    Lopez?

5    A     As level, you mean in level of organization within the

6    cartel organization?

7    Q     Yes.

8    A     Oh, no.  Eddie Lopez is -- he's a source of supply.  He's

9    the boss in Guadalajara.  He would be the leader of his own

10   Lopez organization.

11   Q     All right, I just have a few more.

12         MR. MARONICK:  Page 48, please, I think it's 48.  It

13   begins right before 1:24:26.

14   Q     Chaidez-Meza says: "No, I only saw" -- do you see that,

15   Detective?

16   A     "No, I only saw the bags.  That's it.

17   Q     "So he never opened the bags in front of you?

18   A     "Well, yes, but...

19   Q     "But you saw that they were bricks, and you knew it was

20   drugs?  They didn't necessarily need to be opened for you to

21   know what it was?  You knew what it was, yes or no?

22   A     "Yes."

23   Q     So I go back to it because you asked earlier about

24   examples of questions and then yes or nos.  You would agree

25   that's another example of a yes-or-no question, where the

1   phrase has been stated and then simply a yes or no; correct?

2   A    Yes.

3   Q    He didn't tell you the phrase?  You put the phrase out,

4   and then he just said yes or no; right?

5   A    No, if you look at the questions, we're following up on

6   the stuff that he had mentioned that obviously he had

7   knowledge.

8   Q    But you previously stated, if I have this correct, that

9   you put some of the facts out because that's your style of

10  interviewing?  You stated that you don't put things out,

11  quote, to confuse?  Did I have that right from your

12  testimony?

13  A    Yeah.

14  Q    Okay.  Page 51, this is after the one minute, 30:58 mark.

15       "Agent: If he went for business, it was the business with

16  Chuchi."  Do you see that?

17  A    Page 51?

18  Q    I have it as 51, if he went for business --

19  A    I have it as 52.  I'm sorry.

20  Q    May be 52.  "If he went for business, it was business

21  with Chuchi."

22  A    "Well, yes, like I said, when he went, I don't remember

23  if we went to eat.  That time we went to the store, but yes,

24  he'd communicate with Chuchis."

25  Q    Who's he referring to there?

1    A    Oscar Miranda.

2    Q    So your question was about Oscar Miranda doing business

3    with Chuchi; is that correct?

4    A    Yes.

5    Q    As far as Chuchi, he did business with different people

6    from what you know, correct?

7    A    Based on my investigation, Chuchi's business -- well,

8    part of it was do business with the people here, customers

9    here in Baltimore.  Then whatever instructions he was

10   receiving from the bosses in Mexico.  That's the only facts I

11   would know, he'd be getting instructions.

12   Q    From your interview and knowledge of the case, did

13   Mr. Chaidez-Meza receive anything from Oscar Miranda?

14   A    No, not based on the facts that I have.

15            MR. WARWICK:  Objection.  Hearsay, move to strike.

16            THE COURT:  Sustained.  It will be stricken.

17            MR. MARONICK:  No further questions.

18            THE COURT:  Redirect, Mr. Warwick?

19            MR. WARWICK:  Yes, Your Honor.

20                   **REDIRECT EXAMINATION**

21   **BY MR. WARWICK:**

22   Q    Detective Rodriguez, do you find a yes-or-no answer to be

23   confusing?

24   A    No.  It's one of the easiest questions to answer.

25   Q    Do you find a yes-or-no answer to be coercive?

1    A      No.

2    Q      Why did you contact Special Agent High during the course

3    of your conversation with the defendant?

4    A      The purpose of doing that was because Agent Brian High

5    would be able to corroborate the facts and corroborate the

6    statements that Mr. Chaidez was providing us.

7    Q      Can you tell us whether or not Agent High was the case

8    agent or the person responsible for this case in Baltimore?

9    A      Yes, he was.

10   Q      Would you expect -- strike that.

11         Can you tell us whether or not you would expect the case

12   agent to be the most knowledgeable of any individual about the

13   particular investigation?

14   A      Yes --

15             MR. MARONICK:  Objection to the form.

16             THE COURT:  Overruled.

17   A      Yes.

18   BY MR. WARWICK:

19   Q      When you called Agent High, can you tell us whether or

20   not you were trying to get things right?

21   A      Correct.

22             MR. MARONICK:  Objection.

23             THE COURT:  That's sustained.  That requires

24   qualification of the witness.  That objection is sustained.

25   BY MR. WARWICK:

1   Q    When you called Special Agent High, can you tell us

2   whether or not it was your intention to put the most accurate

3   facts before Mr. Chaidez-Meza?

4   A    Yes.  He would be the only one that would be able to

5   corroborate the truthfulness of the statements.

6          MR. WARWICK:  That's it, Your Honor.  Thank you very

7   much.

8          THE COURT:  Any recross just on those points,

9   Mr. Maronick?

10         MR. MARONICK:  No, Your Honor.

11         THE COURT:  Thank you very much, Detective

12   Rodriguez.  You may step down.

13         THE WITNESS:  Thank you, sir.

14         THE COURT:  You shouldn't discuss your testimony

15   with anyone until this case concludes.  Thank you very much.

16         MR. WARWICK:  Thank you, Detective.

17         THE COURT:  Counsel, if you'll approach the bench

18   for a minute, please.

19       **(Bench conference on the record:**

20         THE COURT:  The Government is now resting, correct?

21         MR. WARWICK:  Yes, Your Honor, the Government is

22   going to rest, subject to checking the exhibit list with the

23   clerk.

24         THE COURT:  Check the exhibit list, basically she

25   has a check-off.  I've been keeping track in my notes.  I

 1    think most exhibits are in, if not all.

 2              MR. WARWICK:  Correct.

 3              THE COURT:  So the Government is going to rest.

 4              With respect to the defense, I'll need to advise him

 5    again of his rights to testify or not testify.  Any witnesses

 6    that you intend to call, Mr. Maronick?

 7              MR. MARONICK:  I would like to discuss that with my

 8    client.

 9              THE COURT:  Why don't we have the jury -- excuse the

10    jury for a few minutes.

11              MR. MARONICK:  Okay.

12              THE COURT:  Here's what we'll do.  We'll excuse the

13    jury.  I'll advise again on his rights to testify or not

14    testify.  You'll have time to talk about any witnesses being

15    presented.  Let's assume if he does not intend to testify, as

16    I understood to be the case, I'll reiterate with him what I'll

17    tell the jury, they should not consider in any way.  I have

18    that instruction ready from yesterday.

19              Then it would seem to me that we're then ready for

20    closing arguments, and I'll explain to the jury the process,

21    we'll have closing arguments and recess at some point in time

22    during closing arguments.  And I'll tell the jury depending

23    upon the length of the closing arguments -- I'm not going to

24    constrain anybody -- but depending on the length, I may or may

25    not be giving them instructions today, or I might give them

1    instructions when you come back tomorrow morning.  Just the

2    way it's played out.  First step is have the jury take a

3    break.

4             MR. MARONICK:  Okay.

5             THE COURT:  Agreeable to the Government?

6             MR. WARWICK:  Yes, absolutely.

7             MR. MARONICK:  It's agreeable.  My other question is

8    Rule 29 --

9             THE COURT:  I'll go over that.  Clearly, you'll make

10   a Rule 29 motion --

11            MR. MARONICK:  Yes.

12            THE COURT:  So let's go through all this now.  All

13   right.)

14       **(Bench conference concluded.)**

15            THE COURT:  Ladies and gentlemen, at the risk of you

16   having to listen to too much white noise here, I'm going to

17   stay up on the bench, we're going to take a recess as to

18   you-all.  You can go back to the jury room, have a cup of

19   coffee, and use the facilities.  I'll have you back here in

20   another ten minutes or so, I think.  Thank you.

21            THE CLERK:  All rise.

22       (Jury left the courtroom at 10:54 a.m.)

23            THE COURT:  All right.  The Government is now

24   resting.

25            MR. IZANT:  That's correct.

1    THE COURT:  Subject to clarifying any exhibits, make

2    sure all the exhibits have been listed.  With that, first step

3    is here -- everyone can be seated here.

4    Mr. Maronick, you are now making a Rule 29 motion --

5    you're not required under Rule 29(c)(1)(3) to make a motion

6    for judgment of acquittal at the conclusion of the

7    Government's case.  You can await the jury verdict, but you're

8    certainly free to make a motion under Rule 29 now, and I'll be

9    glad to hear from you if you choose to make that motion.

10   MR. MARONICK:  I will make a motion, but I will --

11   obviously at this point, I'm not going to make any argument.

12   THE COURT:  That's fine.  The record will reflect

13   the Rule 29 motion is being made.  The standard for this Court

14   to review a Rule 29 motion at this stage is if, upon viewing

15   the evidence in the light most favorable to the Government,

16   any rational trier of facts could find the defendant guilty

17   beyond a reasonable doubt.  That standard is set, reiterated

18   by the United States Court of Appeals for the Fourth Circuit

19   in the *United States v. Tresvant*, 677 F.2d 1018, a Fourth

20   Circuit opinion in 1982, and reiterated in *United States v.*

21   *Romer*, R-o-m-e-r, at 148 F.3d 359, a Fourth Circuit opinion in

22   1998 in which certiorari was denied by the Supreme Court.

23   Specifically in *United States v. Wilson*, 115 F.3d

24   1185, a Fourth Circuit opinion in 1997, the Fourth Circuit

25   held that the uncorroborated testimony of a single witness,

1   even when that witness is an accomplice, co-defendant or

2   informant, is enough to deny a Rule 29 motion, which clearly

3   applies here with respect to the testimony of

4   Mr. Valdez-Garcia and Mr. Rodriguez-Lopez.

5          In ruling on a motion for a judgment of acquittal

6   under Rule 29, I consider whether as a matter of law the

7   Government's evidence would be insufficient to establish

8   factual guilt.  That's clearly, there's clearly evidence from

9   which a jury could find a defendant guilty based on the record

10  in this case.  So the motion, Rule 29 motion for judgment of

11  acquittal is denied by the Court at this time.

12         With respect to the presentation of a case by the

13  defense, Mr. Chaidez-Meza, if you'll stand, please.  I want to

14  advise you again, sir, as I did a few days ago -- and I want

15  to make sure you had plenty of time to think about that

16  through the week -- under American law, all defendants in

17  American courtrooms, be they citizens or not citizens, are

18  still entitled to the same rights of due process under

19  American law.

20         Do you understand that, sir?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Specifically, the Fifth Amendment to the

23  United States Constitution provides that no person can be

24  compelled to be a witness against himself, meaning that you

25  have a privilege against self-incrimination.  The Government

1    cannot call you to the witness stand.  This Court could not

2    call you to the witness stand and compel you to testify.

3            Do you understand that, sir?

4            THE DEFENDANT:  Yes.

5            THE COURT:  But if you do testify, you can be

6    subject to impeachment on cross-examination by Government

7    counsel.  Do you understand that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  You've had an opportunity to discuss

10   whether you choose to testify or not.  Let me explain to you

11   if you choose not to testify, I will specifically give an

12   instruction that has already been discussed with the lawyers

13   in this case, and the instruction will essentially be that --

14   I will say the defendant did not testify in this case, and

15   under our Constitution, he's not required to testify.  And I

16   will specifically tell the jury that they should not draw any

17   adverse inference against you because you did not testify.

18            I will also specifically tell the jury that the

19   burden is always upon the Government to prove guilt beyond a

20   reasonable doubt, and that burden never shifts.  Specifically,

21   they'll be told the burden is always upon the Government to

22   prove guilt beyond a reasonable doubt.  There's never any

23   burden upon a defendant to prove his innocence.

24            Do you understand your rights in that regard?

25            THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand the jury will be so

2     instructed if you choose not to testify?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Have you had an opportunity to consider

5     whether you want to testify or not, and have you discussed it

6     with your lawyer?

7          THE DEFENDANT:  Yes, I spoke with him.

8          THE COURT:  As to that, Mr. Maronick, I don't want

9     to question about any conversations obviously with you, but

10    what is your client's position here as to whether he wants to

11    testify or not?

12         MR. MARONICK:  My understanding is he does not wish

13    to testify.

14         THE COURT:  Mr. Chaidez-Meza, your choice is not to

15    testify; is that correct?

16         THE DEFENDANT:  Yes.

17         THE COURT:  That's fine.  Are you under the

18    influence of any drugs, medication or any alcoholic beverage

19    or narcotics at this point in time?

20         THE DEFENDANT:  No.

21         THE COURT:  Is there medication that you normally

22    take which you did not take today?

23         THE DEFENDANT:  No.

24         THE COURT:  Mr. Maronick, you're satisfied that this

25    is a knowing and intelligent decision on his part?  Are you

```
 1   satisfied with that?

 2            MR. MARONICK:  Without revealing anything

 3   confidential, Mr. Chaidez-Meza and I have discussed this at

 4   length, and he had indicated to me that at that time he did

 5   not wish to testify --

 6            THE COURT:  -- and still feels that way.

 7            MR. MARONICK:  That's correct.  I said if you change

 8   your mind or based on anything we discussed, you'd still like

 9   to testify, you have that opportunity.  So it's my

10   understanding he's essentially not changing from where he was

11   when we talked.  Is that right, Mr. Chaidez-Meza?

12            THE DEFENDANT:  Yes.

13            THE COURT:  You may be seated, Mr. Chaidez-Meza.

14   Thank you very much, sir.

15            Mr. Maronick, are there any witnesses that you

16   choose to put forth?

17            MR. MARONICK:  What I'd like to do, Your Honor, if

18   we could have a brief recess, to discuss some options with

19   Mr. Chaidez-Meza --

20            THE COURT:  That's fine.  We'll take a ten-minute

21   recess and see where we are on this.  Counsel is ready.  If

22   there is not any evidence to be presented, we'll explain to

23   the jury the case has ended, and we'll be ready to proceed

24   fairly directly with closing argument.

25            Is that correct from the point of view of the
```

 1    Government?

 2              MR. WARWICK:  It is, Your Honor.

 3              THE COURT:  From the point of view of the defense?

 4              MR. MARONICK:  Yes, Your Honor.

 5              THE COURT:  As I said, we'll wait and see as to

 6    whether I charge the jury at the end of the day.  We're not

 7    going to have deliberations today.  I think I'm inclined to

 8    charge the jury tomorrow when they come back and proceed right

 9    to deliberations, but we'll wait and see how it plays out.

10    With that, we'll take a ten-minute recess.

11              MR. IZANT:  Thank you.

12              MR. MARONICK:  Thank you, Your Honor.

13              THE CLERK:  All rise.  This Honorable Court now

14    stands in recess.

15         (Recess taken at 11:01 a.m.)

16         (11:20 a.m.)

17              THE COURT:  Mr. Maronick, where are we, sir, on this

18    now?

19              MR. MARONICK:  The Defense rests.

20              THE COURT:  So I'm going to bring the jury in,

21    indicate to them that the Government rests, the Defense rests,

22    and we are ready to go with closing argument.  The plan is

23    we're going to go -- I think based upon the estimates that

24    you-all have given me yesterday, I think we should be able to

25    finish closing arguments by 1:30, total.  I think that's a

1   reasonable target.

2           Agree from the point of view of the Government?  A

3   little over two hours total.

4           MR. IZANT:  Yes, Your Honor.

5           MR. WARWICK:  Hopefully by 1:00.

6           THE COURT:  Certainly by 1:30.

7           MR. WARWICK:  Yes.

8           THE COURT:  I'll charge the jury tomorrow morning.

9   I'll tell them we're going to excuse them, and I'll charge the

10  jury tomorrow morning, after which they'll immediately

11  deliberate.  Madam Clerk, when they arrive tomorrow morning,

12  then we'll order lunch.  I think we're all on the same

13  wavelength with that.

14          Mr. Mani, if you'll bring the jury in, please.

15  Thank you.

16      (Jury entered the courtroom at 11:21 a.m.)

17          THE COURT:  Ladies and gentlemen, you-all may be

18  seated.  Here is the schedule.  The Government is now resting.

19  Is that correct, Mr. Izant, Mr. Warwick?

20          MR. IZANT:  That's correct, Your Honor.

21          MR. WARWICK:  Yes.

22          THE COURT:  The Government has rested.

23          With respect to the Defense, the Defense rests?

24          MR. MARONICK:  It does.

25          THE COURT:  Defense rests.  The case has concluded

 1   with respect to evidence, presentation of evidence.  We're now

 2   going to proceed with closing argument.  As I indicated to

 3   you, I have a matter in Annapolis later this afternoon, so

 4   we're not going to be sitting this afternoon.  The schedule is

 5   as follows: You'll hear closing argument from the Government,

 6   closing argument from the Defense, rebuttal argument from the

 7   Government because the burden is still on the Government, so

 8   the Government responds in rebuttal.  We believe all that will

 9   be done no later than 1:30.  Then you're finished for the day.

10        Tomorrow morning, you'll come back here, we'll start

11   promptly at 9:30.  Ms. Herndon will give you menus.  I usually

12   say to the juries we buy you lunch, but we don't buy you

13   anything.  You pay for everything that happens here, so you

14   get some of your tax dollars back tomorrow because the U.S.

15   government pays for lunch.  You'll come in, be here before

16   9:30, she'll take lunch orders.  At 9:30 you'll come back in

17   the courtroom thereabouts, and I will give you the

18   instructions on the law, and then you immediately begin your

19   deliberations.  So that is the schedule here.

20        So with that, we have the closing arguments here in

21   the next two hours.  Mr. Izant, I'll be glad to hear from

22   you.

23        MR. IZANT:  Thank you, Your Honor.

24        Good morning.  This trial was about a business.  It

25   was a lucrative business.  It was a sophisticated business.

1    It was an international business.  This business was also well

2    organized.  It had an executive.  You learned his name was

3    Eddie Lopez.  And you learned that he ran the business's

4    operations from Mexico.  You also learned during this trial

5    that that business had operations throughout the United

6    States.  It had operations in California, in Ohio, in New

7    Jersey, in Virginia, and here in Maryland.  You learned that

8    its U.S. operations were based in Los Angeles, and those

9    operations were run by two men known as Primo and Huero.

10          And you learned that in the fall of 2016 and in the

11   early winter of 2017, that business in Los Angeles was

12   connected with the business in Maryland by two individuals

13   named Pedro Valdez-Garcia and Oscar Miranda.

14          But you also learned this business was illegal.  Its

15   goal was to profit from the unlawful sale of narcotics.  It

16   was a drug trafficking organization.  And you'll learn that

17   organization was thriving.  Eddie's business was sending

18   hundreds of kilograms of cocaine across the United States,

19   including to here in Maryland, and it was receiving millions

20   of dollars in return.

21          But you also learned that in August 2016 or

22   thereabouts, Eddie's business had a problem.  It specifically

23   had a problem in the Maryland operations.  You learned at that

24   time Eddie had sent his cousin to run the Maryland operations.

25   You heard from him.  His name was Hilario Rodriguez-Lopez.

 1   Eddie sent Hilario to Baltimore in about late August or early
 2   September 2016, but when Hilario got to Baltimore, he ran into
 3   a problem.  Hilario realized that he didn't have good enough
 4   credit, and so for that reason he couldn't rent an apartment.
 5   Without an apartment, Eddie's business operations in Maryland
 6   couldn't continue.
 7         So how did Eddie solve this problem?  He found a
 8   solution.  He found someone who had good enough credit, who
 9   had legal status in the United States and who was willing to
10   go to Baltimore.  Ladies and gentlemen, Eddie found the
11   defendant, Jesus Chaidez-Meza, and the defendant agreed to go
12   to Baltimore.  And he agreed to let Eddie use his credit, and
13   he agreed to rent an apartment in Baltimore.
14         Eddie had invited the defendant to his wedding, and
15   a couple of days later, he asked him if he wanted to do this,
16   and the defendant did.  So the defendant went to Baltimore.
17   He replaced Hilario.  He acquired the apartment, and the
18   defendant made it possible for Eddie's business to succeed
19   here.
20         But you also learned that the defendant didn't just
21   make it possible for his business to succeed here.  Along with
22   Chuchi, the defendant helped run the business in Maryland.  He
23   helped operate it from at least September 2016 to December
24   2016.  The defendant and Chuchi received the cocaine from
25   Pedro Valdez-Garcia.  They put it in their car.  They stored

1    it in their apartment.  They drove it to customers in

2    Baltimore or other distributors here.  They met them at

3    hotels.  They exchanged cocaine for currency.  They took the

4    currency back to their apartment.  They packaged it, and then

5    they brought it back to Pedro Valdez-Garcia to deliver it to

6    Los Angeles.

7            And that is why the defendant has been charged with

8    conspiracy to distribute more than 5 kilograms of cocaine.  He

9    agreed to join and participate in a business that he knew was

10   trafficking narcotics.  That is why the United States is

11   asking you to find him guilty of Count 1 in the indictment.

12           Ladies and gentlemen, my name is Jeff Izant, and I'm

13   an assistant United States attorney with the U.S. Attorney's

14   Office for the District of Maryland.  Along with my colleague,

15   Assistant U.S. Attorney James Warwick, our paralegal, Matthew

16   Kerrigan, and our case agent, Special Agent Brian High of the

17   DEA, it is my privilege to represent the United States in this

18   matter.  In that position, I want to thank you for your time,

19   both your time as the evidence was presented to you in this

20   case and the time that you're going to spend during your

21   deliberations.  Thank you.

22           We recognize that you have lives outside of the

23   courtroom, and we've separated you from your lives just for

24   the period of this trial because you have an important

25   responsibility.  As Judge Bennett instructed you at the

1    beginning of the trial and as I expect he'll instruct you

2    tomorrow, you are the finders of the facts.  The defendant,

3    Jesus Chaidez-Meza, cannot be found guilty unless you find him

4    guilty, so over the next few minutes, I'm going to explain two

5    things.  I'm going to explain what are the facts you need to

6    find to find him guilty and what is the evidence that you've

7    seen that we've presented that will allow you to find him

8    guilty.

9         As I mentioned, the indictment in this case charges

10   the defendant with conspiracy to distribute or possess with

11   intent to distribute more than 5 kilograms of cocaine.  Based

12   on this charge, you'll be given a verdict form.  On that

13   verdict form, you'll be asked to answer two questions.

14        The first question: Is the defendant guilty of

15   conspiring to distribute controlled substance between roughly

16   September 2016 to December 2016?

17        The second question is: How much of a particular

18   controlled substance, cocaine, was involved in this

19   conspiracy?

20        So let me start with the first one, the controlled

21   substance trafficking conspiracy.  As I'm going to explain it,

22   there are two overall elements to that conspiracy charge.  Now

23   as you heard, Judge Bennett is going to give you instructions

24   tomorrow, and so if anything I say is different from what

25   Judge Bennett says tomorrow, what Judge Bennett says tomorrow

 1    controls.  But I'd like to explain it this way.  There are two

 2    overall elements.  The first element of a drug trafficking

 3    conspiracy is there has to have been an agreement, an

 4    agreement to distribute or to possess with intent to

 5    distribute controlled substances.  And the second element is

 6    that the defendant had to have knowingly and willfully joined

 7    in that agreement.

 8          So although I've articulated it as just two

 9    elements, that second element, whether the defendant knowingly

10    and willfully joined that conspiracy or became a member of

11    that conspiracy, that itself actually has three subparts.

12    First, did the defendant know the purpose of that unlawful

13    agreement?  Second, did the defendant participate in some way

14    in that agreement?  And third, did he intend to assist it?

15          Now you've heard several references thus far to the

16    Government's burden.  I think defense counsel mentioned it in

17    his opening statement.  And it's the Government's burden in

18    this prosecution and any criminal prosecution to prove the

19    defendant's guilt beyond a reasonable doubt.  What that means

20    is each element I've described to you, you have to be

21    satisfied that each element is proved beyond a reasonable

22    doubt.  Now I'm mentioning this burden now, and we don't shy

23    away from it at any point because we welcome it.  We welcome

24    it for two reasons.

25          The first is in evaluating whether the defendant has

1   been proved guilty beyond a reasonable doubt, this requires

2   you to ask yourself is there any reasonable doubt?  And in

3   determining whether you have reasonable doubt, you get to use

4   your common sense.  That's it.  Rely on your common sense.

5   You don't have to check it at the door when you enter the

6   deliberation room.

7            Secondly, we believe we've more than overcome that

8   burden in this case.  I submit the evidence that you heard and

9   that I'm going to summarize for you now more than overcomes

10  that burden.  So let me turn to that evidence.

11           So as I mentioned before, conspiracy to distribute

12  controlled substances has two.  The first one is the

13  agreement.  Was there an unlawful agreement?  I submit you can

14  have no doubt there was an unlawful agreement to distribute

15  controlled substances in this case.  That's what the business

16  was, an unlawful agreement to traffic cocaine.  It imported

17  cocaine from Mexico into California, and in California that

18  cocaine was packaged into kilogram-sized bricks, sealed in

19  plastic, wrapped in electrical tape, hidden in secret

20  compartments in trucks.  And as the case was in Maryland,

21  driven by truck from California to Maryland once a month, in

22  September 2016, October, November and December.

23           In Maryland when the truck arrived, those bricks

24  were loaded into duffels.  Those duffels were delivered into

25  the trunk of a car.  That car was driven to various hotels

1   where it met with other individuals in other cars.  At those

2   hotels, the drugs in the duffels were exchanged for money in

3   duffels.  That money was picked up, repackaged, packaged in

4   heat-sealed plastic wrap, wrapped in black electrical tape,

5   delivered to a driver at a Wal-Mart where the duffels were

6   unloaded inside the tractor, hidden in the compartment and

7   trucked back to Los Angeles.

8         You learned about this from participants in that

9   business.  You learned about it from Pedro Valdez-Garcia, the

10  truck driver.  He told you he acted at the direction of two

11  individuals he knew as Primo and Huero, and he trucked drugs

12  and money back and forth from Los Angeles to Maryland once a

13  month during this period of time.  He told you he picked the

14  drugs up in Los Angeles, hid them and drove them to Baltimore.

15  He told you that he carried, every single time he came here,

16  between 60 and 70 kilograms.

17        He told you that when he got to Baltimore, he met

18  people at a Wal-Mart, delivered the drugs to them and waited

19  for a day or so.  After he waited for a day or so, he received

20  United States currency, packaged it back in his secret

21  compartment, and drove it back to Los Angeles.

22        You know from his seizure, from the seizure of money

23  from Pedro Valdez-Garcia in December 2016, that it was about a

24  million dollars each time.  So each time there was about 60 to

25  70 kilograms of cocaine going east and each time about a

1   million dollars in proceeds going west.

2          You also heard about this business from another one

3   of its participants.  You heard about it from Hilario

4   Rodriguez-Lopez.  He told you he was sent to Baltimore by

5   Eddie Lopez, his cousin.  He told you he furnished an

6   apartment at the Arbors, that complex in White Marsh,

7   Maryland.  He told you he bought a white Hyundai, he bought a

8   Nissan Altima.  He paid for it using drug proceeds from prior

9   transactions.  He paid in cash.  He specifically told you that

10  in September 2016, he picked up kilograms of cocaine in two

11  duffel bags from a truck driver that looked just like Pedro

12  Valdez-Garcia.

13         And he told you about the way the business operated.

14  He told you why they needed latex gloves, so they wouldn't

15  leave fingerprints on the drugs or the money.  He told you why

16  they used plastic wrap or FoodSaver machines and heat-sealed

17  the currency, so that air could be compressed and more could

18  be fit in a given space.  He told you what the electrical tape

19  was for.  That's so the heat-sealed plastic doesn't get

20  punctured on the route.

21         You heard a brief reference to this in defense

22  counsel's opening statement, and you got a hint of it during

23  cross-examination.  I anticipate that defense counsel may

24  challenge the credibility of these witnesses simply because

25  they're accomplices.  They also participated in this crime.

1    He might further challenge them because they testified before

2    you, as they told you, pursuant to cooperation agreements and

3    that under those agreements, they hope to obtain leniency when

4    they are sentenced.

5            But as I expect Judge Bennett will instruct you

6    tomorrow, you should evaluate the testimony of those witnesses

7    carefully.  When you evaluate the testimony of those

8    witnesses, you should keep some things in mind that you should

9    keep in mind for any witnesses whose credibility you evaluate

10   because you alone decide the credibility of the witnesses.

11           So one of the questions you should be asking

12   yourself when you consider that testimony: what was their

13   understanding of what they were supposed to do under those

14   agreements?  They both told you they understood they were

15   supposed to tell you the truth.  Ask yourself: were they

16   forthcoming about their motivations?  There's a suggestion

17   that they might be biased because they're seeking leniency.

18   But they told you they were seeking leniency.  They were

19   up-front that they hoped to gain something from this.

20           Then ask yourself: did they minimize any of their

21   own conduct?  I submit to you that both Pedro Valdez-Garcia

22   and Hilario Rodriguez-Lopez described their involvement in

23   substantial criminal enterprises.

24           Finally, I suggest you ask yourself: was any of

25   their testimony corroborated by other evidence?  I submit the

1    answer to that question is yes.  The Government is not asking

2    you to take their word for it.  Consider what other evidence

3    there is.  First of whether there was an agreement.  The

4    physical evidence, you saw the business operating in Maryland

5    between September and December 2016.  You saw photographs of

6    Pedro's truck at the IKEA in September and at the Wal-Mart in

7    October, November and December.

8         You saw video surveillance of Chuchi carrying large

9    duffel bags in and out of the Arbors and putting those bags

10   into the trunk of a white Hyundai.  You saw photographs of

11   that Hyundai meeting with Pedro's truck at that Wal-Mart in

12   Nottingham.  You even saw photographs of Chuchi carrying a

13   large item between the Hyundai and Pedro's truck.

14        You saw this with the hotels too.  You saw video

15   surveillance of Chuchi taking bags out of the Hyundai and

16   bringing them into hotel rooms.  You heard about GPS data,

17   data from GPS tracking devices that were affixed to the

18   defendant's vehicle or Pedro's truck or that tracked Pedro's

19   phone.  That GPS data, as law enforcement witnesses told you,

20   showed the Hyundai going to and from the Arbors and to the

21   Wal-Mart and back late at night and early in the morning.  And

22   that GPS data showed the Hyundai going from the Arbors to

23   hotels and back to the Arbors.

24        You also saw the money.  You didn't see any of the

25   drugs, but you saw the money.  You saw Pedro when he got

1    stopped by the state trooper in Hagerstown right after the

2    Hyundai had delivered a duffel bag to his truck.  And what was

3    in his truck?  $1.2 million in U.S. currency, sealed in

4    plastic wrap and taped up in electrical tape.

5            You saw this at the truck stop of Oscar Miranda in

6    California.  There law enforcement seized $1.5 million wrapped

7    in plastic wrap, wrapped in black tape.  You saw that happen

8    just after he was with Chuchi, carrying bags from the Hyundai

9    to the La Quinta and from the La Quinta to his truck.

10           So, in sum, we submit the Government has proved the

11   existence of that agreement beyond a reasonable doubt.

12           So I'm now going to turn to the second element of a

13   drug trafficking conspiracy, whether the defendant knowingly

14   and willfully joined that conspiracy.  I also told you that

15   had three subsidiary parts.  Did the defendant know its

16   purpose, did the defendant participate in it, and did the

17   defendant intend to assist it?  So let me first talk about the

18   defendant's participation.

19           I submit to you in the light of the evidence that

20   you've seen at this trial, you can have no doubt that the

21   defendant participated.  Now I expect Judge Bennett will

22   instruct you that the extent of participation is not relevant.

23   A single act is sufficient to show that somebody knowingly and

24   willfully participated in a conspiracy.  But you know you've

25   got more than a single act here.  You've got many.  Look at

1    the CBP records.  The defendant entered the United States in

2    late August 2016.  Look at the Alaska Airlines records.  The

3    defendant flew from LA to Baltimore on or about August 27,

4    2016.  Look at the Arbors rental records.  The defendant

5    rented an apartment at the Arbors.  Look at the MVA records.

6    The defendant got a Maryland license and registered the white

7    Hyundai in his name, and he registered it at the Arbors.

8         Look at those photographs from September 26, 2016,

9    the ones that have been referred to as a shopping trip.  You

10   saw the defendant -- this is in Exhibit 18A -- you saw the

11   defendant go to a Costco and to a Home Depot with two people

12   who were also involved in this drug trafficking conspiracy.

13   And you saw photographs of him taking a FoodSaver machine from

14   the shopping cart and putting it into his Hyundai.  You saw

15   photographs of him carrying plastic Home Depot bags into the

16   trunk of the Hyundai.  Then you saw him get into the driver

17   seat of the Hyundai, and you heard that he drove it back to

18   the Arbors where you saw photographs of him and Chuchi

19   carrying those items into the apartment they lived in

20   together.

21        But the defendant's actions in this case weren't

22   just a shopping trip with two people who just happened to be

23   members of a drug trafficking conspiracy.  We submit the

24   defendant drove Chuchi to exchange drugs and money in

25   connection with this conspiracy.  He drove him to the

1    Wal-Mart, and he drove him to hotels.  Now you heard defense

2    question witnesses about whether they saw the defendant behind

3    the steering wheel on every single occasion that the Hyundai

4    was involved in this conspiracy.  But I ask you not to get

5    lost in the weeds of every single individual transaction or

6    every single photograph or every single occurrence.  Step back

7    and think about this using your common sense.  Using your

8    common sense, you can infer that the defendant was present

9    every single time.

10         The defendant was the registered owner of the

11   vehicle.  The vehicle address was at the Arbors where he lived

12   with Chuchi.  Chuchi was the one going to and from the

13   passenger door, not the driver door.  In between trips to the

14   Wal-Mart and hotels, that car was always back at the Arbors.

15   You heard from Special Agent Wood, Task Force Officer

16   Crisostomo and Task Force Officer Ermer.  This team surveilled

17   the defendant almost every day between the end of September

18   and the beginning of December 2016.  Every time they saw him

19   during that period of time, he was in the driver seat.  And if

20   there was ever anyone in the passenger seat, it was Chuchi.

21         Now I know there is one exception to that and you

22   saw it.  It was the Home Depot shopping trip they did with

23   Oscar Miranda.  But you also heard from Special Agent Ronald

24   Sparrow that there was a drop-off at a Fairfield Inn after

25   that shopping trip before the car went back to the Arbors.

1    You saw in Special Agent Wood's photographs that when the car

2    got back to the Arbors, it was just Chuchi and the

3    defendant.

4           But, in fact, I've asked you to make that inference,

5    but you don't even have to rely on inferences alone.  Pedro

6    Valdez-Garcia told you he saw the defendant at the Wal-Mart.

7    Now let me ask you to make one more observation about Pedro's

8    credibility.  He testified that he pleaded guilty in front of

9    Judge Bennett and that he was awaiting sentencing.  Ask

10   yourself: does he stand to gain more or lose more by lying in

11   this court?

12          But it wasn't just Pedro who saw him at the

13   Wal-Mart.  You heard testimony from law enforcement officers

14   that the defendant was at the Wal-Mart.  You heard testimony

15   that the defendant was engaging in transactions at hotels.

16   You heard from Special Agent Ron Sparrow about a Hilton Garden

17   Inn where Special Agent Sparrow watched the defendant put a

18   large duffel bag in the trunk of the Hyundai.  You heard from

19   Task Force Officer Ermer in late September, on the 29th, he

20   watched the defendant arrive at the IKEA and watched his

21   Hyundai meet with Pedro's truck.

22          Detective Ermer told you again in November at the

23   Wal-Mart, he saw the defendant operating the Hyundai as it was

24   parked next to Pedro's truck.  Task Force Officer Crisostomo

25   told you when the Hyundai was at the Wal-Mart and Pedro's

1  truck was at the Wal-Mart, he saw Chuchi and the defendant at

2  the Wal-Mart.  And then Task Force Officer Crisostomo also

3  told you about a time when he was watching on the fourth floor

4  of the parking garage at the Arbors, and he watched on GPS the

5  Hyundai was coming back from the Wal-Mart.  And he watched it

6  park, and he watched the defendant get out of the driver seat,

7  and he watched Chuchi get out of the passenger seat, and he

8  watched the defendant hold the door open for Chuchi as he was

9  carrying bags in and out of the Arbors.

10            And so I submit the Government has proved beyond a

11  reasonable doubt that the defendant participated.

12            Now the next question and what you have to find

13  next, that the defendant knew what the goal of the conspiracy

14  was and intended to advance it.  As I expect Judge Bennett

15  will instruct you and as defense counsel mentioned at the

16  beginning of this trial, it's not enough just that the

17  defendant was there.  And it's also not enough just that the

18  defendant knew what was going on.  But you can infer from

19  physical evidence and from your common sense that the

20  defendant not only knew what was going on, he knew the

21  unlawful purpose of the agreement, but he intended to further

22  it.  I made reference to an inference, but for clarity I might

23  explain what is an inference, and how can you infer someone's

24  intent?

25            A classic example is if I had been bringing my

1  briefcase to and from counsel table during this trial, and

2  before I left every day, I always made sure to zip up my

3  briefcase and take it out of the courtroom with me every time

4  you saw me.  But then one time you saw me, you saw me leave

5  the courtroom, but I didn't take the briefcase.  You can infer

6  that I intended to come back.  And that's all an inference is.

7  So what are the inferences you can make in this case that

8  allow you to say you know that the defendant knew what the

9  unlawful purpose was?

10         There's no evidence the defendant had any connection

11  to Maryland.  He flew here from Los Angeles.  He signed a

12  one-year lease on an apartment but stayed for only three

13  months and terminated it after six months.  He lived there

14  with Chuchi, and there was no evidence he had any other

15  connection with Chuchi.  He bought a car with $18,000 in cash

16  that someone else gave to him, but he only used that car for

17  three months and sold it six months later.  He never reported

18  or no wages were ever reported on his behalf in Maryland.  He

19  was surveilled almost every day but never went to a job.

20  There's no evidence he ever enrolled or attended class.

21         You can also infer he knew about the agreement

22  because he didn't just happen to be at a Costco buying

23  FoodSaver machines.  He didn't just happen to be with two

24  other drug traffickers at a Home Depot, buying the entire

25  shelf of electrical tape.  This wasn't an accident.  He didn't

1   just happen to regularly arrive at the Wal-Mart when Pedro

2   Valdez-Garcia was there.  He didn't happen to only go there in

3   the evening or early in the morning.

4           And you saw on so many of these transfers of duffel

5   bags, Chuchi was coming and going right from that car.  Is it

6   really credible to suggest that he didn't know what his

7   roommate was doing?  Or that it was normal that he would

8   regularly be taking duffel bags and meeting trucks in the

9   middle of the night?  Is it even credible he was living in the

10  apartment with Chuchi and didn't know what Chuchi was doing?

11  Perhaps the shopping trip, if you just consider it by itself,

12  might be chalked up to a coincidence or mistake.

13          But I submit when you consider all the evidence

14  together, you realize that this was no accident.  The

15  defendant knew.  He knew because that was the very purpose of

16  the business he joined.  But as with the agreement, you don't

17  have to rely on inference alone.

18          You heard from Hilario.  Hilario testified Eddie

19  Lopez sent the defendant.  "I received the defendant at BWI.

20  I taught the defendant about what he was here for," and it was

21  crystal clear the defendant understood and that he had

22  everything under control.  Specifically what did Hilario tell

23  you he discussed with the defendant?  He told the defendant he

24  was responsible for managing the drugs and money.

25          If there were any remaining doubt after considering

1    the physical evidence, the inferences you can draw from it

2    using your common sense, and Hilario's testimony, the words of

3    the defendant himself remove all doubt.  We spent a lot of

4    time on the defendant's words, and I'm not going to go through

5    the entire statement; it's lengthy.  But you'll have it with

6    you in the jury room.  Look at it.  Read it.  Look at it

7    closely, read the entire thing.  You'll have that exhibit with

8    you, it's 37B.  But what can you glean from that exhibit?

9         The defendant himself told law enforcement that a

10   guy whose name he didn't know but recognized as Eddie Lopez,

11   met him at the wedding, invited him to lunch after the

12   wedding.  Asked him to go to Baltimore to set up an apartment.

13   Said he needed somebody with credit.  The defendant admitted

14   he agreed to go to Baltimore.  The defendant admitted he went

15   to Baltimore, he purchased a car, he rented an apartment.  He

16   lived there with Chuchi.  And the defendant told you he

17   received loads of drugs three or four times at the Wal-Mart.

18        He told you in that statement that he knew it was

19   cocaine.  And he told you that he drove Chuchi and him to the

20   Wal-Mart, they took the cocaine, and they brought all of it to

21   other people at hotels.  He told you that he received money

22   and brought it back to the truck.  He told you it was a white

23   truck.  He told Task Force Officer Rodriguez in his statement

24   that he did this early in the morning and he did it late at

25   night, just like the physical evidence suggested.  He told you

1    that he left Baltimore in December 2018 and went back to

2    Sinaloa.

3            In the statement to Officer Rodriguez, he said at

4    some point in January or February 2017, he met with Eddie

5    again.  Eddie asked him to go back to Baltimore and close up

6    shop.  Eddie asked him to terminate the lease, to move

7    everything out.  You saw the defendant went to Baltimore.  You

8    see in the Arbors records he paid almost $5,000 in money

9    orders to end the lease early.  He said he sold his car to

10   CarMax.  You found a CarMax address in the apartment.  He told

11   Officer Rodriguez that he drove back to LA with Chuchi --

12            MR. MARONICK:  Judge, can we approach?

13            THE COURT:  Yes, is there an objection?  Approach

14   the bench.

15       **(Bench conference on the record:**

16            THE COURT:  Basis of your objection?

17            MR. MARONICK:  They presented evidence of the lease

18   being terminated early, but as far as anything that was

19   brought into trial about money orders, I don't think the

20   Government ever presented --

21            THE COURT:  You mean there's no evidence of

22   termination of the lease that was presented --

23            MR. MARONICK:  Any money paid for the termination,

24   simply that it was --

25            THE COURT:  The objection is he referred to

1   something that's not in evidence?

2           MR. MARONICK:  Correct.

3           THE COURT:  Maybe it was just inadvertent, isn't

4   prejudicial -- is there or is there not evidence of

5   termination of the lease?

6           MR. IZANT:  It is.  It's in the exhibits for the

7   Arbors documents.

8           THE COURT:  What exhibit number is it?

9           MR. IZANT:  I believe it's 16, Your Honor, but it

10  could also be 12.

11          THE COURT:  Exhibit 16 is Capital One records.

12          MR. IZANT:  I misspoke.  It's 13, Your Honor.

13          THE COURT:  13, rental records from the Arbors

14  apartment complex.  It's in the records.  Objection will be

15  overruled.  We don't have to stop and look at it.  I think

16  it's a fair reference --

17          MR. MARONICK:  I don't recall a specific dollar

18  amount of $5,000.  I mean --

19          THE COURT:  I think --

20          MR. IZANT:  It's in the evidence.

21          MR. MARONICK:  I'm not disputing, however, that he

22  terminated the lease --

23          THE COURT:  -- I don't believe he's incorrectly

24  stated the evidence, so it's overruled.

25          MR. MARONICK:  All right.)

1        **(Bench conference concluded.)**

2            THE COURT:  Any objection is overruled.  You may

3    continue, Mr. Izant.

4            MR. IZANT:  Thank you, Your Honor.

5            Finally, the defendant told Officer Rodriguez in May

6    of this year that he carried the bags, he saw the bags, and he

7    knew they had cocaine and money.

8            So I mentioned to you that there were going to be

9    two questions on that verdict form.  The first one: Is the

10   defendant guilty of that conspiracy?  And I submit to you

11   beyond any doubt, he is.

12           The second question you'll be asked: How much

13   cocaine was involved in this conspiracy?  So you're going to

14   be asked to decide what amount of cocaine can be attributed to

15   the defendant's conduct.  I expect Judge Bennett will instruct

16   you the Government doesn't have to show the defendant was

17   aware that it was cocaine specifically.  It's enough that he

18   was aware of a controlled substance generally.  But in this

19   case, you know the defendant did know.  Hilario told you it

20   was cocaine.  And the defendant told Officer Rodriguez it was

21   cocaine.

22           But as for the amount, the judge will instruct you,

23   I expect, that there are two ways the Government can prove

24   drug weight.  The first is the defendant's personal

25   involvement.  The second is what was reasonably foreseeable to

1   the defendant in this conspiracy.

2          As to the first, the defendant's role, I submit in

3   the statement that you heard about, that we went through at

4   length, the defendant admitted to his role in the conspiracy,

5   but he tried to minimize it.  He claimed he was just the

6   driver, as if that somehow mitigated his culpability.  He

7   claimed -- or he didn't state in that statement that he knew

8   any particular amount of money or drugs.  He said he never saw

9   it.  But that doesn't matter.  You don't need to lay eyes on

10  it to know about it, and that claim isn't credible.  Use your

11  common sense.  You can infer the defendant knew exactly how

12  much cocaine he was handling.  He admitted that he picked up

13  drugs and returned money for three loads.

14          And Pedro told you each load was 60 to 70 kilograms.

15  When Pedro brought back money, it was about a million dollars.

16  You heard from Hilario that the street value of cocaine at

17  that time or a kilogram of cocaine was approximately $25,000,

18  so corresponding to the distribution of 40 kilograms.  So if

19  the defendant admitted to taking three loads, he admitted to

20  picking up at least 150 kilograms of cocaine.  And he admitted

21  to delivering three loads of about a million dollars or 120

22  kilograms of cocaine.

23          But don't take Pedro's word for it or Hilario's word

24  for how much drugs were involved.  Just look at Government's

25  Exhibit 2.  You heard evidence that this is what a kilogram of

1   cocaine looks like.  I can hold it in my hand.  The Government

2   is asking you to find the defendant knew his conspiracy

3   involved at least five of these.  He told you he took three

4   loads.  So if there were more than two of these in each load,

5   he knew about more than five kilograms of cocaine.  He knew

6   about at least six.

7           But you saw the bags.  The bags were much bigger

8   than my hand.  You heard they were duffel bags or hockey-size

9   bags or gym bags, and they were full, they were weighted down.

10  Think about how many of these had to be in there.

11          As I mentioned, the defendant is responsible for not

12  only what he personally distributed or delivered but what was

13  reasonably foreseeable to him would be distributed or

14  possessed in the course of the conspiracy he participated in.

15  And it was clearly reasonably foreseeable to the defendant

16  that more than 5 kilograms of cocaine were involved.

17          Even if you take the defendant at his word that he

18  never touched the drugs or he never touched the money, Hilario

19  told you the defendant watched him count two duffel bags of 25

20  kilograms each inside his apartment, inside the defendant's

21  apartment.  Even if the defendant didn't see it on that

22  occasion, the defendant was living in the apartment with

23  Chuchi.  Is it really reasonable to suggest he didn't know

24  that Chuchi, over the course of three months, was counting and

25  packaging more than 150 kilograms of cocaine or more than

1    $3 million?  Look at the photos of the packages.  They had the

2    amounts written on the top, 20 for 20,000, 50 for 50,000.

3            Finally, consider the broader context.  The

4    defendant knew Eddie Lopez was operating a drug trafficking

5    organization in the United States.  Eddie bought him a $1,000

6    ticket to fly to Baltimore.  Through Hilario, the defendant

7    received thousands of dollars for rent at the apartment.

8    Through Hilario, the defendant received an $18,000 white

9    Hyundai, and his partner Hilario bought another car for 15- or

10   $16,000.  Hilario furnished the apartment with more than

11   $25,000 in furnishings.  And the defendant got to live there

12   for three months and didn't have to work a job.  There is no

13   doubt that the defendant could have foreseen that this

14   business involved more than five of those bricks or more than

15   $125,000.

16           So having reviewed the elements that you need to

17   find and having described the evidence that we provided in

18   support of those elements, I submit it should be clear to you

19   why the Government embraces its burden, its burden of proof

20   beyond a reasonable doubt.  There is simply overwhelming

21   evidence of the defendant's guilt.  The evidence showed the

22   defendant knowingly and willfully joined the unlawful

23   agreement.  The defendant knew what the purpose of the

24   business was.  He joined the business, and he helped it.

25           So when you return to consider your verdict, I ask

 1    that you return the verdict, the only verdict that is

 2    consistent with that evidence.  I ask that you find the

 3    defendant guilty of conspiracy to distribute more than

 4    5 kilograms of cocaine.

 5               Thank you, Your Honor.

 6               THE COURT:  Thank you very much, Mr. Izant.  Closing

 7    argument for the defense, Mr. Maronick.

 8               MR. MARONICK:  May I have Exhibit 22 on the screen?

 9               Thank you, ladies and gentlemen.  First of all, I

10    join with what the Government told you, thanking you for the

11    time --

12               THE COURT:  Does he have the same microphone?  I

13    didn't think they could hear you over there, the translators,

14    Ms. Dopazo and Ms. Goldstein.

15               MR. MARONICK:  Mic me up.

16               THE COURT:  That's okay, take your time.

17               MR. MARONICK:  Thank you, Your Honor.  Court's

18    indulgence.

19               THE COURT:  Take your time.

20               MR. MARONICK:  Do we have the exhibit?  I don't see

21    it on mine.  Thank you.  Everybody hear me now?

22               THE COURT:  Yes.

23               MR. MARONICK:  It's been a long process.  It's four

24    days, and I believe we're coming back tomorrow.  Some of you

25    have had to stay overnight and come from a long distance.  As

1   someone who spends a lot of time on the Eastern Shore and

2   other parts of Maryland, I totally understand that and

3   appreciate it, as does Mr. Chaidez-Meza who's over there.

4   It's a hard job.  And I said in the opening remarks about the

5   process we went through just to get all of you on the jury,

6   so, again, can't thank you enough for that.

7           Now here's the hard part.  Now is where there's a

8   difference between more likely than not or clear and

9   convincing and beyond a reasonable doubt.  That's where things

10  get really difficult because the easy answer is to say, sure,

11  he's involved in a conspiracy, there must be a conspiracy and

12  Mr. Chaidez-Meza is part of it.  I don't think probably anyone

13  here is thinking that's not an easy way to go.

14          But when you get in to deliberate, that standard of

15  beyond a reasonable doubt is what comes into play, and this is

16  what I'm going to be talking about in my remarks.

17          As you know, Mr. Chaidez-Meza throughout the process

18  maintains the presumption of innocence.  We don't have to

19  present a single exhibit, and for the most part, we didn't.  I

20  think we relied on some of the Government exhibits.  We don't

21  have to present a single exhibit, we don't have to call a

22  single witness, we don't have to do anything, and it's still

23  the Government's burden to prove the case beyond a reasonable

24  doubt.  If they don't do that and you have those doubts and

25  they're reasonable, if you have any one of those doubts and

1    it's reasonable, then the only option is to find him not

2    guilty.

3              So let's talk a little bit about the evidence.

4    Let's talk about what they have and what they don't have.  And

5    I think that's what will help your deliberations when you go

6    in the jury room and consider all of this.  Obviously, the

7    confession, supposedly, is something they're going to heavily

8    rely on.  I believe that's Exhibit 37.  I'm going to start

9    there.

10              Mr. Chaidez-Meza goes in -- first of all, you've

11   heard the testimony today.  There were about ten different

12   police who were involved in some form or fashion in his

13   arrest.  Ten, think about that.  Detective Rodriguez who

14   testified said they were, at least many of them, in tactical

15   gear.  Think about that, think about what tactical gear means

16   to you.  That's who was out there after one guy.  And he's

17   taken out by armed officers, at least some or even most in

18   tactical gear, and brought into a vehicle.  This is in Los

19   Angeles in the morning.  Los Angeles, I've been there, the

20   traffic is just as he described.  He said it could take an

21   hour just to get from downtown LA or more to where the station

22   was.  In other words, it's a lot of traffic.

23              He's in the back of a police car with his hands

24   handcuffed in an hour of traffic, and there's been no

25   advisement that you have the right to have a lawyer, nothing.

1    Just you're under arrest and there was a warrant out for

2    him.

3          So he's brought to the police station and he goes --

4    from Detective Rodriguez's recollection of the process, the

5    procedures, what he believes was followed there -- goes to a

6    holding cell.  He was put in a holding cell, held there.  Then

7    brought from the holding cell into an interview room.  In the

8    interview room with a 3-foot table, two officers who have been

9    involved, at least in some form or fashion, in this process

10   are in there with him.

11         He has no lawyer, has nobody with him, and I believe

12   Detective Rodriguez admits, he said anybody in that situation

13   is probably going to be scared.  I think he was terrified.  I

14   think Jesus Chaidez-Meza was absolutely --

15         MR. WARWICK:  Objection to the form, "I think, I

16   believe."

17         THE COURT:  Overruled, overruled.

18         MR. MARONICK:  I think he was terrified.  You heard

19   the evidence.  The evidence confirms that, corroborates that.

20         So he's in this interview room and you heard my

21   questions this morning; it went about 11 minutes from the

22   advisement to when Mr. Chaidez-Meza was finally asked some

23   questions about why he was actually there.  He was advised

24   about his right to have a lawyer, he was Mirandized at the

25   beginning, but then the questions were about biographical

1    information.  And when the officers weren't getting answers or

2    information quite yet, what do they do?  They start talking

3    about his daughter.  He was already scared, and then they were

4    going to bring his young daughter into this.

5              I believe the evidence shows he was prepared to tell

6    them anything they wanted to hear at that point, and that was

7    their interview with him.  And he did.  He told them

8    everything they wanted to know.  Detective Rodriguez, when he

9    was asked, said, "I had lots of knowledge about this.  I was

10   involved in the investigation for a lengthy period of time,

11   years."  And he'd been in contact with other people who had

12   been involved.  As the transcript showed, he brought in Agent

13   High on FaceTime into this.

14             But he also said he was prepared to call the

15   government lawyers.  That never happened.  And there was

16   inference and reference to the fact that Mr. Chaidez-Meza

17   could help himself.  Where were the government lawyers?  Why

18   weren't they brought in?  Agent High was brought in -- I

19   believe it was page 17 out of the lengthy exhibit, I believe

20   it's about a 60-page exhibit.  You'll have a chance to read

21   it, and I encourage you to do that.

22             So you have to consider the weight of that evidence,

23   how reliable it is under the circumstances in which it was

24   obtained.  This is not a man who's had an hour's worth of

25   consultation with a lawyer.  This is not a man who has had

1   lots of time to think about what he wants to do.  He was

2   placed a form in front of him.  He was given a quick

3   advisement at the very beginning, and all he said was, "I have

4   nothing to hide."  He didn't even say, "Yes, I'll answer your

5   questions."  He said, "I have nothing to hide," and Detective

6   Rodriguez and Agent Duarte interpreted that as he had

7   something to say.

8          But that's what the Government is relying on, that

9   kind of an interview.  So if that's the best they have is to

10  rely on that, when you're going to talk about his daughter,

11  his family, then I think that's the time to start to look at

12  what else they have.  Because I believe that evidence has very

13  little value.

14         So we'll talk about the people who testified against

15  him.  And there's Hilario and there's Pedro Valdez.  I asked

16  some questions of both witnesses.  I asked them about deals

17  that they had made where they're getting something to testify

18  potentially.  They are hoping for a lower sentence, a better

19  disposition by testifying.  So, in other words, they're not

20  just there out of the goodness of their hearts.  They're there

21  because they made a deal.  So when the Government relies so

22  heavily on those two witnesses, think about what they have to

23  gain versus what they have to lose.  What would they gain or

24  lose if they said Chaidez-Meza had nothing to do with it?

25  That's not the evidence, obviously.  Only consider the

1    evidence, but consider the context of what the evidence is and

2    what they actually tell you.

3            Think about a few things.  Hilario said he didn't

4    recognize Pedro Valdez.  A picture was put on, "Do you

5    recognize Pedro Valdez?"  "No, I do not."  That was Exhibit 5.

6            If I could have that, Mr. Kerrigan?

7            By the way, Mr. Kerrigan has been tremendously

8    helpful to both sides throughout the process.  Appreciate

9    that.

10           Here's Pedro Valdez who was not recognized by

11   Hilario.

12           Pedro said he recognized Hilario as the mechanic the

13   first time.  He kept saying the word "mechanic."  Mechanic,

14   mechanic.  Did you hear anybody else use that term throughout?

15   Anybody?  I didn't.

16           Pedro said the car the second time was blue, he

17   believed.  Mr. Chaidez-Meza at all times when he was driving

18   was driving the white Hyundai, not a blue vehicle.

19           Pedro was shown a picture of Eddie Lopez.  That's

20   Exhibit 4, please.

21           MR. WARWICK:  10.

22           MR. MARONICK:  Exhibit 10, thank you.  Pedro saw a

23   picture of Eddie Lopez, but he didn't recognize him.

24           I asked Special Agent Wood when she same on if she

25   had any audio or video of Mr. Chaidez-Meza discussing his role

1    with anyone, such as Chuchi.  I'll come back to Chuchi in a

2    minute.  She had no audio, no video.  That's a recurring

3    theme.  Because the surveillance was going on, if not 24/7,

4    then something close to it at times, but there's nothing with

5    him.  What do they have in the surveillance?  They have

6    Mr. Chaidez-Meza going shopping at Home Depot.  Going shopping

7    to Costco.  They have evidence that he drove a white Hyundai

8    and he rented it -- or obtained it, shall we say.  Rented an

9    apartment and obtained a white Hyundai.

10        He, many of the times, is not seen getting out of

11   the Hyundai, but he does drive it a good bit, and he goes back

12   to his apartment at the Arbors.  He also went to Baltimore

13   County Community College, according to some of the testimony.

14   They don't know why he was there, but yet that fits in that he

15   did seek some education.  That's in evidence.  He went to

16   Baltimore County Community College for some purpose.

17        Lots of pictures of Chuchi carrying bags, black

18   duffel bags, and the inference being they're full of drugs.

19   But, again, Chuchi.  Not Chaidez-Meza.  Chuchi carrying the

20   black bags.  Chuchi taking the black bags, putting them into

21   the trailer.  Chuchi doing all these things.  Where's Chuchi?

22   I asked, I believe it was Special Agent Wood about that, and

23   she said, "I don't know."  I don't know either.  But you want

24   to talk about a conspiracy, there's Chuchi.  There's the guy

25   who's doing a lot.

1              There was no conversation between the driver and

2      Chaidez-Meza.  The conversation was between Chuchi coming in

3      and giving bags.  Yet again, you heard the testimony from

4      Valdez-Garcia, "I was there to meet the mechanic."  He

5      identified two people as the mechanic, Chaidez-Meza, and then

6      he also identified the man he believed to be Hilario as being

7      the mechanic the first time.  But there's a difference.

8      Chaidez-Meza has no conversations with him.  If he was the

9      mechanic and he's supposed to meet him, how come he didn't

10     have any conversations?  How come another guy, Chuchi, was the

11     one who got out of the car?

12             The Government says that Mr. Chaidez-Meza knew about

13     the conspiracy; I'll get into knew and willingly participated

14     as well.  But he never looks in the bags.  He doesn't know how

15     much drugs.  He has no idea exactly how much is in any bag.

16             When it comes to money -- because I mentioned follow

17     the money -- the only testimony that he got paid for this,

18     other than just flying there with the plane ticket, he says,

19     "I was paid 5,000 a month."  Yet when I asked Detective

20     Rodriguez about it, he says, "I believe the bank records were

21     subpoenaed."  The Government didn't present any of those.

22     They didn't present any record showing that Chaidez-Meza made

23     any money off this.  Think about that.  This guy is so

24     involved in a conspiracy, how come he's not making money off

25     it?  If he's willingly taking part in a conspiracy, what is

1  his possible gain?  What is his motive to be involved in a

2  conspiracy where he's not getting anything out of it?

3          The evidence shows either he didn't know nearly as

4  much as the Government would like you to believe or he wasn't

5  willingly participating in it.  Eddie Lopez, according to some

6  of the testimony, has a conversation with him and says,

7  "You're going to the United States."  Eddie Lopez then,

8  according to the Government, asks him to close the operation.

9  I don't think Eddie Lopez asked anything.  I think Eddie Lopez

10 told.  Sort of like a "do it or else" type of situation.  You

11 ask yourself: how willingly was this, whatever he was involved

12 in?  Not packaging money -- not except based on Hilario's

13 testimony.  As I already told you, think about that in the

14 guise of what he had to gain by testifying.  Not counting

15 money, except from Hilario.  Not doing anything other than

16 going on shopping trips and driving a vehicle.

17          That's the Government's case.  That's where they're

18 trying to convince you he knows of all these kilos.  He wasn't

19 the one looking in the bags.  You repeatedly heard police tell

20 you that.  He wasn't looking in the bags.  He doesn't look at

21 the money.  Just picked up -- actually just drove a car.

22 Chuchi picks up something and puts it in the other vehicle.

23 Again, when he's in that interview room, he's told essentially

24 the statements and it's "si" or "no."  After they get into

25 this business about his daughter and he's been driven an hour

1   in cuffs to a holding cell.

2           They provided testimony of a less than thousand

3   dollar money order that was sent to Mexico.  That was from one

4   of the officers.  And that money that was supposedly sent to

5   Mexico, according to testimony, it wasn't even Chaidez-Meza.

6   It went to somebody else named Chaidez-Meza, but it wasn't

7   even sent by him, and it was under a thousand bucks.

8           Agent Ermer, he testified -- I believe Agent

9   Ermer -- he testified he saw what he thought was Jesus

10  Chaidez-Meza taking something out of the Hyundai, and then he

11  sees a couple of pairs of feet, but he's so far away, he can't

12  even see very much.

13          Their evidence is infer, infer, infer, infer.  Their

14  whole evidence is they want you to make inferences of what was

15  going on, not to rely on the facts.  And that's where your

16  work in the jury room is so critical.

17          He has no criminal record.  You heard that from

18  Detective Rodriguez.  He had good credit.  What would be the

19  possible motive to willingly enter into some criminal

20  conspiracy if you're not making money from it, and you're not

21  a career criminal?  And you've heard testimony earlier from

22  the witnesses from the Government, one says he considers

23  himself a career criminal.  That's not Jesus Chaidez-Meza.

24          He didn't know what the Government would like you to

25  believe he knew.  Other people were involved, and other people

1   were doing things, and if this case was about Chuchi, if

2   that's who was on trial here, it's a totally different case.

3   Because Chuchi is seen doing all these things.  Chuchi is seen

4   carrying the bags.  Chuchi is having these meetings.  Chuchi

5   is working with Oscar Miranda.  Meanwhile, they have Jesus

6   Chaidez-Meza in a car.  Not even in a car all of the time,

7   some of the time.  The testimony that they have that he knew

8   what was going on comes from Hilario, who has every reason not

9   to be truthful with you because it benefits him.

10          You heard Mr. Izant say, well, there was testimony

11  that he was holding the door for Chuchi.  Okay.  There was

12  also testimony, and there was a photo of Mr. Chaidez-Meza

13  coming back from a store with a white bag.  There's lots of

14  evidence here; not all of it is critical to your finding.

15          This case has been deeply involved and I know that.

16  I know there's a lot going on.  But there had to be knowledge

17  by Mr. Chaidez-Meza, specific knowledge of what was going on;

18  then there had to be willing participation.  And the evidence

19  doesn't show that the participation was willing, and the

20  evidence doesn't show that his knowledge of what was going on

21  was quite what the Government wants you to believe.

22          This is a man who was used, not a conspirator.  This

23  is a man who was pressured, scared, coerced by Eddie Lopez to

24  even come to the U.S., when to come back.  Again, it's not

25  Eddie Lopez on trial, and it's not Huero, and it's not Primo

1   who are on trial.  It's Jesus Chaidez-Meza, who is given the

2   presumption of innocence from the very beginning of the case.

3   The Government, based on what they're asking you to do, is

4   "just find him guilty."  But do they satisfy the elements?

5   No.  No.  That's the hard part.  Because the easy part is to

6   just think that the Government has proven its case.  Because

7   maybe they did if it were more likely than not.  And maybe

8   they did if it were even clear and convincing.  But if you

9   have even one reasonable doubt, that's where the buck stops.

10          It's not going to be easy, what I'm asking you to

11  do, but neither is the standard of law in this country, beyond

12  a reasonable doubt.  So I'm asking you to keep all this in

13  mind because I only get to speak once.  I come up here, and

14  then Mr. Izant, Mr. Warwick come in and say whatever they want

15  to say.  They get the right to speak last is essentially how

16  the system works.  But I leave you with this: This case isn't

17  what it seems, and he's not the conspirator that they're

18  telling you he is.  Thank you.

19          THE COURT:  Thank you very much, Mr. Maronick.  With

20  that, rebuttal, Mr. Warwick.

21          MR. WARWICK:  Yes, Your Honor.  Just one moment,

22  Your Honor, to mic up.

23          THE COURT:  That's fine.

24          MR. WARWICK:  The evidence, ladies and gentlemen,

25  conclusively establishes that Jesus Chaidez-Meza was not

1  operating a restaurant from his apartment at the Arbors.  He

2  was not operating a cleaning business.  He was presiding over,

3  with Chuchi, Mr. Lopez's drug operation in Baltimore.  The

4  evidence suggests it's as simple as that.

5         There were multiple components to the evidence that

6  you have heard in this case.  The first being cooperating

7  witnesses, Hilario Rodriguez-Lopez, Pedro Valdez-Garcia.  Ask

8  yourself: do I believe them?  One of the tests for a witness's

9  credibility is simply to look at them and say, all right, what

10 have they said, and what have they not said?

11        Hilario Rodriguez Lopez told us: I came here to

12 Baltimore at Eddie Lopez's request to set things up.  I ran

13 into problems being able to rent a residence, an apartment, so

14 reinforcements were sent, the defendant and Chuchi.  Hilario

15 Lopez said: I paid for everything, I set things up.  I made

16 sure that they knew what their role was and how to conduct

17 business, taking delivery of the drugs, processing the money

18 and sending it back.

19        And after the one delivery that Hilario Rodriguez-

20 Lopez took, he was satisfied that the defendant and Chuchi

21 knew what they were doing.  If Hilario Rodriguez was going to

22 lie to us and lie to you, he could have put many more facts

23 that were incriminatory on the defendant than he did.

24 Rodriguez-Lopez said: This is my role, this is what I did.

25 This man knew what his role was, and when I left in late

1  September or early October of 2016, the operation was in good

2  hands.  And that was his job to do.

3          Pedro Valdez-Garcia delivered -- I should say made

4  four trips to Maryland.  September, October, November, he

5  dropped off drugs, picked up money.  December was money only

6  to be picked up and brought back to California.  Valdez-Garcia

7  testified that he saw the defendant on the second occasion,

8  which was October, the third occasion, November, and the

9  fourth occasion, December.  No conversations.  If

10 Valdez-Garcia was going to lie to you about the defendant's

11 participation, he could have easily made up conversations with

12 the defendant.  He did not.

13         So one way of assessing credibility is looking at

14 what a witness said, as well as what a witness did not say but

15 could have said.  That's one aspect of the evidence in this

16 case.

17         The second aspect is the testimony of law

18 enforcement officers.  They tell us and have told you

19 specifically about the September, October, November and

20 December trips by Valdez-Garcia.  What they viewed was exactly

21 what Hilario Rodriguez-Lopez told us about the first delivery

22 that he took, the only one, and what Valdez-Garcia told us

23 about the October, November and December transactions

24 involving this defendant.

25         The surveillance was all there.  They could track

1   where that white Hyundai was going, and then they responded.

2   You can't watch somebody 24 hours a day, 7 days a week, so one

3   way of trying to get an understanding of what the pattern is

4   and what the practice is is to see where the car goes.  And

5   there was always a meeting when Valdez-Garcia's truck came in

6   from California.  Then activity began at the Arbors, and where

7   do they go?  To meet the truck on every occasion, October,

8   November, December.

9          So we've got the co-conspirator, the accomplice

10  testimony.  We have the physical surveillance and the

11  photographs by the law enforcement personnel.  But there's

12  more.  You've got business records.  You've got the lease for

13  the apartment.  You've got the vehicles being registered, the

14  driver's license.

15         Jesus Chaidez-Meza followed instructions knowingly

16  and willfully to embed himself in Baltimore as a legitimate

17  citizen.  "Get yourself a part-time job or go to school.  Make

18  it appear that you're here for the right reasons."  He didn't

19  want to get a job obviously, but he made one attempt to go out

20  to the community college of Baltimore County.  One occasion.

21  If he was there regularly, the agents would have been out

22  there regularly to see that he was there because the GPS would

23  have indicated that the vehicle was, in fact, at the college,

24  but it was only there once.  It was a cover that the evidence

25  suggests that the defendant pursued and then discounted.  Too

1   much effort, I suggest.

2         Then we have another piece of evidence in the form

3   of the statements of Chaidez-Meza.  He was given his rights.

4   When you look at the entire statement, it's a conversation.

5   Not once did he say, "I want a lawyer."  Not once did he say,

6   "I've had enough, I want to stop."  Not once did he say, "I

7   don't know what's going on."  But the things that he told the

8   police were exactly, for the most part, what they knew.  He

9   admitted to three deliveries, he admitted to sending money.

10  He admitted to driving from one place to the other.  And when

11  you look at the big picture of all of the evidence, the

12  defendant admitted everything, but he tried to minimize his

13  role.

14        Defense counsel mentioned, oh, they mentioned -- the

15  police brought up his family, his daughter.  Every person acts

16  in his or her self-interest.  In looking at Hilario Rodriguez-

17  Lopez and in looking at Pedro Valdez-Garcia, ask yourself: is

18  it in their interest to tell the truth and hope to get

19  leniency?  Or is it in their interest to lie?  But if they

20  were lying, that testimony would have been in conflict with

21  all the other evidence.

22        In terms of a conversation, a questioning of a

23  person in custody, you want that person too to act in their

24  own best interest to tell the truth, whether it be a reduction

25  in a possible jail sentence, whether it's consider your

1  family.  We do that every day in our lives.  What's best for

2  us?  What's best for our family?  How should I act to do the

3  right thing?  So Jesus Chaidez-Meza, he was in the middle of

4  that drug conspiracy, and he admitted that in his conversation

5  with the law enforcement officers, Detective Duarte and

6  Detective Rodriguez.

7           What was "the defendant had no motive"?  Well, there

8  is a motive here.  And the motive is very simple.  It's money.

9  Hilario Rodriguez-Lopez said, "Hey, two months here, I made

10 about $20,000."  The defendant wasn't going to admit that he

11 made that much for what he was doing because that would be too

12 incriminatory.  It would be too devastating.  "Oh, I made

13 5,000 a month."  You come from Mexico, cross the border, fly

14 to Baltimore, you have a car purchased for you, you put it in

15 your name.  You have the lease, which he was uncomfortable

16 putting in his name, as Hilario Rodriguez-Lopez told us -- and

17 I'll get back to that in a minute.  But he was living all

18 expense paid in Baltimore and making money, coordinating and

19 running Eddie Lopez's distribution network in this area.

20          When you look at -- things -- one of the best ways

21 to determine what somebody's intent was is by looking at the

22 actions.  What did they do, what did they not do?  Look at the

23 efforts of this defendant to conceal his actions.  Wasn't

24 happy about being on the lease but he agreed to it.  And you

25 look at the lease, he said he was making an awful lot of money

1  a month, $7,900 a month as his reference to get this

2  apartment.  He was a fiber-optic technician in California, but

3  we know he came from Mexico.  Another example, one trip to the

4  college.  Just make it look good.

5          The money transfer which is Exhibit 42.  The

6  interesting thing about that, it's to a woman, Sarah

7  Chaidez-Meza, and it's from Ramone Vega Meza.  Ramone is the

8  defendant's middle name, as you saw from the transcript, and

9  he admitted sending it to his sister.  So why would he not put

10 his real name on the money transfer?  Because that's a piece

11 of paper he didn't want to be traced to.  Just like he didn't

12 want to be traced to many of the events that were going on.

13 He preferred to stay in the car, oversee things, and let

14 Chuchi get in and out of the car and move the bags around.  If

15 you weren't running a business such as a restaurant, why would

16 you need all those FoodSaver bags?  If you weren't running an

17 electrical business, why you would need all the electrical

18 tape?

19          The methodology as described by Hilario Rodriguez is

20 exactly what you found in the evidence in this case.  What the

21 latex gloves were for -- they weren't for sanitary purposes.

22 They were for the prevention of any fingerprints or other

23 forensic evidence being left.  Even bad guys look at

24 television.  Everybody knows crime scene technology nowadays.

25 It's a way to insulate themselves from their wrongdoing.  Just

1   as the use of hidden compartments, the vacuum-sealing of bags

2   containing money so that they're compressed, so that more

3   money can be packaged in the compartments and sent from the

4   pockets of drug users and addicts in Baltimore, back to

5   California, and then to the drug dealers in Mexico.  That was

6   the purpose for all of that.

7        And on September 26 when Chuchi, Oscar Miranda, and

8   this defendant went to Costco and Home Depot, they were

9   setting up shop to be able to receive the cocaine, to send it

10  back out, and to collect the money, wrap it and send it to the

11  West Coast.  What's informative not only about the physical

12  appearance of the money that was seized on December 11 of 2016

13  from Valdez-Garcia's truck, it's the same thing that was

14  seized from Oscar Miranda's truck six weeks later, eight weeks

15  later.  It's the same thing, the same methodology.

16       Chaidez-Meza followed instructions.  He knew the

17  deal.  When Hilario Lopez went back to California and before

18  he was arrested in Virginia, he was confident that this

19  defendant knew how to run Eddie Lopez's business here in

20  Maryland.

21       One of the things you're going to have to find -- by

22  the way, your recollection of what the evidence is is what

23  controls.  That's the most important thing.  When you look at

24  the evidence and the testimony, you say, wow, drugs were

25  brought in, was said to be cocaine -- well, it was sold.

1    Money was made on it.  That's the proof that it was cocaine.

2           The second thing is a kilogram is just over two

3    pounds.  That wouldn't fill a duffel bag.  But Hilario

4    Rodriguez-Lopez told us the one I picked up, that load, two

5    duffel bags, they were both heavy, they were full, at least

6    25 kilos, 50 pounds, almost 60 pounds each.  That's heavy,

7    that's bulk.  That's when somebody holds the door for you so

8    you can get the bag of drugs or the bag of money through

9    there.  That's why you put it from one trunk to the other.

10   You take it in, and you get rid of it as quickly as possible,

11   so the police don't find it.  But at $1.2 million in cash,

12   that's about 50 kilograms of cocaine.  And the $1.5 million is

13   almost 60 kilograms of cocaine.  This was a vast and lucrative

14   business.

15          But most important, ladies and gentlemen, actions

16   speak louder than words.  Any time there was a significant

17   transaction, the truck arrives from California, people being

18   given drugs that were obtained from the truck at hotels.

19   Hotels where this defendant wasn't registered.  Chuchi wasn't

20   registered.  The hotels were a market because you've got

21   parking lots, you've got public access, people coming and

22   going all the time.  It's a great cover.  Chuchi was there.

23   This defendant was always there.  Actions speak louder than

24   words.

25          There was no coincidence in the fact that he would

1    be up at midnight, 1:00 a.m., 6:00 a.m. in the morning.

2    There's no business going on in Wal-Mart.  He wasn't there for

3    a blue-light special.  He was there to conduct a drug

4    business, conduct it covertly.  Well, "Did you see him look in

5    the bags?"  These men are professionals.  They knew what to

6    expect, and they knew that the quicker they took the drugs,

7    got away from the trailer -- from the tractor, so to speak and

8    got rid of the drugs to the sellers, the safer they were.

9           But they still had to take care of the life blood of

10   the drug business, and that is the money.  The money is a

11   little bit more complicated.  It has to be counted, it had to

12   be packaged, and then it had to be delivered to the truck, and

13   then the truck driver, in turn, has to package it away in a

14   secret compartment.

15          Valdez-Garcia told us, "Hey, I was making $400 a

16   kilo for everything I transported.  It was always 60 to 70

17   kilos."  That's what fit in his compartment.  That was

18   consistent with what Hilario Rodriguez-Lopez told us as well.

19   But Jesus Chaidez-Meza was present at almost every critical

20   juncture and at every event where there was a transfer of

21   drugs or money.  That is no coincidence, and certainly actions

22   speak louder than words.

23          One of the things that you're asked to do in terms

24   of looking at the evidence is the nature of the business.

25   It's a dangerous business.  The stakes are high.  The profits

1   are huge, and they take the necessary precautions.  So one

2   person necessarily doesn't know what the role of another

3   person is.  I guess in intelligence parlance, people are

4   compartmented.  The truck drivers knew where to go, who to

5   see, to meet the mechanic -- which was a generic term.

6   Because as Valdez-Garcia told us, being a truck driver, you

7   always need a mechanic, so having somebody in your phone with

8   the name "mechanic" wouldn't be particularly suspicious.

9   Because everything was done to conceal their activity, whether

10  it would be the masking agent that Trooper McNeely told us

11  about or the compartments.  Everything was done to keep their

12  business from scrutiny and from discovery by the police.

13          But in this case, much to their surprise and dismay,

14  there were accidents.  There were seizures.  There were

15  arrests.  Because the agents both in California and in

16  Maryland worked hard and worked diligently to get to the

17  bottom of this conspiracy.  And what you have seen and heard

18  during the course of this trial are the fruits of their hard

19  work and honest efforts.

20          I suggest to you, ladies and gentlemen, that to

21  define justice is fairly simple.  Justice is the calm and

22  dispassionate application of the facts that have been

23  presented to you, to the law, as Judge Bennett will give the

24  law to you.  And your finding will be justice.  The defendant

25  in this case, Jesus Chaidez-Meza, is entitled to nothing more

1    than justice, and the people of this district are entitled to

2    nothing less.

3            I ask you, based on the law and the evidence, to

4    return a verdict of guilty.  Thank you very much.

5            Your Honor.

6            THE COURT:  Thank you, Mr. Warwick.  Thank you very

7    much.

8            All right, ladies and gentlemen, we're going to

9    conclude now, a little bit faster than we thought, 1:00.

10   Works out well so we have plenty of time tomorrow to

11   deliberate.  If you'll try to get here, I would think, by

12   quarter after 9:00.  We're going to get started as quickly as

13   we can, not any earlier than 9:30.  If you can get here about

14   quarter after 9:00, Ms. Herndon will give you menus.  You'll

15   pick out whatever you want for lunch, sandwiches, whatever,

16   and then I will instruct you on the law immediately around

17   9:30.  It will last about 45 minutes.

18           It's a very important process.  You don't see it on

19   television because, again, the TV ratings would go right

20   through the floor.  It's very important, it's done in all

21   cases.  The judge instructs on the law.  You will have copies

22   of everything I say tomorrow.  The lawyers are aware of what I

23   will say; they already made reference to it today.  I'll read

24   from it, and each one of you, the 12 of you will get copies of

25   what I say.

1          The alternate jurors will be dismissed at the

2     conclusion of my instructions.  You can go home but will be

3     instructed not to discuss the case with anyone in case a juror

4     is taken ill.  It actually happened a few weeks ago, a juror

5     could not come back, so we needed an alternate.  So the two

6     alternates will be dismissed, and then Jurors 1 through 12

7     will deliberate.  That will be the process.  Around noon your

8     lunch will be brought to you.  That will be the process

9     tomorrow.

10         With that, unless there is anything further, you-all

11    will be excused.  I have to go over a few things with counsel.

12    Thank you very much.  I'll stay on the bench here a second.

13         (Jury left the courtroom at 12:58 p.m.)

14         THE COURT:  With that, we're done.  You-all should

15    be back here, obviously, tomorrow and ready to go at 9:30.

16    Mr. Maronick, I'm not sure if you know, but there's a

17    conference room here on the third floor where you can operate,

18    and it's hooked up with all kinds of equipment.  Law firms

19    here in the city have made contributions to it; my old firm

20    contributed to it as well years ago.  It's a really nice room.

21    Not sure if you've seen it this week, we've been so busy in

22    trial, but it's a nice place to wait.

23         You don't have to stay in the building, but I

24    suggest you do.  You can make yourself at home.  There's

25    computer access, equipment down there and everything else.

```
1    Mr. Izant and Mr. Warwick can obviously go across the
2    street.
3            MR. WARWICK:  Just one thing.
4            THE COURT:  Yes.
5            MR. WARWICK:  The Court will take notice it's 1:00,
6    just like I said.
7            THE COURT:  It is.  Your estimate on 1:00 was better
8    than your estimate on 2:00 yesterday, Mr. Warwick.
9            MR. WARWICK:  Certainly was.
10           THE COURT:  That's quite all right.  With that,
11   you-all did a nice job.  Thank you very much.  With that, we
12   will stand -- Ms. Dopazo and Ms. Goldstein, again, thank you
13   for all your work on this case.  And we will proceed, I'll try
14   not to go too fast when I read instructions tomorrow.
15           MS. GOLDSTEIN:  You're welcome.  Thank you, Your
16   Honor.
17           MS. DOPAZO:  Thank you.
18           THE COURT:  Always nice to have you here.  With
19   that, this Court stands adjourned for the day.
20           MR. IZANT:  Thank you.
21           MR. MARONICK:  Thank you, Your Honor.
22           THE CLERK:  All rise.  This Honorable Court now
23   stands adjourned.
24      (Proceedings concluded at 1:00 p.m.)
25                               *  *  *
```

1          I, Patricia G. Mitchell, RMR, CRR, do hereby certify
that the foregoing is a correct transcript from the
2   stenographic record of the October 24, 2019 proceedings in the
above-entitled matter.
3
          Dated this 18th day of January 2021.
4

5

6                    _____
                        Patricia G. Mitchell
7                       Official Court Reporter

8
                              INDEX
9

10
WITNESS FOR THE GOVERNMENT                                    Page
11
**Antonio Rodriguez** (continued)
12
    Redirect Examination By MR. WARWICK...................... 51
13

14
GOVERNMENT RESTS ....................................... 62
15
DEFENDANT RESTS ....................................... 62
16

17

18
GOVERNMENT'S CLOSING
19
    By MR. IZANT ........................................ 63
20

21  DEFENDANT'S CLOSING

22      By MR. MARONICK ..................................... 88

23
GOVERNMENT'S REBUTTAL
24
      By MR. WARWICK  ..................................... 100
25

**< Dates >.**
**"January 23, 1980.** 15:19 .
**10/24/19** 114:3 .
**August 2016** 64:21, 75:2 .
**August 27, 2016** 75:3 .
**December 11** 107:12 .
**December 2016** 65:23, 67:16, 70:23, 73:5, 76:18 .
**December 2018** 82:1 .
**February 2017** 82:4 .
**January 2021.** 114:6 .
**January, january** 16:14 .
**May 1st** 3:12, 3:13 .
**May 3** 3:12 .
**November, december** 3:19 .
**November, november 2016** 3:19 .
**October 24, 2019** 1:17 .
**October, november** 73:7, 102:23 .
**October, november, december** 103:7 .
**September 2016** 65:2, 65:23, 67:16, 71:10 .
**September 2016, october, november** 69:22 .
**September 26** 107:7 .
**September 26, 2016** 75:8 .
**September, october, november** 102:4, 102:19 .
**"$5,000** 44:11 .
**"20.** 16:15 .
**"one** 39:6, 39:10, 40:12, 40:14 .
**$1,000** 87:5 .
**$1.2** 74:3, 108:11 .
**$1.5** 74:6, 108:12 .
**$125,000.** 87:15 .
**$16,000.** 87:10 .
**$18,000** 79:15, 87:8 .
**$20,000.** 105:10 .
**$25,000** 85:17, 87:11 .
**$3** 87:1 .
**$400** 109:15 .
**$5,000** 44:8, 44:10, 82:8 .
**$5,000.** 83:18 .
**$7,900** 106:1 .
**(11:20** 61:16 .
**(9:39** 2:2 .
.

.
**< 1 >.**
**1** 14:6, 66:11, 112:6 .
**1.** 12:15 .
**1/2** 3:6 .
**10** 30:23, 94:21 .
**100** 115:33 .
**101** 1:49 .
**1018** 56:19 .
**10:04.** 24:16, 24:18 .
**10:20** 26:10 .
**10:54** 55:22 .
**11** 91:21 .
**11-minute** 30:8 .
**110** 5:1 .
**115** 56:23 .
**1185** 56:24 .
**11:01** 61:15 .
**11:21** 62:16 .
**11:24** 30:3 .
**11:24.** 27:7 .
**11:53** 29:10 .
**12** 33:24, 111:24, 112:6 .
**12.** 83:10 .
**120** 85:21 .
**12:58** 112:13 .
**13** 83:12, 83:13 .
**14** 32:25, 33:1 .
**148** 56:21 .
**14:19** 30:24 .
**15-** 87:9 .
**150** 85:20, 86:25 .
**16** 83:9 .
**17** 28:18, 29:2, 35:13, 35:14, 92:19 .
**17.** 28:22, 35:4 .
**17:51** 33:25, 34:19, 34:24 .
**18A** 75:10 .
**18th** 33:22, 114:6 .
**19-cr-00165-rdb-1** 1:10 .
**1982** 56:20 .
**1997** 56:24 .
**1998** 56:22 .
**1:** 1:10 .
**1:00** 62:5, 109:1, 113:5, 113:7, 113:24 .
**1:00.** 111:9 .
**1:05** 44:22 .
**1:09:47** 45:23 .
**1:24:26.** 49:13 .

**1:30** 61:25 .
**1:30.** 62:6, 63:9 .
.
.
**< 2 >.**
**20** 3:6, 87:2 .
**20,000** 87:2 .
**2016** 3:8, 3:19, 64:10, 102:1, 107:12 .
**2017** 64:11 .
**2019** 3:14 .
**202** 14:4, 17:2 .
**2020** 16:14 .
**21201** 1:50 .
**22** 88:8 .
**22.** 37:2, 38:4 .
**24** 39:5, 103:2 .
**24/7** 22:14, 95:3 .
**25** 86:19, 108:6 .
**27** 40:9, 40:11, 40:12 .
**28** 26:20 .
**29** 42:13, 55:8, 55:10, 56:4, 56:8, 56:13, 56:14, 57:2, 57:6, 57:10 .
**29(c)(1)(3** 56:5 .
**29th** 77:19 .
**2:00** 113:8 .
.
.
**< 3 >.**
**3** 10:15, 16:1 .
**3-foot** 91:8 .
**30** 5:2, 29:7 .
**30:58** 50:14 .
**32** 16:21, 16:22 .
**34:09** 37:3 .
**34:09:** 38:4 .
**34:25** 39:8 .
**359** 56:21 .
**37.** 43:14, 43:15, 90:8 .
**37B** 81:8 .
**38** 43:23 .
**38.** 43:25 .
**38:25** 39:5, 39:9 .
**39.** 44:22 .
.
.
**< 4 >.**
**4** 20:22, 20:25 .
**40** 85:18 .

**42** 45:22 .
**42.** 106:5 .
**43:51** 40:12 .
**44** 40:9 .
**44:06.** 40:10 .
**45** 5:3, 111:17 .
**48** 49:12 .
**48.** 49:12 .
**48:32** 42:15 .
**4th** 1:49 .
.
.
**< 5 >.**
**5** 21:5, 66:8, 67:11, 86:16,
    88:4 .
**5,000** 44:8, 44:12, 96:19,
    105:13 .
**50** 87:2, 108:6, 108:12 .
**50,000.** 87:2 .
**51** 50:14, 50:17, 50:18,
    115:9 .
**52.** 50:19, 50:20 .
**5D** 1:23 .
.
.
**< 6 >.**
**6** 21:19 .
**60** 70:16, 70:24, 85:14, 108:6,
    108:13, 109:16 .
**60-page** 92:20 .
**62** 115:13, 115:15 .
**63** 115:23 .
**677** 56:19 .
**6:00** 109:1 .
**6:13** 21:2 .
**6th** 5:1 .
.
.
**< 7 >.**
**7** 25:17, 103:2 .
**7.** 24:15 .
**70** 70:16, 70:25, 85:14,
    109:16 .
**7:12** 21:5 .
.
.
**< 8 >.**
**8** 10:15, 29:2, 30:2, 30:3 .
**8.** 27:6, 29:10 .
**88** 115:28 .

.
**< 9 >.**
**9** 29:23 .
**9:00** 111:14 .
**9:00.** 111:12 .
**9:30** 63:16 .
**9:30.** 63:11, 111:13, 111:17,
    112:15 .
**9:40** 2:11 .
.
.
**< A >.**
**a.m.** 2:2, 2:11, 55:22, 61:15,
    61:16, 62:16, 109:1 .
**ability** 42:18 .
**able** 7:13, 10:14, 18:8, 26:17,
    26:19, 34:15, 36:11, 36:15,
    36:25, 43:5, 52:5, 53:4,
    61:24, 101:13, 107:9 .
**about.** 26:5 .
**above** 45:23 .
**above-entitled** 114:4 .
**absolutely** 55:6, 91:14 .
**accept** 18:15 .
**acceptance** 18:17 .
**access** 6:19, 6:22, 108:21,
    112:25 .
**accident** 79:25, 80:14 .
**accidentes.** 33:18 .
**accidents** 33:9, 33:11,
    110:14 .
**accomplice** 57:1, 103:9 .
**accomplices** 71:25 .
**According** 38:25, 39:2, 39:22,
    95:13, 97:5, 97:8, 98:5 .
**accounting** 38:7 .
**accounts** 44:18 .
**accurate** 53:2 .
**acquired** 65:17 .
**acquittal** 56:6, 57:5, 57:11 .
**across** 64:18, 113:1 .
**act** 74:23, 74:25, 104:23,
    105:2 .
**acted** 70:10 .
**Actions** 75:21, 105:22, 105:23,
    108:15, 108:23, 109:21 .
**activities** 4:13 .
**activity** 103:6, 110:9 .
**acts** 104:15 .

**Actually** 14:18, 16:5, 27:7,
    36:21, 41:2, 41:13, 41:20,
    68:11, 91:23, 94:2, 97:21,
    112:4 .
**addicts** 107:4 .
**address** 13:6, 13:19, 76:11,
    82:10 .
**adjourned** 113:19, 113:23 .
**admissions** 19:19 .
**admit** 105:10 .
**admits** 91:12 .
**admitted** 81:13, 81:14, 85:4,
    85:12, 85:19, 85:20, 104:9,
    104:10, 104:12, 105:4,
    106:9 .
**advance** 78:14 .
**adverse** 58:17 .
**advise** 6:25, 54:4, 54:13,
    57:14 .
**advised** 91:23 .
**advisement** 90:25, 91:22,
    93:3 .
**advising** 14:6 .
**affect** 19:18 .
**affixed** 73:17 .
**afford** 13:1 .
**afraid** 30:17 .
**afternoon** 63:3, 63:4 .
**Agency** 3:8 .
**Agent** 1:39, 4:20, 12:20, 16:5,
    21:8, 22:8, 22:18, 24:7,
    25:16, 26:6, 26:14, 27:8,
    27:18, 27:19, 27:20, 27:24,
    28:3, 28:10, 28:13, 28:23,
    28:24, 29:3, 29:11, 31:3,
    31:12, 32:15, 34:1, 34:6,
    36:12, 36:24, 36:25, 37:4,
    42:14, 43:8, 43:16, 44:22,
    46:9, 46:12, 46:22, 46:23,
    46:25, 47:1, 47:2, 50:15,
    52:2, 52:4, 52:7, 52:8, 52:12,
    52:19, 53:1, 66:16, 76:15,
    76:23, 77:1, 77:16, 77:17,
    92:12, 92:18, 93:6, 94:24,
    95:22, 98:8, 110:10 .
**agents** 3:22, 7:10, 27:14, 28:24,
    36:9, 103:21, 110:15 .
**agents.** 36:7 .
**ago** 57:14, 112:4, 112:20 .
**Agree** 23:11, 29:1, 31:17, 36:16,

37:17, 37:23, 49:24,
   62:2 .
**Agreeable** 55:5, 55:7 .
**agreed** 65:11, 65:12, 65:13, 66:9,
   81:14, 105:24 .
**agreement** 68:3, 68:4, 68:7,
   68:13, 68:14, 69:13, 69:14,
   69:16, 73:3, 74:11, 78:21,
   79:21, 80:16, 87:23 .
**agreements** 72:2, 72:3,
   72:14 .
**ah** 40:17 .
**ahead** 47:18 .
**air** 71:17 .
**Airlines** 75:2 .
**Alaska** 75:2 .
**alcoholic** 59:18 .
**alleged** 3:15, 3:16, 4:7,
   23:5 .
**allegedly** 37:24 .
**alley** 4:25 .
**allow** 67:7, 79:8 .
**allowed** 19:21 .
**Almost** 2:12, 23:2, 24:19, 25:5,
   76:17, 79:19, 82:8, 108:6,
   108:13, 109:19 .
**alone** 72:10, 77:5, 80:17 .
**already** 4:11, 22:25, 25:19,
   25:21, 26:4, 31:6, 35:9,
   35:10, 36:23, 39:14, 39:22,
   42:6, 58:12, 92:3, 97:13,
   111:23 .
**alternate** 112:1, 112:5 .
**alternates** 112:6 .
**although** 68:8 .
**Altima** 71:8 .
**Amendment** 57:22 .
**AMERICA** 1:5 .
**American** 57:16, 57:17,
   57:19 .
**amount** 83:18, 84:14, 84:22,
   85:8 .
**amounts** 87:2 .
**Angeles** 4:25, 64:8, 64:11, 66:6,
   70:7, 70:12, 70:14, 70:21,
   79:11, 90:19 .
**Annapolis** 63:3 .
**answer** 10:9, 10:11, 13:9, 13:18,
   14:8, 14:9, 14:18, 18:7,
   19:14, 32:6, 32:7, 32:20,

37:16, 38:23, 47:18, 49:1,
   51:22, 51:24, 51:25, 67:13,
   73:1, 89:10, 93:4 .
**answered** 14:20 .
**answering** 35:21 .
**answers** 17:10, 28:23, 92:1 .
**anticipate** 71:23 .
**Antonio** 2:18, 2:21, 115:7 .
**Anybody** 30:18, 30:19, 54:24,
   91:12, 94:14, 94:15 .
**anyway** 4:8 .
**apartment** 31:6, 37:5, 38:5,
   38:6, 65:4, 65:5, 65:13,
   65:17, 66:1, 66:4, 71:6, 75:5,
   75:19, 79:12, 80:10, 81:12,
   81:15, 82:10, 83:14, 86:20,
   86:21, 86:22, 87:7, 87:10,
   95:9, 95:12, 101:1, 101:13,
   103:13, 106:2 .
**apartment.** 38:17, 45:10,
   46:7 .
**Appeals** 56:18 .
**appear** 22:9, 103:18 .
**appearance** 107:12 .
**application** 110:22 .
**applies** 57:3 .
**appointed** 13:2 .
**Appreciate** 89:3, 94:8 .
**Approach** 18:24, 41:23, 53:17,
   82:12, 82:13 .
**approached** 9:8, 11:9,
   44:25 .
**appropriate** 31:17, 32:16 .
**Approximate** 5:2 .
**approximately** 7:14, 23:19,
   85:17 .
**April** 20:14 .
**Arbors** 71:6, 73:9, 73:20, 73:22,
   73:23, 75:4, 75:5, 75:7,
   75:18, 76:11, 76:14, 76:25,
   77:2, 78:4, 78:9, 82:8, 83:7,
   83:13, 95:12, 101:1,
   103:6 .
**area** 7:16, 105:19 .
**argument** 56:11, 60:24, 61:22,
   63:2, 63:5, 63:6, 88:7 .
**arguments** 54:20, 54:21, 54:22,
   54:23, 61:25, 63:20 .
**armed** 8:16, 90:17 .
**Around** 2:13, 30:3, 33:22, 33:25,

40:9, 42:15, 106:14, 111:16,
   112:7 .
**arrest** 4:18, 6:23, 6:25, 7:7, 7:23,
   14:15, 19:6, 19:12, 19:13,
   19:15, 19:20, 19:21, 20:2,
   20:3, 20:7, 20:10, 20:12,
   25:14, 25:18, 31:7, 39:16,
   39:18, 39:22, 40:7, 90:13,
   91:1 .
**arrested** 4:23, 5:6, 14:17, 19:6,
   19:13, 20:2, 20:3, 20:7, 27:1,
   30:19, 30:20, 33:18, 33:20,
   107:18 .
**arrests** 33:3, 33:7, 110:15 .
**arrive** 40:14, 40:25, 42:25,
   62:11, 77:20, 80:1 .
**arrived** 44:9, 69:23 .
**arrives** 108:17 .
**articulated** 68:8 .
**asks** 11:23, 97:8 .
**aspect** 102:15, 102:17 .
**assessing** 102:13 .
**assist** 68:14, 74:17 .
**Assistant** 1:30, 66:13,
   66:15 .
**assume** 8:19, 54:15 .
**attempt** 103:19 .
**attended** 79:20 .
**attitude** 11:20 .
**Attorney** 12:25, 13:1, 66:13,
   66:15 .
**Attorneys** 1:30 .
**attributed** 84:14 .
**audio** 94:25, 95:2 .
**August** 65:1 .
**await** 56:7 .
**awaiting** 77:9 .
**aware** 6:1, 14:24, 15:1, 40:8,
   42:4, 44:20, 84:17, 84:18,
   111:22 .
**away** 4:22, 4:24, 24:3, 68:23,
   98:11, 109:7, 109:13 .
**awful** 105:25 .
**.**

**< B >.**
**back** 3:9, 4:16, 5:8, 6:8, 6:18,
   8:22, 9:9, 9:23, 20:21, 21:8,
   22:25, 29:9, 29:10, 30:2,
   35:22, 40:24, 46:2, 46:6,

49:23, 55:1, 55:18, 55:19,
61:8, 63:10, 63:14, 63:16,
66:4, 66:5, 70:7, 70:12,
70:20, 70:21, 73:21, 73:23,
75:17, 76:6, 76:14, 76:25,
77:2, 78:5, 79:6, 81:22, 82:1,
82:5, 82:11, 85:15, 88:24,
90:23, 95:1, 95:11, 99:13,
99:24, 101:18, 102:6, 105:17,
107:4, 107:10, 107:17, 112:5,
112:15 .
**background** 15:1, 15:3 .
**bad** 106:23 .
**badges** 8:6, 8:19 .
**bag** 74:2, 77:18, 96:15, 99:13,
108:3, 108:8 .
**bags** 37:5, 38:5, 38:17, 40:14,
40:15, 40:16, 41:15, 42:24,
45:19, 49:16, 49:17, 71:11,
73:9, 73:15, 74:8, 75:15,
78:9, 80:5, 80:8, 84:6, 86:7,
86:8, 86:9, 86:19, 95:17,
95:18, 95:20, 96:3, 96:14,
97:19, 97:20, 99:4, 106:14,
106:16, 107:1, 108:5,
109:5 .
**Baltimore** 1:16, 1:50, 3:22, 4:14,
21:21, 21:25, 22:1, 22:9,
25:14, 25:19, 26:1, 27:10,
27:12, 27:14, 28:24, 29:25,
30:4, 39:11, 39:16, 43:8,
44:17, 45:20, 51:9, 52:8,
65:1, 65:2, 65:10, 65:12,
65:13, 65:16, 66:2, 70:14,
70:17, 71:4, 75:3, 81:12,
81:14, 81:15, 82:1, 82:5,
82:7, 87:6, 95:12, 95:16,
101:3, 101:12, 103:16,
103:20, 105:14, 105:18,
107:4 .
**bank** 44:18, 96:20 .
**Based** 13:14, 14:12, 15:3, 18:9,
22:6, 23:9, 32:17, 32:18,
36:14, 41:14, 43:12, 45:17,
47:19, 51:7, 51:14, 57:9,
60:8, 61:23, 64:8, 67:11,
97:12, 100:3, 111:3 .
**basic** 13:5 .
**basically** 40:20, 53:24 .
**Basis** 82:16 .

**beard** 25:20 .
**became** 68:10 .
**become** 12:16 .
**began** 12:7, 103:6 .
**begin** 42:15, 63:18 .
**beginning** 67:1, 76:18, 78:16,
91:25, 93:3, 100:2 .
**Begins** 43:19, 49:13 .
**behalf** 79:18 .
**behind** 6:18, 76:2 .
**beings** 30:22 .
**belief** 19:19 .
**beliefs** 18:23, 19:3 .
**believe** 6:4, 19:25, 32:21, 43:3,
47:20, 48:3, 63:8, 69:7, 83:9,
83:23, 88:24, 90:8, 91:11,
92:5, 92:19, 93:12, 95:22,
96:20, 97:4, 98:8, 98:25,
99:21, 101:8 .
**believe.** 91:16 .
**believed** 46:15, 94:17, 96:6 .
**believes** 91:5 .
**Bench** 18:24, 19:1, 20:19, 41:23,
42:1, 42:10, 53:17, 53:19,
55:14, 55:17, 82:14, 82:15,
84:1, 112:12 .
**benefits** 99:9 .
**Bennett** 1:22, 66:25, 67:23,
67:25, 72:5, 74:21, 77:9,
78:14, 84:15, 110:23 .
**best** 27:7, 93:9, 104:24, 105:1,
105:2, 105:20 .
**better** 93:18, 113:7 .
**beverage** 59:18 .
**beyond** 56:17, 58:19, 58:22,
68:19, 68:21, 69:1, 74:11,
78:10, 84:11, 87:20, 89:9,
89:15, 89:23, 100:11 .
**biased** 72:17 .
**big** 25:8, 104:11 .
**bigger** 86:7 .
**binder** 25:8, 25:9 .
**biographical** 15:22, 21:3, 22:17,
23:3, 91:25 .
**birth** 13:7, 13:15, 13:21,
15:18 .
**bit** 11:25, 29:9, 33:24, 34:12,
34:18, 35:3, 45:22, 90:3,
95:11, 109:11, 111:9 .
**black** 7:19, 9:6, 9:9, 9:11, 9:15,

70:4, 74:7, 95:17, 95:20 .
**black-and-white** 7:16, 8:4,
9:1 .
**blocks** 28:20 .
**blood** 109:9 .
**blue** 94:16, 94:18 .
**blue-light** 109:3 .
**body** 8:5 .
**border** 105:13 .
**boss** 49:9 .
**bosses** 51:10 .
**bottom** 110:17 .
**bought** 71:7, 79:15, 87:5,
87:9 .
**box** 45:4 .
**bread** 29:21 .
**break** 42:19, 55:3 .
**Brian** 1:39, 4:15, 22:8, 27:20,
28:24, 36:10, 43:5, 43:8,
46:9, 46:23, 52:4, 66:16 .
**bricks** 38:8, 38:18, 38:25, 49:19,
69:18, 69:23, 87:14 .
**brief** 60:18, 71:21 .
**briefcase** 79:1, 79:3, 79:5 .
**bring** 2:5, 10:12, 32:22, 40:24,
61:20, 62:14, 92:4 .
**bringing** 73:16, 78:25 .
**brings** 32:16 .
**broader** 87:3 .
**brother** 48:19 .
**brought** 9:21, 9:25, 11:11, 22:18,
22:21, 46:16, 66:5, 81:20,
81:22, 82:19, 85:15, 90:18,
91:3, 91:7, 92:12, 92:18,
102:6, 104:15, 107:25,
112:8 .
**buck** 100:9 .
**bucks** 98:7 .
**building** 112:23 .
**bulk** 108:7 .
**burden** 58:19, 58:20, 58:21,
58:23, 63:7, 68:16, 68:17,
68:22, 69:8, 69:10, 87:19,
89:23 .
**business** 31:2, 37:4, 50:15,
50:18, 50:20, 51:2, 51:5,
51:7, 51:8, 63:24, 63:25,
64:1, 64:3, 64:5, 64:11,
64:12, 64:14, 64:17, 64:22,
65:5, 65:18, 65:21, 65:22,

66:9, 69:15, 70:9, 71:2,
71:13, 73:4, 80:16, 87:14,
87:24, 97:25, 101:2, 101:17,
103:12, 106:15, 106:17,
107:19, 108:14, 109:2, 109:4,
109:10, 109:24, 109:25,
110:12 .
**busy** 112:21 .
**buy** 63:12 .
**buying** 79:22, 79:24 .
**BWI** 80:19 .

.

.

**< C >.**
**California** 15:4, 48:12, 64:6,
69:17, 69:21, 74:6, 102:6,
103:6, 106:2, 107:5, 107:17,
108:17, 110:15 .
**call** 7:13, 26:1, 27:20, 28:10,
28:13, 29:12, 36:9, 36:10,
43:5, 54:6, 58:1, 58:2, 89:21,
92:14 .
**called** 52:19, 53:1 .
**calling** 27:12, 30:4 .
**calls** 33:14 .
**calm** 110:21 .
**Capital** 83:11 .
**car** 6:8, 9:8, 45:24, 47:1, 47:2,
65:25, 69:25, 76:14, 76:25,
77:1, 79:15, 79:16, 80:5,
81:15, 82:9, 87:9, 90:23,
94:16, 96:11, 97:21, 99:6,
103:4, 105:14, 106:13,
106:14 .
**Card** 16:13, 16:17 .
**Card.** 16:18 .
**care** 38:7, 109:9 .
**career** 26:21, 98:21, 98:23 .
**carefully** 72:7 .
**Carmax** 82:10 .
**carried** 70:15, 84:6 .
**carry** 8:18, 38:17 .
**carrying** 45:18, 73:8, 73:12,
74:8, 75:15, 75:19, 78:9,
95:17, 95:19, 99:4 .
**cars** 70:1 .
**cart** 75:14 .
**cartel** 33:15, 49:6 .
**case** 4:4, 18:16, 33:14, 35:7,
42:4, 42:18, 47:1, 51:12,

52:7, 52:8, 52:11, 53:15,
54:16, 56:7, 57:10, 57:12,
58:13, 58:14, 60:23, 62:25,
66:16, 66:20, 67:9, 69:8,
69:15, 69:20, 75:21, 79:7,
84:19, 89:23, 97:17, 99:1,
99:2, 99:15, 100:2, 100:6,
100:16, 101:6, 102:16,
106:20, 110:13, 110:25,
112:3, 113:13 .
**cases** 4:16, 31:24, 111:21 .
**cash** 71:9, 79:15, 108:11 .
**caught** 25:2 .
**cause** 19:10, 19:16 .
**CBP** 75:1 .
**cell** 10:19, 10:22, 91:6, 91:7,
98:1 .
**cells** 10:2, 10:21 .
**certain** 18:23, 24:12, 24:13,
28:2 .
**Certainly** 19:24, 56:8, 62:6,
109:21, 113:9 .
**certify** 114:1 .
**certiorari** 56:22 .
**Chaidez** 7:4, 15:13, 28:4, 38:16,
46:16, 46:18, 47:4, 52:6 .
**Chaidez-meza** 1:10, 3:11, 3:17,
3:18, 4:4, 4:11, 4:18, 4:22,
6:2, 6:19, 7:8, 7:23, 8:22, 9:4,
11:6, 11:9, 12:20, 13:11,
14:24, 18:12, 23:17, 26:15,
26:18, 26:23, 31:10, 31:18,
33:10, 34:3, 35:13, 39:6,
41:2, 41:12, 41:15, 41:20,
42:7, 43:6, 43:7, 44:14, 46:8,
47:22, 49:14, 51:13, 53:3,
57:13, 59:14, 60:3, 60:11,
60:13, 60:19, 65:11, 67:3,
89:3, 89:12, 89:17, 90:10,
91:14, 91:22, 92:16, 93:24,
94:17, 94:25, 95:6, 95:19,
96:2, 96:5, 96:8, 96:12,
96:22, 98:5, 98:6, 98:10,
98:23, 99:6, 99:12, 99:17,
100:1, 100:25, 103:15, 104:3,
105:3, 106:7, 107:16, 109:19,
110:25 .
**Chaidez.** 21:17 .
**chair** 9:16, 24:2, 25:1, 25:6,
25:7 .

**chalked** 80:12 .
**challenge** 71:24, 72:1 .
**chance** 92:20 .
**change** 60:7 .
**changing** 60:10 .
**charge** 42:17, 61:6, 61:8, 62:8,
62:9, 67:12, 67:22 .
**charged** 66:7 .
**charges** 32:1, 67:9 .
**Check** 53:24, 69:5 .
**check-off** 53:25 .
**checking** 53:22 .
**children** 13:8, 21:6, 21:10 .
**choice** 59:14 .
**choose** 56:9, 58:10, 58:11, 59:2,
60:16 .
**Christmas** 33:22 .
**Chuchi** 35:5, 51:3, 51:5, 51:7,
65:22, 65:24, 73:8, 73:12,
73:15, 74:8, 75:18, 75:24,
76:12, 76:20, 77:2, 78:1,
78:7, 78:8, 79:14, 79:15,
80:5, 80:10, 81:16, 81:19,
82:11, 86:23, 86:24, 95:1,
95:17, 95:19, 95:20, 95:21,
95:24, 96:2, 96:10, 97:22,
99:1, 99:3, 99:4, 99:11,
101:3, 101:14, 101:20,
106:14, 107:7, 108:19,
108:22 .
**Chuchi.** 50:16, 50:21 .
**Chuchis** 41:16, 45:8, 45:11,
45:15, 45:18, 46:6,
46:16 .
**Chuchis.** 50:24 .
**Circuit** 56:18, 56:20, 56:21,
56:24 .
**circumstances** 92:23 .
**citizen** 103:17 .
**citizens** 57:17 .
**citizenship** 16:16 .
**city** 112:19 .
**claim** 85:10 .
**claimed** 43:9, 85:5, 85:7 .
**claiming** 39:2 .
**clarify** 16:20 .
**clarifying** 56:1 .
**clarity** 78:22 .
**class** 79:20 .
**classic** 78:25 .

cleaning 101:2 .
clear 35:20, 80:21, 87:18, 89:8, 100:8 .
Clearly 8:6, 11:9, 11:23, 55:9, 57:2, 57:8, 86:15 .
CLERK 2:16, 2:19, 53:23, 55:21, 61:13, 62:11, 113:22 .
client 19:25, 54:8, 59:10 .
close 2:13, 23:17, 82:5, 95:4, 97:8 .
closely 81:7 .
CLOSING 54:20, 54:21, 54:22, 54:23, 60:24, 61:22, 61:25, 63:2, 63:5, 63:6, 63:20, 88:6, 115:21, 115:26 .
clothes 8:5 .
co-conspirator 103:9 .
co-defendant 57:1 .
Coast 107:11 .
cocaine 38:18, 38:25, 39:3, 41:15, 64:18, 65:24, 66:3, 66:8, 67:11, 67:18, 69:16, 69:17, 69:18, 70:25, 71:10, 81:19, 81:20, 84:7, 84:13, 84:14, 84:17, 84:20, 84:21, 85:12, 85:16, 85:17, 85:20, 85:22, 86:1, 86:5, 86:16, 86:25, 88:4, 107:9, 107:25, 108:1, 108:12, 108:13 .
code 16:22, 30:24, 33:2, 39:5 .
coded 21:20, 22:18 .
coerced 99:23 .
coercion 19:19 .
coercive 32:21, 51:25 .
coffee 55:19 .
coincidence 80:12, 108:25, 109:21 .
coke 38:8 .
colleague 66:14 .
collect 107:10 .
collecting 34:3 .
College 95:13, 95:16, 103:20, 103:23, 106:4 .
color 45:2, 45:23 .
comes 17:24, 89:15, 96:16, 99:8 .
coming 5:8, 14:22, 16:14, 24:18, 25:14, 78:5, 80:5, 88:24,

96:2, 99:13, 108:21 .
common 34:10, 69:4, 76:7, 76:8, 78:19, 81:2, 85:11 .
communicate 50:24 .
Community 95:13, 95:16, 103:20 .
compartment 70:6, 70:21, 109:14, 109:17 .
compartmented 110:4 .
compartments 69:20, 107:1, 107:3, 110:11 .
compel 58:2 .
compelled 57:24 .
complex 71:6, 83:14 .
complicated 109:11 .
components 101:5 .
composed 7:9 .
compound 36:1 .
compressed 71:17, 107:2 .
computer 1:43, 112:25 .
conceal 105:23, 110:9 .
concern 39:24 .
concerned 40:1 .
concerns 40:3 .
conclude 111:9 .
concluded 62:25, 113:24 .
concluded. 20:19, 42:10, 55:14, 84:1 .
concludes 53:15 .
conclusion 56:6, 112:2 .
conclusively 100:25 .
conduct 72:21, 84:15, 101:16, 109:3, 109:4 .
conducted 3:10, 4:17, 4:23 .
conducting 8:11 .
conference 19:1, 20:19, 42:1, 42:10, 53:19, 55:14, 82:15, 84:1, 112:17 .
confession 90:7 .
confident 107:18 .
confidential 60:3 .
confirming 35:16, 37:24 .
confirms 91:19 .
conflict 104:20 .
confuse 17:22, 17:25, 50:11 .
confuses 18:4 .
confusing 51:23 .
confusion 16:20 .
connected 23:25, 64:12 .
connection 75:25, 79:10,

79:15 .
Consider 54:17, 57:6, 59:4, 72:12, 73:2, 80:11, 80:13, 87:3, 87:25, 90:6, 92:22, 93:25, 94:1, 104:25 .
considering 80:25 .
considers 98:22 .
consistent 88:2, 109:18 .
conspiracy 3:16, 23:4, 31:23, 66:8, 67:10, 67:19, 67:21, 67:22, 68:3, 68:10, 68:11, 69:11, 74:13, 74:14, 74:24, 75:12, 75:23, 75:25, 76:4, 78:13, 84:10, 84:13, 85:1, 85:4, 86:2, 86:14, 88:3, 89:11, 95:24, 96:13, 96:24, 96:25, 97:2, 98:20, 105:4, 110:17 .
conspirator 99:22, 100:17 .
conspiring 67:15 .
Constitution 57:23, 58:15 .
constrain 54:24 .
constrained 34:12 .
consultation 92:25 .
contact 3:20, 7:4, 52:2, 92:11 .
containing 107:2 .
contend 19:17 .
contention 12:1 .
context 87:3, 94:1 .
continue 5:23, 16:11, 24:25, 42:12, 65:6, 84:3 .
continued 115:7 .
continuing 37:16 .
contributed 112:20 .
contributions 112:19 .
control 80:22 .
controlled 67:15, 67:18, 67:20, 68:5, 69:12, 69:15, 84:18 .
controls 68:1, 107:23 .
conversation 7:3, 36:6, 36:13, 52:3, 96:1, 96:2, 97:6, 104:4, 104:22, 105:4 .
conversations 59:9, 96:8, 96:10, 102:9, 102:11 .
convince 97:18 .
convincing 89:9, 100:8 .
Cooper 46:15, 46:17 .
cooperate 27:13, 30:5, 32:1 .

cooperate. 27:16 .
cooperating 101:6 .
cooperation 72:2 .
coordinated 4:21 .
coordinating 105:18 .
copies 111:21, 111:24 .
copy 33:1, 33:2 .
Correct 3:24, 4:19, 6:3, 6:9,
    8:14, 10:20, 10:23, 11:1,
    11:4, 12:8, 12:11, 12:12,
    13:19, 14:3, 15:7, 15:23,
    16:24, 18:13, 19:7, 20:9,
    21:3, 21:4, 23:5, 23:6, 23:12,
    23:13, 23:15, 24:4, 24:10,
    25:12, 26:10, 29:2, 29:25,
    30:6, 30:17, 31:14, 34:25,
    35:5, 35:10, 36:2, 37:12,
    38:19, 39:1, 41:10, 41:13,
    43:11, 45:13, 45:16, 46:20,
    46:23, 47:9, 50:1, 50:8, 51:3,
    51:6, 52:21, 53:20, 54:2,
    55:25, 59:15, 60:7, 60:25,
    62:19, 62:20, 83:2,
    114:2 .
correctly 9:10 .
Correo 47:20 .
corresponding 85:18 .
corroborate 43:6, 52:5,
    53:5 .
corroborated 72:25 .
corroborates 91:19 .
Costco 75:11, 79:22, 95:7,
    107:8 .
Counsel 18:24, 53:17, 58:7,
    60:21, 68:16, 71:22, 71:23,
    78:15, 79:1, 104:14,
    112:11 .
Count 66:11, 86:19 .
counted 109:11 .
counting 86:24, 97:14 .
country 100:11 .
County 95:13, 95:16,
    103:20 .
couple 65:15, 98:11 .
course 35:12, 42:19, 52:2, 86:14,
    86:24, 110:18 .
Courtroom 1:23, 2:11, 20:24,
    55:22, 62:16, 63:17, 66:23,
    79:3, 79:5, 112:13 .
courtrooms 57:17 .

cousin 64:24, 71:5 .
cover 103:24, 108:22 .
covertly 109:4 .
credibility 71:24, 72:9, 72:10,
    77:8, 101:9, 102:13 .
credible 80:6, 80:9, 85:10 .
credit 65:4, 65:8, 65:12, 81:13,
    98:18 .
crime 71:25, 106:24 .
Criminal 1:9, 15:1, 15:3, 15:5,
    68:18, 72:23, 98:17, 98:19,
    98:21, 98:23 .
Crisostomo 76:16, 77:24,
    78:2 .
critical 98:16, 99:14,
    109:19 .
cross 105:13 .
cross-exam 17:19 .
CROSS-EXAMINATION 2:4,
    2:24, 3:1, 58:6, 71:23 .
CRR 1:47, 114:1 .
crystal 80:21 .
cuff 11:14 .
cuffed 12:2 .
cuffs 9:22, 10:5, 10:13,
    98:1 .
Culiacan 22:24 .
culpability 85:6 .
cup 55:18 .
currency 66:3, 66:4, 70:20,
    71:17, 74:3 .
custody 39:14, 39:18, 39:22,
    40:4, 40:5, 104:23 .
customers 51:8, 66:1 .
.
.
< D > .
D. 1:22 .
dangerous 109:25 .
Daniel 48:18 .
data 15:4, 73:16, 73:17, 73:19,
    73:22 .
date 13:6, 13:15, 13:20, 15:18,
    20:10 .
Dated 114:6 .
daughter 21:11, 31:4, 31:10,
    31:21, 32:16, 32:22, 92:3,
    92:4, 93:10, 97:25,
    104:15 .
day 3:10, 5:5, 22:14, 40:14, 61:6,

    63:9, 70:19, 76:17, 79:2,
    79:19, 103:2, 105:1, 113:19,
    114:6 .
day. 40:13 .
days 57:14, 65:15, 88:24,
    103:2 .
DEA 1:39, 3:21, 3:23, 3:25, 14:4,
    66:17 .
deal 93:21, 107:17 .
dealers 107:5 .
deals 93:16 .
December 33:23, 69:22, 73:7,
    102:5, 102:9, 102:20,
    102:23 .
decide 72:10, 84:14 .
decide. 39:12 .
decision 31:5, 59:25 .
deep 46:3 .
deeply 99:15 .
DEFENDANT 1:12, 1:33, 18:6,
    19:6, 20:6, 42:8, 52:3, 56:16,
    57:9, 57:21, 58:4, 58:8,
    58:14, 58:23, 58:25, 59:3,
    59:7, 59:16, 59:20, 59:23,
    60:12, 65:11, 65:14, 65:16,
    65:18, 65:20, 65:22, 65:24,
    66:7, 67:2, 67:10, 67:14,
    68:6, 68:9, 68:12, 68:13,
    68:19, 68:25, 73:18, 74:13,
    74:15, 74:16, 74:17, 74:18,
    74:21, 75:1, 75:3, 75:4, 75:6,
    75:10, 75:11, 75:21, 75:24,
    76:2, 76:8, 76:10, 76:17,
    77:3, 77:6, 77:14, 77:15,
    77:17, 77:20, 77:23, 78:1,
    78:6, 78:8, 78:11, 78:13,
    78:17, 78:18, 78:20, 79:8,
    79:10, 80:15, 80:19, 80:20,
    80:21, 80:23, 81:3, 81:4,
    81:9, 81:13, 81:14, 81:16,
    82:7, 84:5, 84:10, 84:15,
    84:16, 84:19, 84:20, 84:24,
    85:1, 85:2, 85:4, 85:11,
    85:19, 86:2, 86:11, 86:15,
    86:17, 86:19, 86:20, 86:21,
    86:22, 87:4, 87:6, 87:8,
    87:11, 87:13, 87:21, 87:22,
    87:23, 88:3, 101:14, 101:20,
    101:23, 102:7, 102:10,
    102:12, 102:24, 103:25,

104:12, 105:7, 105:10, 105:23, 106:8, 107:8, 107:19, 108:19, 108:23, 110:24, 115:15 .
**DEFENDANT'S** 115:26 .
**defendants** 31:24, 57:16 .
**Defense** 2:8, 23:21, 23:22, 23:24, 54:4, 57:13, 61:3, 61:19, 61:21, 62:23, 62:25, 63:6, 68:16, 71:21, 71:23, 76:1, 78:15, 88:7, 104:14 .
**define** 110:21 .
**deliberate** 62:11, 89:14, 111:11, 112:7 .
**deliberation** 69:6 .
**deliberations** 61:7, 61:9, 63:19, 66:21, 90:5 .
**deliver** 44:12, 66:5 .
**delivered** 69:24, 70:5, 70:18, 74:2, 86:12, 102:3, 109:12 .
**deliveries** 104:9 .
**delivering** 29:21, 85:21 .
**delivery** 101:17, 101:19, 102:21 .
**demeanor** 11:20, 23:17 .
**denied** 56:22, 57:11 .
**deny** 57:2 .
**depending** 54:22, 54:24 .
**Depot** 75:11, 75:15, 76:22, 79:24, 95:6, 107:8 .
**described** 68:20, 72:22, 87:17, 90:20, 106:19 .
**desk** 23:20, 25:10, 34:17, 35:2 .
**detail** 14:21 .
**detain** 4:20 .
**detained** 14:14 .
**Detective** 2:4, 2:9, 2:14, 2:24, 3:3, 4:15, 4:21, 12:6, 16:4, 16:19, 20:21, 21:22, 22:3, 23:8, 25:7, 26:17, 26:20, 27:8, 30:25, 32:19, 33:5, 39:7, 40:13, 49:15, 51:22, 53:11, 53:16, 77:22, 90:13, 91:4, 91:12, 92:8, 93:5, 96:19, 98:18, 105:5, 105:6 .
**detention** 10:13, 14:21 .
**determination** 19:9 .

**determine** 32:12, 105:21 .
**determined** 19:15 .
**determining** 69:3 .
**devastating** 105:12 .
**device** 25:2 .
**devices** 73:17 .
**did.** 38:1 .
**difference** 89:8, 96:7 .
**different** 8:13, 17:18, 17:21, 17:22, 18:3, 51:5, 67:24, 90:11, 99:2 .
**difficult** 89:10 .
**diligently** 110:16 .
**direct** 3:20, 16:25, 17:19 .
**direction** 70:10 .
**directly** 9:24, 60:24 .
**disagree** 35:25 .
**discounted** 103:25 .
**discovery** 110:12 .
**discuss** 23:17, 53:14, 54:7, 58:9, 60:18, 112:3 .
**discussed** 14:8, 58:12, 59:5, 60:3, 60:8, 80:23 .
**discussing** 94:25 .
**dismay** 110:13 .
**dismissed** 112:1, 112:6 .
**dispassionate** 110:22 .
**disposition** 93:19 .
**disputing** 83:21 .
**distance** 88:25 .
**distribute** 66:8, 67:10, 67:11, 67:15, 68:4, 68:5, 69:11, 69:14, 88:3 .
**distributed** 86:12, 86:13 .
**distribution** 85:18, 105:19 .
**distributors** 66:2 .
**District** 1:1, 1:2, 19:7, 20:8, 66:14, 111:1 .
**DIVISION** 1:3, 7:16 .
**document** 28:17 .
**documents** 16:16, 16:18, 83:7 .
**doing** 16:10, 18:16, 25:21, 26:21, 35:18, 43:4, 43:9, 43:17, 43:20, 44:4, 51:2, 52:4, 80:7, 80:10, 95:21, 95:25, 97:15, 99:1, 99:3, 101:21, 105:11 .
**dollar** 83:17, 98:3 .
**dollars** 63:14, 64:20, 70:24,

71:1, 85:15, 85:21, 87:7 .
**done** 12:10, 32:18, 63:9, 110:9, 110:11, 111:20, 112:14 .
**door** 10:25, 11:2, 69:5, 76:13, 78:8, 99:11, 108:7 .
**DOPAZO** 1:38, 5:19, 88:14, 113:12, 113:17 .
**double-check** 28:1 .
**doubt** 8:8, 56:17, 58:20, 58:22, 68:19, 68:22, 69:1, 69:2, 69:3, 69:14, 74:11, 74:20, 78:11, 80:25, 81:3, 84:11, 87:13, 87:20, 89:9, 89:15, 89:24, 100:9, 100:12 .
**doubts** 89:24, 89:25 .
**down** 4:8, 5:19, 8:7, 9:15, 10:13, 11:21, 28:20, 31:6, 43:15, 53:12, 86:9, 112:25 .
**downtown** 4:25, 5:9, 6:11, 90:21 .
**draw** 58:16, 81:1 .
**drive** 5:2, 6:11, 6:13, 6:16, 35:15, 95:11 .
**drive.** 35:15 .
**driven** 9:20, 69:21, 69:25, 97:25 .
**driver** 40:23, 45:6, 70:5, 70:10, 71:11, 75:16, 76:13, 76:19, 78:6, 85:6, 96:1, 103:14, 109:13, 110:6 .
**drivers** 41:17, 48:13, 110:4 .
**drives** 43:10 .
**driveway** 9:16 .
**driving** 94:17, 94:18, 97:16, 104:10 .
**drop-off** 76:24 .
**dropped** 102:5 .
**drove** 6:5, 66:1, 70:14, 70:21, 75:17, 75:24, 75:25, 76:1, 81:19, 82:11, 95:7, 97:21 .
**Drug** 3:8, 3:16, 33:15, 48:7, 64:16, 68:2, 71:8, 74:13, 75:12, 75:23, 79:24, 84:24, 87:4, 101:3, 105:4, 107:4, 107:5, 109:3, 109:10 .
**drugs** 33:19, 41:17, 48:13, 49:20, 59:18, 70:2, 70:11, 70:14, 70:18, 71:15, 73:25, 75:24, 80:24, 81:17, 85:8,

85:13, 85:24, 86:18, 95:18,
96:15, 101:17, 102:5, 107:24,
108:8, 108:18, 109:6, 109:8,
109:21 .
**dual** 3:25 .
**Duarte** 11:5, 12:6, 16:5, 24:7,
25:16, 26:6, 26:14, 26:18,
26:20, 28:23, 29:11, 31:12,
32:15, 32:19, 93:6,
105:5 .
**due** 57:18 .
**duffel** 41:15, 45:18, 71:11, 73:9,
74:2, 77:18, 80:4, 80:8, 86:8,
86:19, 95:18, 108:3,
108:5 .
**duffels** 69:24, 70:2, 70:3,
70:5 .
**During** 6:16, 6:20, 6:22, 6:25,
9:18, 18:14, 25:1, 27:20,
35:6, 46:18, 47:10, 48:16,
52:2, 54:22, 64:4, 66:20,
70:13, 71:22, 76:19, 79:1,
110:18 .
**duties** 3:25, 4:1 .
**duty** 8:18 .
.
.
**< E >** .
**earlier** 29:3, 30:13, 33:24, 36:4,
43:10, 45:11, 49:23, 98:21,
111:13 .
**early** 7:12, 64:11, 65:1, 73:21,
80:3, 81:24, 82:9, 82:18,
102:1 .
**earn** 44:6, 44:7 .
**easiest** 51:24 .
**easily** 102:11 .
**east** 70:25 .
**Eastern** 89:1 .
**easy** 89:10, 89:13, 100:5,
100:10 .
**eat** 50:23 .
**Eddie** 47:8, 48:14, 48:17, 48:22,
49:3, 49:8, 64:3, 64:17,
64:22, 64:24, 65:1, 65:5,
65:7, 65:10, 65:12, 65:14,
65:18, 71:5, 80:18, 81:10,
82:4, 82:5, 82:6, 87:4, 87:5,
94:19, 94:23, 97:5, 97:7,
97:9, 99:23, 99:25, 101:12,

105:19, 107:19 .
**Ediberto** 47:8 .
**education** 14:24, 95:15 .
**effort** 104:1 .
**efforts** 105:23, 110:19 .
**eight** 7:22, 7:24, 107:14 .
**Either** 11:14, 18:9, 19:3, 24:23,
25:7, 41:15, 46:11, 95:23,
97:3 .
**electrical** 69:19, 70:4, 71:18,
74:4, 79:25, 106:17 .
**element** 68:2, 68:5, 68:9, 68:20,
68:21, 74:12 .
**elements** 67:22, 68:2, 68:9,
87:16, 87:18, 100:4 .
**eleven** 21:13 .
**embed** 103:16 .
**embraces** 87:19 .
**encourage** 92:21 .
**end** 43:19, 48:19, 61:6, 76:17,
82:9 .
**ended** 16:7, 16:13, 60:23 .
**Enforcement** 3:8, 7:7, 8:9, 8:11,
8:14, 30:20, 33:17, 73:19,
74:6, 77:13, 81:9, 102:18,
103:11, 105:5 .
**engaging** 77:15 .
**English** 28:24, 36:6, 36:10,
36:12, 36:14, 36:20,
36:22 .
**enough** 57:2, 65:3, 65:8, 78:16,
78:17, 84:17, 89:6,
104:6 .
**enrolled** 79:20 .
**enter** 69:5, 98:19 .
**entered** 2:11, 12:11, 62:16,
75:1 .
**entering** 38:6 .
**enterprises** 72:23 .
**entire** 4:4, 12:1, 28:12, 79:24,
81:5, 81:7, 104:4 .
**entitled** 57:18, 110:25,
111:1 .
**equipment** 112:18, 112:25 .
**Ermer** 76:16, 77:19, 77:22, 98:8,
98:9 .
**Esquire** 1:28, 1:29, 1:35 .
**essentially** 3:23, 8:10, 15:22,
17:19, 21:2, 23:1, 58:13,
60:10, 97:23, 100:15 .

**establish** 57:7 .
**establishes** 100:25 .
**estimate** 7:10, 24:2, 113:7,
113:8 .
**estimates** 61:23 .
**evaluate** 72:6, 72:7, 72:9 .
**evaluating** 68:25 .
**evening** 80:3 .
**event** 109:20 .
**events** 106:12 .
**Everybody** 88:21, 106:24 .
**Everyone** 2:3, 5:13, 56:3 .
**Everything** 25:22, 34:3, 63:13,
80:22, 82:7, 92:8, 101:15,
104:12, 109:16, 110:9,
110:11, 111:22, 112:25 .
**evidence** 10:3, 10:17, 12:11,
18:16, 41:18, 42:5, 56:15,
57:7, 57:8, 60:22, 63:1,
66:19, 67:6, 69:8, 69:10,
72:25, 73:2, 73:4, 74:19,
78:19, 79:10, 79:14, 79:20,
80:13, 81:1, 81:25, 82:17,
82:21, 83:1, 83:4, 83:20,
83:24, 85:25, 87:17, 87:21,
88:2, 90:3, 91:19, 92:5,
92:22, 93:12, 93:25, 94:1,
95:7, 95:15, 97:3, 98:13,
98:14, 99:14, 99:18, 99:20,
100:24, 101:4, 101:5, 102:15,
103:24, 104:2, 104:11,
104:21, 106:20, 106:23,
107:22, 107:24, 109:24,
111:3 .
**exact** 36:21 .
**exactly** 16:10, 30:23, 85:11,
96:15, 102:20, 104:8,
106:20 .
**Examination** 51:20, 115:9 .
**example** 43:20, 44:5, 49:25,
78:25, 106:3 .
**examples** 37:10, 49:24 .
**except** 97:12, 97:15 .
**exception** 76:21 .
**exchange** 41:17, 75:24 .
**exchanged** 66:3, 70:2 .
**Excuse** 5:10, 54:9, 54:12,
62:9 .
**excused** 112:11 .
**executive** 64:2 .

**Exhibit** 28:12, 53:22, 53:24, 75:10, 81:7, 81:8, 83:8, 88:8, 88:20, 89:19, 89:21, 90:8, 92:19, 92:20, 106:5 .
**exhibit 10** 47:5, 94:22 .
**exhibit 16** 83:11 .
**exhibit 2** 85:25 .
**exhibit 4** 94:20 .
**exhibit 5** 94:5 .
**exhibit 8** 47:11 .
**exhibit 9** 47:21 .
**exhibits** 54:1, 56:1, 56:2, 83:6, 89:20 .
**existence** 74:11 .
**expect** 18:6, 52:10, 52:11, 67:1, 72:5, 74:21, 78:14, 84:15, 84:23, 109:6 .
**expense** 105:18 .
**experience** 18:2, 26:22, 32:8, 32:17, 33:12 .
**expire** 16:14 .
**explain** 12:22, 26:3, 54:20, 58:10, 60:22, 67:4, 67:5, 67:21, 68:1, 78:23 .
**explained** 13:24, 25:13 .
**exposure** 40:1 .
**expression** 26:4, 26:14, 26:15, 26:20 .
**extent** 74:22 .
**eyes** 85:9 .
.
.
**< F >.**
**F.2d** 56:19 .
**F.3d** 56:21, 56:23 .
**face** 26:4, 26:15, 26:16, 26:18, 39:12 .
**Facetime** 27:14, 27:17, 27:21, 27:22, 36:23, 43:5, 92:13 .
**Facetimed** 27:18, 29:1, 29:3, 29:4 .
**Facetiming** 28:24 .
**facilities** 55:19 .
**facility** 7:1 .
**facing** 31:25, 32:9, 32:13 .
**fact** 3:23, 22:4, 27:17, 39:14, 39:21, 77:4, 92:16, 103:23, 108:25 .
**facts** 4:7, 4:13, 17:23, 18:10,

18:15, 19:18, 22:6, 22:7, 23:9, 45:20, 46:10, 46:13, 46:25, 47:3, 47:19, 50:9, 51:10, 51:14, 52:5, 53:3, 56:16, 67:2, 67:5, 98:15, 101:22, 110:22 .
**factual** 57:8 .
**fair** 83:16 .
**Fairfield** 76:24 .
**fairly** 60:24, 110:21 .
**fall** 64:10 .
**familiar** 17:3, 17:18, 17:21 .
**family** 21:18, 93:11, 104:15, 105:1, 105:2 .
**far** 4:22, 4:23, 15:6, 15:20, 51:5, 68:15, 82:18, 98:11 .
**fashion** 16:9, 90:12, 91:9 .
**fast** 113:14 .
**faster** 111:9 .
**favorable** 29:15, 56:15 .
**fearful** 30:12 .
**Federal** 1:48, 4:1, 27:12, 30:4 .
**feedback** 24:24, 25:3, 25:10 .
**feel** 27:2, 34:17 .
**feelings** 27:2 .
**feels** 60:6 .
**feet** 6:15, 9:22, 11:15, 12:2, 24:1, 24:2, 24:3, 24:4, 24:12, 24:14, 98:11 .
**few** 21:19, 21:24, 35:6, 49:11, 54:10, 57:14, 67:4, 94:3, 112:4, 112:11 .
**fiber-optic** 106:2 .
**field** 11:18, 14:16, 40:6 .
**Fifth** 57:22 .
**fill** 108:3 .
**Finally** 72:24, 84:5, 87:3, 91:22 .
**find** 9:17, 31:25, 51:22, 51:25, 56:16, 57:9, 66:11, 67:3, 67:6, 67:7, 78:12, 86:2, 87:17, 88:2, 90:1, 100:4, 107:21, 108:11 .
**finders** 67:2 .
**finding** 99:14, 110:24 .
**findings** 41:19 .
**fine** 12:18, 20:16, 56:12, 59:17, 60:20, 100:23 .

**fingerprints** 71:15, 106:22 .
**finish** 10:9, 10:10, 17:2, 47:18, 61:25 .
**finished** 17:1, 63:9 .
**firearms** 6:1 .
**fired** 6:2 .
**firm** 112:19 .
**firms** 112:18 .
**First** 2:20, 2:21, 11:8, 48:10, 55:2, 56:2, 67:14, 67:20, 68:2, 68:12, 68:25, 69:12, 73:3, 74:17, 84:9, 84:24, 85:2, 88:9, 90:10, 94:13, 96:7, 101:6, 102:21 .
**fit** 71:18, 109:17 .
**fits** 95:14 .
**five** 28:20, 86:3, 86:5, 87:14 .
**fleeing** 25:24 .
**flew** 75:3, 79:11 .
**Floor** 1:49, 26:12, 78:3, 111:20, 112:17 .
**fly** 87:6, 105:13 .
**flying** 96:18 .
**folder** 24:24, 25:7, 25:8 .
**Follow** 11:10, 22:4, 22:14, 96:16 .
**follow-up** 36:3 .
**followed** 14:4, 91:5, 103:15, 107:16 .
**following** 6:23, 50:5 .
**follows** 31:4, 63:5 .
**Foodsaver** 71:16, 75:13, 79:23, 106:16 .
**Force** 3:25, 31:5, 76:15, 76:16, 77:19, 77:24, 78:2, 81:23 .
**foregoing** 114:2 .
**forensic** 106:23 .
**foreseeable** 84:25, 86:13, 86:15 .
**foreseen** 87:13 .
**form** 8:9, 13:5, 13:18, 13:24, 14:3, 14:5, 14:8, 17:2, 17:12, 30:14, 41:6, 42:2, 52:15, 67:12, 67:13, 84:9, 90:12, 91:9, 91:15, 93:2, 104:2 .
**formatted** 17:21 .
**forth** 4:16, 60:16, 70:12 .
**forthcoming** 72:16 .

forward 17:23 .
fought 11:18 .
found 25:22, 65:7, 65:8, 65:10,
    67:3, 82:10, 106:20 .
foundation 26:12 .
Four 16:21, 16:22, 24:2, 28:20,
    81:17, 88:23, 102:4 .
Fourth 56:18, 56:19, 56:21,
    56:24, 78:3, 102:9 .
free 19:17, 29:16, 29:17, 34:19,
    56:8 .
Freeway 5:1 .
friend 22:24 .
front 34:10, 49:17, 77:8,
    93:2 .
fruits 110:18 .
full 8:3, 86:9, 95:18, 108:5 .
furnished 71:5, 87:10 .
furnishings 87:11 .
.
.
< G > .
G. 1:28, 1:47, 114:1,
    114:12 .
gain 72:19, 77:10, 93:23, 97:1,
    97:14 .
garage 78:4 .
Garden 77:16 .
gardener 29:20 .
gardening 22:2, 22:5 .
gave 79:16 .
gear 8:5, 8:8, 90:15, 90:18 .
generally 84:18 .
generated 14:22 .
generic 110:5 .
gentleman 5:12, 26:2 .
gentlemen 55:15, 62:17, 65:10,
    66:12, 88:9, 100:24, 108:15,
    110:20, 111:8 .
gets 30:19, 33:17, 33:18 .
getting 37:16, 51:11, 92:1,
    93:17, 95:10, 97:2 .
girl. 31:4 .
give 18:7, 25:25, 27:10, 28:14,
    29:15, 29:16, 32:7, 40:14,
    40:15, 40:17, 40:19, 40:20,
    40:21, 40:23, 40:25, 42:19,
    44:7, 44:10, 54:25, 58:11,
    63:11, 63:17, 67:23, 110:23,
    111:14 .

Given 6:1, 14:16, 31:12, 45:19,
    61:24, 67:12, 71:18, 93:2,
    100:1, 104:3, 108:18 .
giving 25:15, 25:24, 26:11,
    54:25, 96:3 .
glad 56:9, 63:21 .
glean 81:8 .
gloves 71:14, 106:21 .
goal 17:15, 18:11, 18:14, 64:15,
    78:13 .
GOLDSTEIN 1:38, 5:14, 5:18,
    5:20, 88:14, 113:12,
    113:15 .
goodness 93:20 .
GOVERNMENT 2:5, 53:20,
    53:21, 54:3, 55:5, 55:23,
    56:7, 56:15, 57:7, 57:25,
    58:6, 58:19, 58:21, 61:1,
    61:21, 62:2, 62:18, 62:22,
    63:5, 63:7, 63:8, 63:15,
    68:16, 68:17, 73:1, 74:10,
    78:10, 82:20, 84:16, 84:23,
    85:24, 86:1, 87:19, 88:10,
    89:20, 89:23, 92:15, 92:17,
    93:8, 93:21, 96:12, 96:21,
    97:4, 97:8, 97:17, 98:22,
    98:24, 99:21, 100:3, 100:6,
    115:5, 115:13 .
GOVERNMENT'S 2:18,
    115:21, 115:31 .
GPS 73:16, 73:17, 73:19, 73:22,
    78:4, 103:22 .
grand 20:13 .
granted 5:19 .
grateful 5:20 .
great 108:22 .
Green 16:13, 16:17, 16:18 .
ground 26:12 .
Guadalajara 49:9 .
guess 7:24, 9:1, 110:3 .
guesstimate 29:8 .
guilt 57:8, 58:19, 58:22, 68:19,
    87:21 .
guilty 56:16, 57:9, 66:11, 67:3,
    67:4, 67:6, 67:8, 67:14, 69:1,
    77:8, 84:10, 88:3, 90:2,
    111:4 .
guilty. 100:4 .
guise 42:4, 97:14 .
guy 81:10, 90:16, 95:24, 96:10,

96:23 .
guys 7:14, 40:20, 106:23 .
gym 86:9 .
.
.
< H > .
Hagerstown 74:1 .
hand 2:17, 31:14, 31:15, 41:3,
    43:1, 86:1, 86:8 .
handcuff 6:18 .
handcuffed 6:6, 6:7, 6:13, 6:15,
    9:19, 9:20, 9:22, 11:6, 11:19,
    12:2, 34:13, 40:6, 90:24 .
handcuffs 9:22, 9:23 .
handed 41:13, 41:15, 41:20,
    46:15 .
handing 41:16 .
handling 85:12 .
hands 6:15, 6:16, 6:17, 6:18,
    11:11, 11:12, 11:14, 11:21,
    11:24, 34:5, 34:6, 34:7, 34:8,
    34:9, 34:11, 34:15, 34:20,
    34:24, 35:1, 90:23,
    102:2 .
happen 74:7, 79:22, 79:23, 80:1,
    80:2 .
happened 27:10, 75:22, 92:15,
    112:4 .
happening 29:19 .
happens 63:13 .
happy 105:24 .
hard 89:4, 89:7, 100:5, 110:16,
    110:18 .
he'll 67:1 .
hear 17:10, 17:19, 28:4, 35:18,
    56:9, 63:5, 63:21, 88:13,
    88:21, 92:6, 94:14 .
heard 17:7, 64:25, 67:23, 68:15,
    69:8, 71:2, 71:3, 71:21,
    73:16, 75:17, 76:1, 76:15,
    76:23, 77:13, 77:14, 77:16,
    77:18, 80:18, 85:3, 85:16,
    85:25, 86:8, 90:11, 91:18,
    91:20, 96:3, 97:19, 98:17,
    98:21, 99:10, 101:6,
    110:17 .
hearing 5:12 .
Hearsay 51:15 .
hearts 93:20 .
heat-sealed 70:4, 71:16,

71:19 .
**heavily** 90:7, 93:22 .
**heavy** 31:25, 108:5, 108:6 .
**held** 56:25, 91:6 .
**help** 26:2, 29:12, 37:5, 38:5, 42:25, 90:5, 92:17 .
**helped** 65:22, 65:23, 87:24 .
**helpful** 94:8 .
**helping** 29:13 .
**hereby** 114:1 .
**Herndon** 63:11, 111:14 .
**hid** 70:14 .
**hidden** 69:19, 70:6, 107:1 .
**hide** 14:11, 93:5 .
**hide.** 13:10, 14:10, 15:11, 93:4 .
**HIDTA** 3:7, 3:9, 7:9, 10:1 .
**High** 1:39, 3:7, 4:15, 22:8, 27:20, 27:24, 28:3, 28:10, 28:13, 29:3, 36:10, 36:12, 36:24, 36:25, 43:5, 43:8, 46:9, 46:12, 46:23, 46:25, 47:2, 52:2, 52:4, 52:7, 52:19, 53:1, 66:16, 92:13, 92:18, 109:25 .
**High.** 28:25 .
**Hilario** 48:19, 64:25, 65:1, 65:2, 65:3, 65:17, 71:3, 72:22, 80:18, 80:22, 81:2, 84:19, 85:16, 85:23, 86:18, 87:6, 87:8, 87:9, 87:10, 93:15, 94:3, 94:11, 94:12, 96:6, 97:12, 97:15, 99:8, 101:7, 101:11, 101:14, 101:19, 101:21, 102:21, 104:16, 105:9, 105:16, 106:19, 107:17, 108:3, 109:18 .
**Hilton** 77:16 .
**him.** 31:9 .
**hint** 71:22 .
**history** 11:17, 15:5 .
**hockey-size** 86:8 .
**hold** 78:8, 86:1 .
**holding** 10:19, 10:21, 10:22, 91:6, 91:7, 98:1, 99:11 .
**holds** 108:7 .
**Home** 75:11, 75:15, 76:22, 79:24, 95:6, 107:8, 112:2, 112:24 .
**honest** 110:19 .

**Honorable** 1:22, 61:13, 113:22 .
**hooked** 112:18 .
**hope** 72:3, 104:18 .
**hoped** 72:19 .
**Hopefully** 62:5 .
**hoping** 93:18 .
**hotel** 44:23, 46:10, 46:16, 73:16 .
**Hotels** 66:3, 69:25, 70:2, 73:14, 73:23, 76:1, 76:14, 77:15, 81:21, 108:18, 108:19, 108:20 .
**hour** 6:13, 9:21, 43:14, 90:21, 90:24, 92:24, 97:25 .
**hours** 5:4, 6:12, 62:3, 63:21, 103:2 .
**house** 6:5, 9:2, 9:10, 9:17 .
**Huero** 48:2, 64:9, 70:11, 99:25 .
**huge** 110:1 .
**human** 27:4, 30:22 .
**hundreds** 64:18 .
**hurt** 34:14 .
**Hyundai** 71:7, 73:10, 73:11, 73:13, 73:15, 73:20, 73:22, 74:2, 74:8, 75:7, 75:14, 75:16, 75:17, 76:3, 77:18, 77:21, 77:23, 77:25, 78:5, 87:9, 94:18, 95:7, 95:9, 95:11, 98:10, 103:1 .

.

< I > .
**idea** 25:15, 26:11, 96:15 .
**identified** 35:7, 35:9, 35:11, 96:5, 96:6 .
**identify** 13:20 .
**IKEA** 73:6, 77:20 .
**ill** 112:4 .
**illegal** 64:14 .
**immediately** 29:4, 62:10, 63:18, 111:16 .
**impeachment** 58:6 .
**important** 66:24, 107:23, 108:15, 111:18, 111:20 .
**imported** 69:16 .
**impossible** 22:14 .
**improper** 20:1 .
**in.** 2:5, 9:7, 86:14 .

**inadvertent** 83:3 .
**inclined** 61:7 .
**included** 36:16 .
**including** 35:5, 64:19 .
**incorrectly** 83:23 .
**incriminatory** 101:23, 105:12 .
**INDEX** 115:1 .
**indicate** 61:21 .
**indicated** 60:4, 63:2, 103:23 .
**indicates** 28:13 .
**indictment** 20:13, 66:11, 67:9 .
**individual** 47:7, 52:12, 76:5 .
**individuals** 64:12, 70:1, 70:11 .
**indulgence** 88:18 .
**infer** 76:8, 78:18, 78:23, 79:5, 79:21, 85:11, 98:13 .
**inference** 58:17, 77:4, 78:22, 78:23, 79:6, 80:17, 92:16, 95:18 .
**inferences** 77:5, 79:7, 81:1, 98:14 .
**influence** 59:18 .
**informant** 57:2 .
**information** 4:16, 13:5, 13:7, 15:22, 22:17, 42:5, 92:1, 92:2 .
**informative** 107:11 .
**Inn** 76:24, 77:17 .
**innocence** 58:23, 89:18, 100:2 .
**inquire** 19:17 .
**inquiry** 19:13, 19:20, 42:7 .
**inside** 25:8, 70:6, 86:20 .
**instruct** 67:1, 72:5, 74:22, 78:15, 84:15, 84:22, 111:16 .
**instructed** 59:2, 66:25, 112:3 .
**instruction** 54:18, 58:12, 58:13 .
**instructions** 51:9, 51:11, 54:25, 55:1, 63:18, 67:23, 103:15, 107:16, 112:2, 113:14 .
**instructs** 111:21 .
**insufficient** 57:7 .
**insulate** 106:25 .

**intelligence** 110:3 .
**intelligent** 59:25 .
**intend** 54:6, 54:15, 68:14, 74:17 .
**intended** 78:14, 78:21, 79:6 .
**Intensity** 3:7 .
**intent** 20:1, 67:11, 68:4, 78:24, 105:21 .
**intention** 53:2 .
**intercepting** 33:14 .
**interest** 104:18, 104:19, 104:24 .
**interested** 29:13 .
**interesting** 106:6 .
**interfere** 5:11 .
**international** 64:1 .
**interpret** 39:24 .
**interpretation** 26:18 .
**interpreted** 93:6 .
**INTERPRETER** 5:10, 5:16, 5:22 .
**Interpreters** 1:38, 5:11, 23:25 .
**interrogation** 13:1 .
**interview** 3:10, 3:11, 3:17, 4:5, 4:10, 4:17, 4:23, 9:24, 10:2, 10:22, 10:25, 11:3, 11:7, 11:10, 11:12, 11:15, 11:17, 11:22, 11:23, 12:4, 14:20, 15:20, 16:22, 17:16, 18:14, 20:21, 21:2, 23:14, 27:20, 27:23, 29:4, 29:7, 31:15, 32:22, 35:6, 42:8, 42:21, 45:12, 46:18, 47:10, 48:16, 51:12, 91:7, 91:8, 91:20, 92:7, 93:9, 97:23 .
**interviewed** 7:4 .
**interviewing** 17:4, 19:16, 19:21, 50:10 .
**interviews** 10:4, 11:16, 31:20, 32:19 .
**inventory** 10:3 .
**investigate** 4:1 .
**investigating** 3:15, 48:11 .
**investigation** 3:20, 6:1, 7:6, 8:12, 22:7, 35:12, 38:19, 39:1, 41:4, 41:10, 41:14, 41:19, 43:13, 44:17, 45:15, 47:15, 48:6, 51:7, 52:13, 92:10 .

**investigations** 26:21, 33:13 .
**investigative** 16:25, 24:24 .
**investigatory** 7:17 .
**invited** 22:22, 22:23, 65:14, 81:11 .
**involve** 33:13 .
**involved** 4:18, 7:7, 7:23, 8:9, 8:14, 8:21, 8:23, 8:24, 34:2, 48:6, 67:18, 75:12, 76:4, 84:13, 85:24, 86:3, 86:16, 87:14, 89:11, 90:12, 91:9, 92:10, 92:12, 96:24, 97:1, 97:11, 98:25, 99:15 .
**involvement** 72:22, 84:25 .
**involving** 3:16, 102:24 .
**issue** 19:4, 25:14 .
**issued** 19:7, 20:12, 20:13 .
**it.** 22:2 .
**item** 73:13 .
**items** 75:19 .
**itself** 8:25, 68:11, 80:11 .
**IV** 1:12 .
**IZANT** 1:29, 20:12, 55:25, 61:11, 62:4, 62:19, 62:20, 63:21, 63:23, 66:12, 83:6, 83:9, 83:12, 83:20, 84:3, 84:4, 88:6, 99:10, 100:14, 113:1, 113:20, 115:23 .

**.**
**.**
**< J >.**
**J.** 1:29, 1:35 .
**jail** 39:25, 40:7, 104:25 .
**James** 1:28, 66:15 .
**January** 82:4 .
**Jeff** 66:12 .
**Jeffrey** 1:29 .
**Jersey** 64:7 .
**Jesus** 1:10, 15:13, 15:14, 65:11, 67:3, 91:14, 98:9, 98:23, 99:5, 100:1, 100:25, 103:15, 105:3, 109:19, 110:25 .
**job** 22:9, 26:20, 29:19, 79:19, 87:12, 89:4, 102:2, 103:17, 103:19, 113:11 .
**join** 66:9, 88:10 .
**joined** 68:6, 68:10, 74:14, 80:16, 87:22, 87:24 .
**Jr** 1:35 .
**Judge** 66:25, 67:23, 67:25, 72:5,

74:21, 77:9, 78:14, 82:12, 84:15, 84:22, 110:23, 111:21 .
**judgment** 56:6, 57:5, 57:10 .
**judicial** 19:10, 19:15 .
**juncture** 109:20 .
**juries** 63:12 .
**juror** 112:3, 112:4 .
**Jurors** 112:1, 112:6 .
**Jury** 2:5, 2:11, 20:13, 54:9, 54:10, 54:13, 54:17, 54:20, 54:22, 55:2, 55:18, 55:22, 56:7, 57:9, 58:16, 58:18, 59:1, 60:23, 61:6, 61:8, 61:20, 62:8, 62:10, 62:14, 62:16, 81:6, 89:5, 90:6, 98:16, 112:13 .
**JURY TRIAL** 1:21 .
**Justice** 110:21, 110:24, 111:1 .

**.**
**.**
**< K >.**
**keep** 10:16, 11:19, 25:7, 34:9, 34:11, 42:9, 72:8, 72:9, 100:12, 110:11 .
**keeping** 53:25 .
**kept** 9:11, 11:2, 11:3, 94:13 .
**Kerrigan** 12:14, 16:2, 28:21, 33:2, 66:16, 94:6, 94:7 .
**kilo** 109:16 .
**kilogram** 85:17, 85:25, 108:2 .
**kilogram-sized** 69:18 .
**kilograms** 64:18, 66:8, 67:11, 70:16, 70:25, 71:10, 85:14, 85:18, 85:20, 85:22, 86:5, 86:16, 86:20, 86:25, 88:4, 108:12, 108:13 .
**kilos** 97:18, 108:6 .
**kilos.** 109:17 .
**kind** 11:17, 47:1, 93:9 .
**kinds** 112:18 .
**knees** 34:16 .
**know.** 95:23 .
**knowing** 59:25 .
**knowingly** 68:6, 68:9, 74:13, 74:23, 87:22, 103:15 .
**knowledge** 7:6, 8:17, 14:12, 14:14, 14:15, 15:8, 41:3,

41:9, 41:12, 41:14, 41:18,
43:12, 45:15, 48:5, 48:6,
50:7, 51:12, 92:9, 99:16,
99:17, 99:20 .
**knowledgeable** 52:12 .
**known** 64:9 .
**knows** 97:18, 106:24 .
.

**< L >.**
**LA** 6:11, 35:7, 74:9, 75:3, 82:11,
90:21 .
**Ladies** 55:15, 62:17, 65:10,
66:12, 88:9, 100:24, 108:15,
110:20, 111:8 .
**LAPD** 6:17, 8:3, 24:13 .
**large** 73:8, 73:13, 77:18 .
**last** 2:20, 2:21, 13:6, 13:19,
15:16, 20:14, 30:24, 48:10,
100:15, 111:17 .
**late** 21:1, 65:1, 73:21, 75:2,
77:19, 81:24, 101:25 .
**Later** 14:20, 29:6, 29:9, 63:3,
63:9, 65:15, 79:17, 107:14,
107:15 .
**latex** 71:14, 106:21 .
**Law** 7:7, 8:9, 8:11, 8:13, 12:25,
30:20, 33:17, 57:6, 57:16,
57:19, 63:18, 73:19, 74:6,
77:13, 81:9, 100:11, 102:17,
103:11, 105:5, 110:23,
110:24, 111:3, 111:16,
111:21, 112:18 .
**laws** 4:2 .
**lawyer** 6:19, 6:22, 6:24, 7:2,
59:6, 90:25, 91:11, 91:24,
92:25 .
**lawyer.** 104:5 .
**lawyers** 58:12, 92:15, 92:17,
111:22 .
**lay** 85:9 .
**laying** 26:12 .
**leader** 49:9 .
**leaders** 33:16 .
**leading** 35:23 .
**learn** 64:16 .
**learned** 18:2, 64:2, 64:3, 64:4,
64:7, 64:10, 64:14, 64:21,
64:23, 65:20, 70:8, 70:9 .
**lease** 79:12, 82:6, 82:9, 82:17,

82:22, 83:5, 83:22, 103:12,
105:15, 105:24, 105:25 .
**least** 6:13, 7:19, 7:22, 33:1, 35:9,
65:23, 85:20, 86:3, 86:6,
90:14, 90:17, 91:9,
108:5 .
**leave** 40:15, 71:15, 79:4,
100:16 .
**leaving** 6:4 .
**left** 33:8, 55:22, 79:2, 82:1,
101:25, 106:23, 112:13 .
**left.** 22:25, 33:4 .
**legal** 65:9 .
**legitimate** 103:16 .
**length** 23:19, 54:23, 54:24, 60:4,
85:4 .
**lengthy** 81:5, 92:10, 92:19 .
**leniency** 72:3, 72:17, 72:18,
104:19 .
**less** 98:2, 111:2 .
**level** 48:22, 49:3, 49:5 .
**liberty** 29:14 .
**license** 75:6, 103:14 .
**lie** 101:22, 102:10, 104:19 .
**life** 40:2, 109:9 .
**light** 56:15, 74:19 .
**likely** 89:8, 100:7 .
**line** 36:5, 42:7 .
**list** 53:22, 53:24 .
**listed** 27:24, 56:2 .
**listen** 24:22, 55:16 .
**little** 10:4, 10:15, 11:25, 23:20,
29:9, 33:24, 34:12, 34:18,
62:3, 90:3, 93:13, 109:11,
111:9 .
**live** 13:7, 21:14, 87:11 .
**lived** 75:19, 76:11, 79:13,
81:16 .
**lives** 22:24, 66:22, 66:23,
105:1 .
**living** 42:24, 80:9, 86:22,
105:17 .
**load** 33:17, 44:5, 85:14, 86:4,
108:4 .
**loaded** 69:24 .
**loads** 81:17, 85:13, 85:19, 85:21,
86:4 .
**located** 7:11 .
**lock** 39:10, 39:17, 39:21 .
**locked** 11:1 .

**locker** 10:16 .
**Lombard** 1:49 .
**long** 3:5, 3:15, 32:10, 39:25,
48:3, 88:23, 88:25 .
**Look** 10:15, 25:19, 26:19, 30:25,
31:2, 42:19, 50:5, 74:25,
75:2, 75:4, 75:5, 75:8, 81:6,
83:15, 85:24, 87:1, 93:11,
97:20, 101:9, 104:4, 104:11,
105:20, 105:22, 105:25,
106:4, 106:23, 107:23,
109:4 .
**looked** 71:11 .
**looking** 4:11, 10:16, 97:19,
97:20, 102:13, 104:16,
104:17, 105:21, 109:24 .
**looks** 86:1, 96:14 .
**Lopez** 47:8, 48:4, 48:14, 48:17,
48:22, 49:4, 49:8, 49:10,
64:3, 71:5, 80:19, 81:10,
87:4, 94:19, 94:23, 97:5,
97:7, 97:9, 99:23, 99:25,
101:3, 101:11, 101:12,
101:15, 101:20, 104:17,
105:19, 107:17, 107:19 .
**Los** 4:25, 64:8, 64:11, 66:6, 70:7,
70:12, 70:14, 70:21, 79:11,
90:18, 90:19 .
**lose** 33:16, 77:10, 93:23,
93:24 .
**lost** 16:3, 16:4, 16:17, 33:3, 33:7,
33:8, 76:5 .
**lot** 5:8, 26:22, 31:19, 31:24,
33:13, 35:11, 46:25, 48:20,
81:3, 89:1, 90:22, 95:25,
99:16, 105:25 .
**Lots** 92:9, 93:1, 95:17, 99:13,
108:21 .
**louder** 108:16, 108:23,
109:22 .
**love** 20:24 .
**lower** 93:18 .
**lucrative** 63:25, 108:13 .
**lunch** 62:12, 63:12, 63:15,
63:16, 81:11, 111:15,
112:8 .
**lying** 18:9, 27:15, 77:10,
104:20 .
.
.

**< M >.**
**machine** 75:13 .
**machines** 71:16, 79:23 .
**Madam** 62:11 .
**maintains** 89:18 .
**major** 33:15 .
**man** 19:21, 20:2, 92:24, 92:25, 96:6, 99:22, 99:23, 101:25 .
**managing** 80:24 .
**Mani** 62:14 .
**Manjarrez** 48:4 .
**Manuel** 48:4 .
**March** 3:8 .
**Marcos** 47:20 .
**mark** 30:3, 30:8, 33:25, 34:19, 34:24, 37:3, 42:16, 43:15, 45:23, 50:14 .
**market** 108:20 .
**MARONICK** 1:35, 2:8, 2:24, 2:25, 3:2, 5:24, 5:25, 10:18, 12:14, 16:1, 16:12, 17:14, 18:22, 19:2, 19:5, 19:11, 19:23, 20:5, 20:17, 20:20, 20:22, 28:21, 30:16, 32:11, 32:25, 34:23, 37:22, 38:22, 39:5, 41:8, 41:25, 42:9, 42:11, 42:13, 43:24, 44:3, 47:5, 47:11, 47:21, 48:25, 49:12, 51:17, 52:15, 52:22, 53:9, 53:10, 54:6, 54:7, 54:11, 55:4, 55:7, 55:11, 56:4, 56:10, 59:8, 59:12, 59:24, 60:2, 60:7, 60:15, 60:17, 61:4, 61:12, 61:17, 61:19, 62:24, 82:12, 82:17, 82:23, 83:2, 83:17, 83:21, 83:25, 88:7, 88:8, 88:15, 88:17, 88:20, 88:23, 91:18, 94:22, 100:19, 112:16, 113:21, 115:28 .
**Marsh** 71:6 .
**Marta** 1:38 .
**Maryland** 1:2, 1:16, 1:50, 25:18, 64:7, 64:12, 64:19, 64:23, 64:24, 65:5, 65:22, 66:14, 69:20, 69:21, 69:23, 70:12, 71:7, 73:4, 75:6, 79:11, 79:18, 89:2, 102:4, 107:20, 110:16 .

**masking** 110:10 .
**matter** 19:19, 20:1, 57:6, 63:3, 66:18, 85:9, 114:4 .
**Matthew** 66:15 .
**Mcneely** 110:10 .
**me.** 11:10 .
**mean** 17:25, 23:24, 26:25, 49:5, 82:21, 83:18 .
**meaning** 57:24 .
**means** 23:7, 38:12, 68:19, 90:15 .
**Meanwhile** 99:5 .
**Mechanic** 94:12, 94:13, 94:14, 96:5, 96:7, 96:9, 110:5, 110:7, 110:8 .
**mechanic.** 94:13, 96:4 .
**mechanical** 1:42 .
**medication** 59:18, 59:21 .
**meet** 77:21, 96:4, 96:9, 103:7, 110:5 .
**meeting** 73:11, 80:8, 103:5 .
**meetings** 99:4 .
**member** 68:10 .
**members** 8:13, 75:23 .
**men** 64:9, 109:5 .
**mentioned** 28:2, 29:3, 30:3, 45:11, 48:9, 50:6, 67:9, 68:16, 69:11, 78:15, 84:8, 86:11, 96:16, 104:14 .
**mentioning** 31:10, 31:13, 68:22 .
**mentions** 27:25 .
**menus** 63:11, 111:14 .
**merchandise** 33:3, 33:8, 34:2, 40:20, 44:10 .
**met** 66:2, 70:1, 70:17, 81:11, 82:4 .
**methodology** 106:19, 107:15 .
**Mexico** 15:9, 21:15, 31:8, 33:16, 48:7, 51:10, 64:4, 69:17, 98:3, 98:5, 105:13, 106:3, 107:5 .
**Meza** 15:16, 15:17, 28:23, 38:16, 106:7 .
**Mic** 88:15, 100:22 .
**microphone** 88:12 .
**Middle** 15:14, 16:3, 16:4, 80:9, 105:3, 106:8 .
**midnight** 109:1 .

**military** 8:9 .
**million** 70:24, 71:1, 74:3, 74:6, 85:15, 85:21, 87:1, 108:11, 108:12 .
**millions** 64:19 .
**mind** 11:18, 18:18, 31:16, 32:20, 35:10, 60:8, 72:8, 72:9, 100:13 .
**mine** 88:21 .
**MINI** 46:15, 46:17 .
**minimize** 42:22, 72:20, 85:5, 104:12 .
**minimizing** 42:23, 43:3, 43:4 .
**minute** 5:14, 18:24, 21:23, 22:14, 50:14, 53:18, 95:2, 105:17 .
**minutes** 5:3, 15:20, 16:21, 16:22, 21:20, 21:24, 23:2, 23:14, 29:7, 54:10, 55:20, 67:4, 91:21, 111:17 .
**Miranda** 48:19, 48:22, 49:3, 51:1, 51:2, 51:13, 64:13, 74:5, 76:23, 99:5, 107:7, 107:14 .
**Mirandized** 91:24 .
**misspoke** 83:12 .
**mistake** 80:12 .
**Mitchell** 1:47, 114:1, 114:12 .
**mitigated** 85:6 .
**mixture** 8:2 .
**moment** 5:11, 14:1, 100:21 .
**Money** 33:3, 33:8, 34:3, 40:21, 40:23, 41:3, 41:13, 41:16, 41:20, 42:25, 44:5, 44:12, 44:14, 44:16, 70:2, 70:3, 70:12, 70:22, 71:15, 73:24, 73:25, 75:24, 80:24, 81:21, 82:8, 82:19, 82:23, 84:7, 85:8, 85:13, 85:15, 86:18, 96:16, 96:17, 96:23, 96:24, 97:12, 97:15, 97:21, 98:3, 98:4, 98:20, 101:17, 102:5, 104:9, 105:8, 105:18, 105:25, 106:5, 106:10, 107:2, 107:3, 107:10, 107:12, 108:1, 108:8, 109:10, 109:21 .
**money.** 38:10 .
**moniker** 47:17 .

month 69:21, 70:13, 106:1 .
month. 96:19, 105:13 .
months 79:13, 79:17, 86:24, 87:12, 105:9 .
morning 2:3, 2:9, 2:10, 2:12, 2:16, 3:3, 3:4, 5:6, 6:12, 7:12, 55:1, 62:8, 62:10, 62:11, 63:10, 63:24, 73:21, 80:3, 81:24, 90:19, 91:21, 109:1 .
moro 31:7 .
motion 55:10, 56:4, 56:5, 56:8, 56:9, 56:10, 56:13, 56:14, 57:2, 57:5, 57:10 .
motivations 72:16 .
motive 97:1, 98:19, 105:7, 105:8 .
Move 20:17, 21:18, 24:15, 32:24, 35:3, 39:4, 44:22, 45:22, 51:15, 82:6, 106:14 .
moved 24:23, 25:1, 25:2, 25:7 .
movement 25:9 .
moves 25:10 .
moving 23:1, 25:6 .
moving. 42:9 .
mule 44:9 .
multiple 101:5 .
MVA 75:5 .
myself 4:20, 29:12 .
. 
. 
< N > .
name 2:20, 2:21, 13:6, 13:19, 15:12, 15:14, 15:16, 21:16, 47:20, 48:3, 64:2, 64:25, 66:12, 75:7, 81:10, 105:15, 105:16, 106:8, 106:10, 110:8 .
named 64:13, 98:6 .
narcotics 59:19, 64:15, 66:10 .
nature 109:24 .
near 43:19 .
nearly 97:3 .
necessarily 32:3, 49:20, 110:2 .
necessary 110:1 .
neck 31:3 .

need 28:16, 49:20, 54:4, 67:5, 85:9, 87:16, 106:16, 106:17, 110:7 .
needed 71:14, 81:13, 112:5 .
neither 100:11 .
nervous 26:24, 26:25, 27:2, 30:21, 30:22 .
network 105:19 .
never. 33:23 .
nevertheless 6:6 .
New 16:18, 64:6 .
next 13:18, 14:2, 15:10, 16:14, 25:16, 29:23, 36:5, 63:21, 67:4, 77:24, 78:12, 78:13 .
nice 112:20, 112:22, 113:11, 113:18 .
night 73:21, 80:9, 81:25 .
Nine 7:10, 21:20, 21:23, 29:6 .
Nissan 71:8 .
No. 1:9, 11:16, 15:8, 22:6, 24:1, 29:3, 33:6, 33:9, 44:13, 44:16, 46:24, 49:8, 51:24, 97:24, 100:5 .
Nobody 31:3, 91:11 .
noise 55:16 .
noon 112:7 .
normal 9:25, 17:2, 23:7, 27:1, 27:2, 27:4, 30:21, 42:21, 42:22, 80:7 .
normally 10:12, 23:9, 34:9, 59:21 .
NORTHERN 1:3 .
nos. 49:24 .
not. 94:5 .
noted 28:6, 28:8 .
notes 53:25 .
nothing 13:10, 14:10, 14:11, 15:11, 29:20, 90:25, 93:4, 93:5, 93:24, 95:4, 110:25, 111:2 .
notice 113:5 .
Nottingham 73:12 .
November 77:22, 102:8 .
nowadays 106:24 .
number 35:4, 83:8 .
. 
. 
< O > .

Object 17:12 .
Objection 16:8, 16:11, 18:20, 19:3, 30:14, 34:21, 37:20, 38:20, 41:6, 41:21, 42:2, 48:23, 51:15, 52:15, 52:22, 52:24, 82:13, 82:16, 82:25, 83:14, 84:2, 91:15 .
objective 19:4 .
observation 77:7 .
obtain 17:17, 72:3 .
obtained 92:24, 95:8, 95:9, 108:18 .
Obviously 4:15, 22:13, 23:16, 50:6, 56:11, 59:9, 90:6, 93:25, 103:19, 112:15, 113:1 .
occasion 76:3, 86:22, 102:7, 102:8, 102:9, 103:7, 103:20 .
occurred 46:10, 46:25 .
occurrence 76:6 .
October 102:1, 102:8 .
offered 6:22 .
Office 7:5, 66:14 .
Officer 3:5, 3:25, 11:20, 19:3, 19:10, 19:14, 20:3, 30:20, 76:15, 76:16, 77:19, 77:24, 78:2, 81:23, 82:3, 82:11, 84:5, 84:20 .
officers 6:17, 7:11, 7:22, 7:25, 8:1, 8:3, 8:4, 8:16, 8:21, 8:23, 9:2, 11:3, 77:13, 90:17, 91:8, 92:1, 98:4, 102:18, 105:5 .
Official 1:48, 19:15, 114:13 .
Ohio 64:6 .
old 21:12, 112:19 .
on. 104:7 .
Once 9:14, 69:21, 70:12, 100:13, 103:24, 104:5, 104:6 .
One 7:12, 10:13, 11:23, 13:1, 15:6, 20:24, 28:20, 39:12, 40:25, 43:14, 45:8, 46:1, 46:9, 50:14, 51:24, 53:4, 67:20, 69:12, 71:2, 72:11, 76:12, 76:21, 77:7, 79:4, 83:11, 84:9, 89:25, 90:16, 96:11, 97:19, 98:3, 98:22, 100:9, 100:21, 101:8, 101:19, 102:13, 102:15, 102:22,

103:2, 103:19, 103:20,
104:10, 105:20, 106:3,
107:21, 108:4, 108:9, 109:23,
110:1, 111:24, 113:3 .
**one-year** 79:12 .
**one.** 41:1 .
**ones** 46:24, 75:9 .
**ongoing** 47:19 .
**open** 11:2, 11:3, 78:8 .
**opened** 49:17, 49:20 .
**opening** 68:17, 71:22, 89:4 .
**operate** 65:23, 112:17 .
**operated** 71:13 .
**operating** 73:4, 77:23, 87:4,
101:1, 101:2 .
**operation** 97:8, 101:3,
102:1 .
**operations** 64:4, 64:5, 64:6,
64:8, 64:9, 64:23, 64:24,
65:5 .
**opinion** 56:20, 56:21, 56:24 .
**opportunity** 27:9, 32:9, 58:9,
59:4, 60:9 .
**opposite** 24:5 .
**option** 90:1 .
**options** 60:18 .
**order** 62:12, 98:3 .
**orders** 63:16, 82:9, 82:19 .
**organization** 49:5, 49:6, 49:10,
64:16, 64:17, 87:5 .
**organized** 64:2 .
**originally** 6:3 .
**Oscar** 48:19, 48:22, 49:3, 51:1,
51:2, 51:13, 64:13, 74:5,
76:23, 99:5, 107:7,
107:14 .
**outside** 9:15, 66:22 .
**outstanding** 20:7 .
**OV** 31:4, 38:8, 38:11 .
**overall** 67:22, 68:2 .
**overcome** 69:7 .
**overcomes** 69:9 .
**Overlap** 38:12, 38:14 .
**overnight** 88:25 .
**Overruled** 30:15, 38:21, 48:24,
52:16, 83:15, 83:24, 84:2,
91:17 .
**oversee** 106:13 .
**overwhelming** 87:20 .
**own** 20:3, 34:11, 49:9, 72:21,

104:24 .
**owner** 76:10 .
.
.
**< P >.**
**p.m.** 112:13, 113:24 .
**package** 109:13 .
**packaged** 66:4, 69:18, 70:3,
70:20, 107:3, 109:12 .
**packages** 38:10, 44:10,
87:1 .
**packaging** 86:25, 97:12 .
**Page** 12:15, 14:6, 16:1, 16:3,
16:4, 20:22, 20:25, 21:5,
21:19, 24:15, 25:17, 27:6,
28:11, 28:18, 28:22, 29:2,
29:10, 29:23, 30:2, 30:3,
30:23, 32:25, 33:1, 33:24,
35:4, 37:2, 38:4, 40:12,
42:13, 43:14, 43:15, 43:19,
43:23, 43:25, 44:22, 45:22,
49:12, 50:14, 50:17, 92:19,
115:5 .
**pages** 29:6 .
**paid** 71:8, 71:9, 82:8, 82:23,
96:17, 96:19, 101:15,
105:18 .
**pairs** 98:11 .
**paper** 106:11 .
**paralegal** 66:15 .
**park** 78:6 .
**parked** 77:24 .
**parking** 46:25, 78:4,
108:21 .
**parlance** 110:3 .
**part** 3:20, 27:22, 33:12, 34:2,
43:13, 51:8, 59:25, 89:7,
89:12, 89:19, 96:25, 100:5,
104:8 .
**part-time** 103:17 .
**participants** 70:8, 71:3 .
**participate** 66:9, 68:13,
74:16 .
**participated** 4:14, 71:25, 74:21,
74:24, 78:11, 86:14,
96:13 .
**participating** 97:5 .
**participation** 42:20, 42:22,
74:18, 74:22, 99:18, 99:19,
102:11 .

**particular** 52:13, 67:17,
85:8 .
**particularly** 110:8 .
**partner** 11:5, 11:6, 12:5, 25:13,
87:9 .
**parts** 28:2, 74:15, 89:2 .
**passenger** 9:7, 46:1, 76:13,
76:20, 78:7 .
**passengers** 46:1, 46:2 .
**passport** 21:1 .
**Patricia** 1:47, 114:1,
114:12 .
**pattern** 37:10, 103:3 .
**Pause.** 5:15 .
**pay** 43:16, 43:20, 44:4,
63:13 .
**pays** 63:15 .
**pedigree** 13:15 .
**Pedro** 64:13, 65:25, 66:5, 70:9,
70:23, 71:11, 72:21, 73:6,
73:11, 73:13, 73:18, 73:25,
77:5, 77:7, 77:12, 77:21,
77:24, 77:25, 80:1, 85:14,
85:15, 85:23, 93:15, 94:4,
94:5, 94:10, 94:12, 94:16,
94:19, 94:22, 101:7, 102:3,
104:17 .
**people** 7:19, 8:7, 17:22, 17:25,
18:4, 33:20, 34:14, 35:5,
40:17, 42:21, 43:1, 51:5,
51:8, 70:18, 75:11, 75:22,
81:21, 92:11, 93:14, 96:5,
98:25, 108:17, 108:21, 110:3,
111:1 .
**perfectly** 26:3, 29:18 .
**Perhaps** 27:25, 80:11 .
**period** 20:8, 66:24, 70:13, 76:19,
92:10 .
**permission** 34:17 .
**person** 52:8, 57:23, 104:15,
104:23, 110:2, 110:3 .
**personal** 13:7, 13:15, 17:17,
48:6, 84:24 .
**personally** 32:13, 41:20, 41:22,
44:15, 44:16, 86:12 .
**personnel** 103:11 .
**phone** 7:13, 27:13, 30:5, 46:12,
46:14, 73:19, 110:7 .
**photo** 46:5, 46:7, 99:12 .
**photograph** 76:6 .

**photographs** 73:5, 73:10, 73:12, 75:8, 75:13, 75:15, 75:18, 77:1, 103:11 .
**photos** 45:18, 87:1 .
**phrase** 36:21, 50:1, 50:3 .
**physical** 73:4, 78:19, 81:1, 81:25, 103:10, 107:11 .
**pick** 38:15, 111:15 .
**pick-up** 9:7 .
**picked** 24:24, 36:19, 70:3, 70:13, 71:10, 85:12, 97:21, 102:5, 102:6, 108:4 .
**picking** 85:20 .
**picks** 97:22 .
**picture** 46:17, 47:9, 47:12, 47:22, 48:14, 48:18, 94:4, 94:19, 94:23, 104:11 .
**pictures** 35:6, 48:10, 48:16, 48:20, 48:21, 95:17 .
**piece** 104:2, 106:10 .
**place** 4:22, 20:15, 104:10, 112:22 .
**placed** 93:2 .
**plain** 8:4 .
**Plaintiff** 1:7, 1:26 .
**plan** 61:22 .
**plane** 96:18 .
**plastic** 69:19, 70:4, 71:16, 71:19, 74:4, 74:7, 75:15 .
**play** 23:16, 89:15 .
**played** 55:2 .
**plays** 61:9 .
**pleaded** 77:8 .
**Please** 2:16, 2:19, 11:11, 16:2, 18:25, 32:25, 39:5, 39:9, 40:9, 41:24, 42:13, 47:5, 47:11, 47:18, 47:21, 49:12, 53:18, 57:13, 62:14, 94:20 .
**plenty** 57:15, 111:10 .
**plus** 7:15, 24:2 .
**pockets** 11:11, 11:12, 11:22, 34:7, 34:8, 34:10, 34:11, 34:16, 107:4 .
**point** 11:23, 13:13, 13:23, 14:12, 15:22, 18:19, 22:16, 23:1, 25:4, 26:7, 26:24, 29:11, 30:9, 31:11, 35:21, 37:7, 37:10, 40:6, 43:3, 54:21, 56:11, 59:19, 60:25, 61:3,

62:2, 68:23, 82:4, 92:6 .
**pointed** 6:2 .
**points** 53:8 .
**Police** 3:5, 6:8, 7:6, 8:6, 9:21, 20:2, 90:12, 90:23, 91:3, 97:19, 104:8, 104:15, 108:11, 110:12 .
**policy** 6:17, 24:13 .
**position** 30:19, 31:25, 32:12, 34:20, 34:25, 59:10, 66:18 .
**possess** 67:10, 68:4 .
**possessed** 86:14 .
**possible** 22:11, 22:13, 65:18, 65:21, 97:1, 98:19, 104:25, 108:10 .
**potentially** 93:18 .
**pounds** 108:3, 108:6 .
**practically** 24:19 .
**practice** 103:4 .
**precautions** 110:1 .
**preferred** 106:13 .
**prejudicial** 83:4 .
**prepared** 92:5, 92:14 .
**Present** 1:38, 12:25, 76:8, 89:19, 89:21, 96:21, 96:22, 109:19 .
**presentation** 57:12, 63:1 .
**presented** 37:15, 54:15, 60:22, 66:19, 67:7, 82:17, 82:20, 82:22, 110:23 .
**presiding** 101:2 .
**pressured** 99:23 .
**presumption** 89:18, 100:2 .
**pretty** 4:7, 25:8 .
**prevention** 106:22 .
**previously** 50:8 .
**primary** 8:18 .
**Primo** 47:17, 64:9, 70:11, 99:25 .
**prior** 37:15, 71:8 .
**prison** 32:10, 40:1 .
**privilege** 57:25, 66:17 .
**probable** 19:10, 19:16 .
**probably** 5:1, 7:9, 20:24, 36:4, 36:8, 89:12, 91:13 .
**problem** 25:23, 64:22, 64:23, 65:3, 65:7 .
**problems** 101:13 .
**procedure** 10:4, 10:12, 27:1,

34:9 .
**procedures** 10:1, 91:5 .
**proceed** 2:4, 2:14, 2:23, 60:23, 61:8, 63:2, 113:13 .
**proceeded** 11:22 .
**proceeding** 16:9 .
**Proceedings** 1:20, 1:42, 113:24, 114:3 .
**proceeds** 71:1, 71:8 .
**process** 16:17, 54:20, 57:18, 88:23, 89:5, 89:17, 91:4, 91:9, 94:8, 111:18, 112:7, 112:8 .
**processing** 101:17 .
**produced** 1:43 .
**professionals** 109:5 .
**profit** 64:15 .
**profits** 109:25 .
**promises** 29:12 .
**promptly** 63:11 .
**proof** 87:19, 108:1 .
**prosecution** 68:18 .
**prosecutor** 26:1, 27:12, 27:17, 29:16, 29:25, 30:4, 39:12, 42:17, 42:18 .
**prove** 58:19, 58:22, 58:23, 68:18, 84:23, 89:23 .
**proved** 68:21, 69:1, 74:10, 78:10 .
**proven** 100:6 .
**provide** 13:20 .
**provided** 6:19, 14:15, 87:17, 98:2 .
**provides** 57:23 .
**providing** 46:13, 47:2, 48:12, 52:6 .
**public** 108:21 .
**pull** 12:14 .
**punctured** 71:20 .
**purchased** 81:15, 105:14 .
**purpose** 43:4, 52:4, 68:12, 74:16, 78:21, 79:9, 80:15, 87:23, 95:16, 107:6 .
**purposes** 12:19, 106:21 .
**pursuant** 20:12, 72:2 .
**pursued** 103:25 .
**put** 6:8, 8:22, 9:4, 9:8, 10:5, 11:11, 17:23, 27:13, 27:22, 30:5, 34:15, 34:17, 34:24, 35:1, 39:25, 50:3, 50:9,

50:10, 53:2, 60:16, 65:25,
77:17, 91:6, 94:4, 101:22,
105:14, 106:9, 108:9 .
**puts** 97:22 .
**putting** 48:22, 49:3, 73:9, 75:14,
95:20, 105:16 .

.

.

**< Q >.**
**qualification** 52:24 .
**quarter** 111:12, 111:14 .
**Question** 10:7, 13:18, 14:3, 14:6,
15:10, 16:8, 16:19, 18:5,
18:6, 22:3, 27:22, 31:12,
31:16, 31:17, 31:19, 32:5,
32:20, 33:16, 35:20, 36:1,
36:3, 36:4, 37:13, 37:14,
37:17, 37:23, 38:24, 39:20,
42:3, 43:18, 47:3, 49:25,
51:2, 55:7, 59:9, 67:14,
67:17, 73:1, 76:2, 78:12,
84:12 .
**questioning** 17:1, 37:16,
104:22 .
**questions** 13:8, 13:9, 13:12,
13:14, 13:16, 13:18, 13:22,
14:4, 14:9, 14:12, 14:19,
14:20, 15:21, 17:9, 17:15,
17:18, 17:19, 17:21, 18:3,
18:12, 21:1, 21:3, 23:2, 23:7,
23:9, 23:12, 25:12, 26:9,
26:11, 28:3, 28:7, 29:24,
30:9, 35:22, 35:23, 37:15,
39:13, 49:24, 50:5, 51:17,
51:24, 67:13, 72:11, 84:9,
91:21, 91:23, 91:25,
93:16 .
**questions.** 93:5 .
**quick** 7:14, 93:2 .
**quicker** 109:6 .
**quickly** 108:10, 111:12 .
**Quinta** 74:9 .
**quite** 92:2, 99:21, 113:10 .
**quote** 50:11 .

.

.

**< R >.**
**R-o-m-e-r** 56:21 .
**raise** 2:16 .
**Ramone** 15:13, 15:14,

106:7 .
**ran** 11:18, 64:3, 65:2,
101:12 .
**ratings** 111:19 .
**rational** 56:16 .
**reaction** 19:25, 30:21 .
**Read** 4:14, 12:19, 12:20, 12:23,
14:2, 24:16, 24:17, 39:6,
40:13, 42:14, 81:6, 81:7,
92:20, 111:23, 113:14 .
**reading** 20:23, 22:8 .
**ready** 2:3, 2:5, 2:8, 2:13, 2:23,
54:18, 54:19, 60:21, 60:23,
61:22, 112:15 .
**real** 106:10 .
**reality** 30:25, 31:2, 31:5 .
**realize** 80:14 .
**realized** 65:3 .
**really** 7:12, 19:4, 19:20, 42:8,
80:6, 86:23, 89:10,
112:20 .
**reason** 19:2, 46:19, 46:22, 65:4,
99:8 .
**reasonable** 56:17, 58:20, 58:22,
62:1, 68:19, 68:21, 69:1,
69:2, 69:3, 74:11, 78:11,
86:23, 87:20, 89:9, 89:15,
89:23, 89:25, 90:1, 100:9,
100:12 .
**reasonably** 84:25, 86:13,
86:15 .
**reasons** 68:24 .
**reasons.** 103:18 .
**reassigned** 3:9 .
**REBUTTAL** 63:6, 63:8, 100:20,
115:31 .
**recall** 7:15, 83:17 .
**receive** 42:7, 51:13, 107:9 .
**received** 44:5, 44:9, 45:8, 65:24,
70:19, 80:19, 81:17, 81:21,
87:7, 87:8 .
**receiving** 34:2, 41:2, 51:10,
64:19 .
**Recess** 54:21, 55:17, 60:18,
60:21, 61:10, 61:14,
61:15 .
**recognize** 66:22, 94:4, 94:5,
94:23 .
**recognized** 81:10, 94:10,
94:12 .

**recollection** 28:16, 91:4,
107:22 .
**recommend** 27:11 .
**record** 2:20, 19:1, 42:1, 53:19,
56:12, 57:9, 82:15, 96:22,
98:17, 114:3 .
**recorded** 1:42 .
**recording** 12:10, 24:20, 24:21,
24:22, 24:23, 25:2, 25:5,
25:8 .
**records** 75:1, 75:2, 75:4, 75:5,
82:8, 83:11, 83:13, 83:14,
96:20, 103:12 .
**recover** 9:17 .
**recovered** 18:16 .
**recross** 53:8 .
**recurring** 95:2 .
**red** 34:13, 46:15, 46:17 .
**Redirect** 51:18, 51:20,
115:9 .
**reduction** 104:24 .
**reference** 71:21, 78:22, 83:16,
92:16, 106:1, 111:23 .
**referenced** 33:24 .
**references** 68:15 .
**referred** 75:9, 82:25 .
**referring** 23:21, 50:25 .
**reflect** 56:12 .
**refresh** 28:16 .
**regard** 58:24 .
**registered** 75:6, 75:7, 76:10,
103:13, 108:19, 108:20 .
**regularly** 80:1, 80:8, 103:21,
103:22 .
**Reid** 17:3, 17:6, 17:8 .
**reinforcements** 101:14 .
**reiterate** 54:16 .
**reiterated** 56:17, 56:20 .
**related** 23:4 .
**relax** 10:14 .
**relaying** 28:4 .
**relevant** 19:20, 74:22 .
**reliable** 92:23 .
**relied** 89:20 .
**relies** 93:21 .
**Rely** 69:4, 77:5, 80:17, 90:8,
93:10, 98:15 .
**relying** 93:8 .
**remain** 12:24 .
**remaining** 80:25 .

**remarks** 89:4, 89:16 .
**remember** 3:12, 4:9, 9:6, 9:10, 45:25, 48:2, 50:22 .
**remove** 81:3 .
**rent** 65:4, 65:13, 87:7, 101:13 .
**rental** 75:4, 83:13 .
**Rented** 75:5, 81:15, 95:8 .
**repackaged** 70:3 .
**Repeat** 38:24 .
**repeatedly** 97:19 .
**rephrase** 49:2 .
**replaced** 65:17 .
**reported** 79:17, 79:18 .
**Reporter** 1:48, 114:13 .
**reports** 4:15, 22:8, 45:17 .
**represent** 66:17 .
**request** 16:18, 101:12 .
**requested** 7:15 .
**required** 11:21, 56:5, 58:15 .
**requires** 52:23, 69:1 .
**reread** 12:16 .
**research** 47:3 .
**researched** 15:3, 46:14 .
**residence** 9:13, 101:13 .
**respect** 19:12, 42:3, 54:4, 57:3, 57:12, 62:23, 63:1 .
**respond** 7:13 .
**responded** 7:11, 7:15, 103:1 .
**responds** 34:6, 63:8 .
**response** 38:16 .
**responsibility** 18:15, 18:17, 66:25 .
**responsible** 18:18, 52:8, 80:24, 86:11 .
**rest** 9:2, 40:2, 53:22, 54:3 .
**restate** 2:20 .
**restaurant** 101:1, 106:15 .
**rested** 62:22 .
**resting** 53:20, 55:24, 62:18 .
**RESTS** 61:19, 61:21, 62:23, 62:25, 115:13, 115:15 .
**resumed** 25:6 .
**resumed.** 24:20 .
**return** 64:20, 87:25, 88:1, 111:4 .
**returned** 85:13 .
**revealing** 60:2 .
**review** 28:14, 37:14, 44:18,

56:14 .
**reviewed** 44:20, 87:16 .
**Reviewing** 28:17, 45:17 .
**Richard** 1:22 .
**rid** 108:10, 109:8 .
**right.** 55:13, 83:25 .
**rights** 12:23, 13:3, 14:2, 14:6, 14:7, 54:5, 54:13, 57:18, 58:24, 104:3 .
**rise** 55:21, 61:13, 113:22 .
**risk** 55:15 .
**RMR** 1:47, 114:1 .
**Rodriguez** 2:4, 2:9, 2:14, 2:18, 2:22, 2:24, 3:3, 16:19, 22:3, 27:8, 48:18, 48:19, 51:22, 53:12, 81:23, 82:3, 82:11, 84:5, 84:20, 90:13, 91:4, 91:12, 92:8, 93:6, 96:20, 98:18, 101:11, 101:21, 105:6, 106:19, 115:7 .
**Rodriguez-** 101:19, 104:16 .
**Rodriguez-lopez** 57:4, 64:25, 71:4, 72:22, 101:7, 101:24, 102:21, 105:9, 105:16, 108:4, 109:18 .
**role** 38:3, 45:14, 45:15, 45:19, 45:21, 85:2, 85:4, 94:25, 101:16, 101:24, 101:25, 104:13, 110:2 .
**Romer** 56:21 .
**Ron** 77:16 .
**Ronald** 76:23 .
**room** 9:24, 10:2, 10:3, 10:4, 10:23, 10:25, 11:4, 11:7, 11:12, 11:15, 12:4, 24:10, 26:6, 38:7, 55:18, 69:6, 81:6, 90:6, 91:7, 91:8, 91:20, 97:23, 98:16, 112:17, 112:20 .
**roommate** 80:7 .
**rooms** 10:14, 10:16, 73:16 .
**rough** 24:2 .
**roughly** 67:15 .
**route** 71:20 .
**Rule** 55:8, 55:10, 56:4, 56:5, 56:8, 56:13, 56:14, 57:2, 57:6, 57:10 .
**ruling** 57:5 .
**ruling.** 20:18 .
**run** 64:9, 64:24, 65:22,

107:19 .
**running** 105:19, 106:15, 106:16 .
.
.
**< S >.**
**safe** 4:3, 6:12, 7:22, 7:24, 10:19, 18:11, 18:17, 18:23, 20:25, 26:23, 27:3, 48:5 .
**safer** 109:8 .
**safety** 11:20, 34:11 .
**Sal** 11:5, 12:6 .
**sale** 64:15 .
**San** 5:4 .
**sandwiches** 111:15 .
**sanitary** 106:21 .
**Sarah** 106:6 .
**sat** 9:15, 11:21 .
**satisfied** 59:24, 60:1, 68:21, 101:20 .
**satisfy** 100:4 .
**saving** 31:3 .
**saw** 38:8, 38:9, 38:10, 38:18, 38:25, 39:2, 42:25, 45:18, 49:14, 49:16, 49:19, 73:4, 73:5, 73:8, 73:10, 73:12, 73:14, 73:24, 73:25, 74:5, 74:7, 75:10, 75:13, 75:14, 75:16, 75:18, 76:2, 76:18, 76:22, 77:1, 77:6, 77:12, 77:23, 78:1, 79:4, 80:4, 82:7, 84:6, 85:8, 86:7, 94:22, 98:9, 102:7, 106:8 .
**saying** 5:20, 11:14, 25:4, 35:17, 36:15, 36:25, 37:8, 37:25, 38:1, 38:6, 46:24, 94:13 .
**says** 5:12, 8:6, 12:19, 12:20, 21:24, 22:18, 25:5, 26:13, 26:14, 26:22, 27:13, 28:10, 29:11, 30:5, 33:2, 33:6, 33:21, 34:3, 37:11, 38:8, 39:6, 39:17, 45:6, 46:4, 49:14, 67:25, 96:12, 96:18, 96:20, 97:6, 98:22 .
**scared** 27:3, 27:5, 30:21, 91:13, 92:3, 99:23 .
**scene** 106:24 .
**schedule** 62:18, 63:4, 63:19 .
**school** 103:17 .
**screen** 20:22, 47:6, 88:8 .

scrutiny 110:12 .
sealed 69:18, 74:3 .
search 9:12, 9:17 .
seat 2:19, 75:17, 76:19, 76:20, 78:6, 78:7 .
seated 56:3, 60:13, 62:18 .
Second 44:1, 67:17, 68:5, 68:9, 68:13, 74:12, 84:12, 84:25, 94:16, 102:7, 102:17, 108:2, 112:12 .
Secondly 69:7 .
seconds 16:21, 16:22, 21:20 .
secret 69:19, 70:20, 109:14 .
secured 9:14 .
seeing 26:14 .
seek 95:15 .
seeking 72:17, 72:18 .
seem 54:19 .
seems 100:17 .
seen 6:4, 18:2, 31:9, 42:6, 67:7, 74:20, 95:10, 99:3, 110:17, 112:21 .
sees 98:11 .
seize 44:16 .
seized 33:17, 33:19, 74:6, 107:12, 107:14 .
seizure 70:22 .
seizures 110:14 .
self-incrimination 57:25 .
self-interest 104:16 .
sellers 109:8 .
send 107:9, 107:10 .
sending 64:17, 101:18, 104:9, 106:9 .
sense 69:4, 76:7, 76:8, 78:19, 81:2, 85:11 .
sent 22:10, 44:5, 45:20, 64:24, 65:1, 71:4, 80:19, 98:3, 98:4, 98:7, 101:14, 107:3 .
sentence 93:18, 104:25 .
sentenced 72:4 .
sentencing 77:9 .
separated 66:23 .
September 73:5, 73:6, 76:17, 77:19, 102:1 .
sequence 44:1 .
set 5:17, 56:17, 81:12, 101:12, 101:15 .
setting 107:9 .

seven 7:10 .
several 15:20, 36:1, 36:3, 68:15 .
shackle 24:13, 24:14 .
shackled 9:18, 9:19, 24:12 .
shall 95:8 .
sharing 4:16, 22:7 .
she'll 63:16 .
shelf 79:25 .
shifts 58:20 .
shitload 25:21 .
shop 82:6, 107:9 .
shopping 75:9, 75:14, 75:22, 76:22, 76:25, 80:11, 95:6, 97:16 .
Shore 89:1 .
shorter 23:20 .
shouldn't 53:14 .
show 28:9, 28:12, 41:19, 46:5, 46:8, 46:19, 46:22, 47:12, 47:22, 74:23, 84:16, 99:19, 99:20 .
showed 46:17, 47:9, 48:11, 48:14, 48:17, 48:18, 73:20, 73:22, 87:21, 92:12 .
showing 35:6, 96:22 .
shown 48:16, 48:20, 48:21, 94:19 .
shows 11:23, 92:5, 97:3 .
shy 68:22 .
si 97:24 .
side 7:24, 24:5, 24:6, 48:11 .
sides 94:8 .
signed 79:11 .
significant 108:16 .
silent 12:24 .
simple 19:14, 101:4, 105:8, 110:21 .
simply 17:10, 25:6, 50:1, 71:24, 82:24, 87:20, 101:9 .
Sinaloa 33:21, 82:2 .
single 56:25, 70:15, 74:23, 74:25, 76:3, 76:5, 76:6, 76:9, 89:19, 89:21, 89:22 .
sir 2:10, 3:4, 3:10, 4:11, 12:21, 12:22, 31:1, 33:11, 46:21, 53:13, 57:14, 57:20, 58:3, 60:14, 61:17 .
sister 106:9 .
sit 10:13, 10:14, 34:15 .

sitting 23:18, 24:4, 24:7, 24:8, 34:10, 63:4 .
situation 27:1, 91:12, 97:10 .
six 7:14, 79:13, 79:17, 107:14 .
six. 86:6 .
small 9:23, 10:1 .
Smaller 23:23, 23:24 .
sold 79:17, 82:9, 107:25 .
solution 65:8 .
solve 65:7 .
somebody 9:14, 22:14, 33:17, 74:23, 81:13, 98:6, 103:2, 105:21, 108:7, 110:7 .
somehow 85:6 .
someone 65:8, 78:23, 79:16, 89:1 .
sometimes 18:4, 26:19, 31:24, 33:15, 34:13 .
sophisticated 63:25 .
sorry 10:8, 25:21, 32:5, 43:18, 50:19 .
Sort 97:10 .
sounds 24:20, 25:5 .
soup 25:25 .
source 49:8 .
space 46:2, 71:18 .
Spanish 12:10, 28:4, 36:13 .
Sparrow 76:24, 77:16, 77:17 .
speaking 36:11, 46:12 .
Special 1:39, 52:2, 53:1, 66:16, 76:15, 76:23, 77:1, 77:16, 77:17, 94:24, 95:22, 109:3 .
specific 14:1, 16:25, 18:5, 22:6, 26:11, 30:18, 45:17, 45:19, 45:20, 46:10, 83:17, 99:17 .
Specifically 21:20, 27:21, 28:11, 32:15, 36:9, 37:25, 38:3, 56:23, 57:22, 58:11, 58:16, 58:18, 58:20, 64:22, 71:9, 80:22, 84:17, 102:19 .
spend 66:20 .
spends 89:1 .
spent 81:3 .
spoke 59:7 .
spoken 29:24 .
stage 56:14 .

stakes 109:25 .
stand 57:13, 58:1, 58:2, 77:10,
    113:12 .
standard 56:13, 56:17, 89:14,
    100:11 .
stands 61:14, 113:19,
    113:23 .
start 16:16, 33:7, 34:14, 63:10,
    67:20, 90:8, 92:2, 93:11 .
started 29:4, 29:7, 30:9, 42:21,
    111:12 .
starting 23:3 .
Starts 45:23 .
state 31:9, 32:19, 74:1,
    85:7 .
stated 50:1, 50:8, 50:10,
    83:24 .
statement 37:18, 39:2, 68:17,
    71:22, 81:5, 81:18, 81:23,
    82:3, 85:3, 85:7, 104:4 .
statements 52:6, 53:5, 97:24,
    104:3 .
States 1:1, 1:5, 15:8, 24:19,
    30:24, 35:13, 36:5, 36:6,
    40:12, 42:18, 56:18, 56:19,
    56:20, 56:23, 57:23, 64:6,
    64:18, 65:9, 66:10, 66:13,
    66:17, 70:20, 75:1, 87:5 .
States. 97:7 .
station 9:21, 90:21, 91:3 .
status 3:25, 65:9 .
stay 55:17, 88:25, 106:13,
    112:12, 112:23 .
stayed 79:12 .
steering 76:3 .
stenographic 114:3 .
stenography 1:42 .
Step 53:12, 55:2, 56:2, 76:6 .
stolen 33:17 .
stop 5:14, 6:4, 7:18, 7:23, 8:21,
    8:23, 8:24, 9:1, 24:21, 45:11,
    74:5, 83:15 .
stop. 104:6 .
stopped 9:7, 24:20, 24:22, 25:5,
    74:1 .
stops 100:9 .
store 50:23, 99:13 .
stored 65:25 .
Street 1:49, 5:1, 8:7, 85:16,
    113:2 .

stricken 51:16 .
strike 43:12, 45:14, 51:15,
    52:10 .
stuff 50:6 .
style 50:9 .
Subject 53:22, 56:1, 58:6 .
subjective 19:4 .
submit 69:8, 69:13, 72:21,
    72:25, 74:10, 74:19, 75:23,
    78:10, 80:13, 84:10, 85:2,
    87:18 .
subparts 68:11 .
subpoenaed 44:21 .
subpoenaed. 96:21 .
subsidiary 74:15 .
substance 67:15, 67:18, 67:21,
    84:18 .
substances 68:5, 69:12,
    69:15 .
substantial 72:23 .
succeed 65:18, 65:21 .
sufficient 74:23 .
suggest 72:24, 80:6, 86:23,
    104:1, 110:20, 112:24 .
suggested 81:25 .
suggestion 72:16 .
suggests 101:4, 103:25 .
sum 74:10 .
summarize 42:4, 69:9 .
supply 49:8 .
support 87:18 .
supposed 72:13, 72:15,
    96:9 .
supposedly 22:1, 43:1, 90:7,
    98:4 .
Supreme 56:22 .
surprise 110:13 .
surprised 39:17, 39:20 .
surveillance 45:18, 46:11, 73:8,
    73:15, 95:3, 95:5, 102:25,
    103:10 .
surveilled 43:7, 76:16,
    79:19 .
suspect 6:18, 10:12, 11:19, 17:9,
    17:10, 17:15, 18:7 .
suspected 45:15 .
suspicious 110:8 .
Sustained 10:10, 17:13, 18:21,
    19:2, 32:7, 34:22, 37:21,
    41:7, 41:23, 42:3, 51:16,

    52:23, 52:24 .
SWORN 2:14, 2:18 .
Sylmar 5:2, 6:11, 9:5 .
system 100:16 .
systems 15:4 .
.
.
< T > .
table 23:18, 23:19, 23:20, 23:21,
    23:22, 23:24, 24:5, 24:6,
    79:1, 91:8 .
tactic 18:4, 18:5 .
tactical 8:5, 8:8, 90:14, 90:15,
    90:18 .
tactics 17:22, 17:23 .
takedown 4:21 .
talked 60:11 .
tape 69:19, 70:4, 71:18, 74:4,
    74:7, 79:25, 106:18 .
taped 74:4 .
target 38:8, 38:11, 62:1 .
targets 33:14, 33:15, 35:7,
    48:11, 48:12 .
Task 3:25, 76:15, 76:16, 77:19,
    77:24, 78:2, 81:23 .
taught 80:20 .
tax 63:14 .
team 7:9, 8:24, 9:12, 76:16 .
technician 106:2 .
technique 17:3, 17:6, 17:9 .
technology 106:24 .
television 106:24, 111:19 .
tells 25:20 .
temporarily 9:9 .
Ten 7:24, 8:13, 8:16, 8:21, 8:23,
    23:2, 23:14, 55:20, 90:11,
    90:13 .
ten-minute 60:20, 61:10 .
ten. 8:1 .
Teresa 21:17 .
term 94:14, 110:5 .
terminate 82:6 .
terminated 79:13, 82:18,
    83:22 .
termination 82:22, 82:23,
    83:5 .
terms 19:17, 42:8, 104:22,
    109:23 .
terrified 91:13, 91:18 .
testified 30:12, 39:23, 72:1,

77:8, 80:18, 90:14, 93:14, 98:8, 98:9, 102:7 .

**testify** 54:5, 54:13, 54:14, 54:15, 58:2, 58:5, 58:10, 58:11, 58:14, 58:15, 58:17, 59:2, 59:5, 59:11, 59:13, 59:15, 60:5, 60:9, 93:17 .

**testifying** 93:19, 97:14 .

**testimony** 2:15, 50:12, 53:14, 56:25, 57:3, 72:6, 72:7, 72:12, 72:25, 77:13, 77:14, 81:2, 90:11, 95:13, 96:3, 96:17, 97:6, 97:13, 98:2, 98:5, 98:21, 99:7, 99:10, 99:12, 102:17, 103:10, 104:20, 107:24 .

**tests** 101:8 .

**thanking** 88:10 .

**theme** 95:3 .

**themselves** 31:25, 106:25 .

**thereabouts** 63:17, 64:22 .

**they'll** 40:15, 58:21, 62:10 .

**thing.** 39:6 .

**thinking** 19:14, 89:13 .

**third** 68:14, 102:8, 112:17 .

**Thomas** 1:35 .

**thorough** 4:3 .

**though** 21:19, 22:12 .

**thousand** 98:2, 98:7 .

**thousands** 87:7 .

**Three** 23:23, 24:1, 24:2, 24:4, 24:10, 28:20, 48:5, 48:9, 48:10, 48:17, 68:11, 74:15, 79:12, 79:17, 81:17, 85:13, 85:19, 85:21, 86:3, 86:24, 87:12, 104:9 .

**thriving** 64:17 .

**throughout** 41:3, 64:5, 89:17, 94:8, 94:14 .

**ticket** 87:6, 96:18 .

**today** 2:15, 54:25, 59:22, 61:7, 90:11, 111:23 .

**together** 75:20, 80:14 .

**Tomorrow** 55:1, 61:8, 62:8, 62:10, 62:11, 63:10, 63:14, 67:2, 67:24, 67:25, 72:6, 88:24, 111:10, 111:22, 112:9, 112:15, 113:14 .

**took** 9:8, 9:14, 20:14, 34:19, 34:24, 46:4, 46:6, 66:3,

81:20, 86:3, 101:20, 102:22, 109:6 .

**top** 32:25, 35:13, 35:14, 42:14, 87:2 .

**total** 41:10, 61:25, 62:3 .

**totally** 89:2, 99:2 .

**touched** 86:18 .

**towards** 48:19 .

**traced** 106:11, 106:12 .

**track** 53:25, 102:25 .

**tracked** 73:18 .

**tracking** 73:17 .

**tractor** 70:6, 109:7 .

**trade** 48:7 .

**traffic** 5:3, 5:7, 5:8, 6:4, 7:17, 69:16, 90:20, 90:22, 90:24 .

**traffickers** 79:24 .

**trafficking** 4:1, 64:16, 66:10, 67:21, 68:2, 74:13, 75:12, 75:23, 87:4 .

**trailer** 45:1, 45:4, 95:21, 109:7 .

**trained** 17:6, 17:8 .

**transaction** 46:10, 76:5, 108:17 .

**transactions** 71:9, 77:15, 102:23 .

**TRANSCRIPT** 1:20, 1:43, 12:11, 20:23, 25:4, 27:24, 28:6, 28:9, 28:15, 36:16, 92:12, 106:8, 114:2 .

**transcripts** 28:3, 36:18 .

**transfer** 106:5, 106:10, 109:20 .

**transferred** 47:2 .

**transfers** 80:4 .

**translate** 37:1 .

**translator** 38:15 .

**translators** 88:13 .

**transport** 7:1 .

**transported** 9:9, 109:16 .

**tremendously** 94:7 .

**Tresvant** 56:19 .

**trial** 63:24, 64:4, 66:24, 67:1, 74:20, 78:16, 79:1, 82:19, 99:2, 99:25, 100:1, 110:18, 112:22 .

**tried** 85:5, 104:12 .

**trier** 56:16 .

**trip** 75:9, 75:22, 76:22, 76:25, 80:11, 106:3 .

**trips** 76:13, 97:16, 102:4, 102:20 .

**Trooper** 74:1, 110:10 .

**truck** 9:7, 40:23, 41:16, 48:13, 69:21, 69:23, 70:10, 71:11, 73:6, 73:11, 73:13, 73:18, 74:2, 74:3, 74:5, 74:9, 77:21, 77:24, 78:1, 81:22, 81:23, 103:5, 103:7, 107:13, 107:14, 108:17, 108:18, 109:12, 109:13, 110:4, 110:6 .

**trucked** 70:7, 70:11 .

**trucks** 69:20, 80:8 .

**true** 18:8 .

**truncate** 27:6 .

**truncating** 24:17 .

**trunk** 69:25, 73:10, 75:16, 77:18, 108:9 .

**trustworthy.** 43:2 .

**truth** 17:17, 17:24, 43:6, 72:15, 104:18, 104:24 .

**truthful** 99:9 .

**truthfulness** 53:5 .

**try** 16:20, 111:11, 113:13 .

**trying** 42:4, 48:2, 52:20, 97:18, 103:3 .

**turn** 15:10, 69:10, 74:12, 109:13 .

**TV** 111:19 .

**two** 7:19, 9:2, 10:1, 10:2, 10:21, 12:4, 24:9, 28:20, 31:13, 46:1, 46:2, 48:10, 62:3, 63:21, 64:9, 64:12, 67:4, 67:13, 67:22, 68:1, 68:8, 68:24, 70:10, 71:10, 75:11, 75:22, 79:23, 84:9, 84:23, 86:4, 86:19, 91:8, 93:22, 96:5, 105:9, 108:2, 108:4, 112:5 .

**two-minute** 43:15 .

**two.** 69:12 .

**type** 8:11, 46:5, 46:6, 46:13, 97:10 .

**types** 17:18, 31:24, 33:12 .

**typical** 30:21 .

.

.

**< U >** .

UI 44:10 .
uncomfortable 34:14,
    105:15 .
uncorroborated 56:25 .
uncover 44:14 .
uncuff 34:14 .
understand 8:24, 9:4, 13:2,
    13:17, 14:7, 20:5, 20:6,
    20:18, 26:13, 29:17, 31:3,
    35:25, 36:5, 36:11, 36:14,
    36:15, 36:20, 36:22, 36:25,
    40:3, 42:9, 48:21, 57:20,
    58:3, 58:7, 58:24, 59:1,
    89:2 .
understanding 4:4, 13:12,
    59:12, 60:10, 72:13,
    103:3 .
understood 40:5, 54:16, 72:14,
    80:21 .
uniform 7:17, 8:1, 8:3 .
unit 7:16, 7:17, 7:19, 9:12 .
United 1:1, 1:5, 15:8, 42:18,
    56:18, 56:19, 56:20, 56:23,
    57:23, 64:5, 64:18, 65:9,
    66:10, 66:13, 66:17, 70:20,
    75:1, 87:5, 97:7 .
unlawful 64:15, 68:12, 69:13,
    69:14, 69:16, 78:21, 79:9,
    87:22 .
unless 11:17, 67:3, 112:10 .
unloaded 70:6 .
until 7:4, 9:12, 22:17, 34:19,
    34:24, 53:15 .
up-front 72:19 .
users 107:4 .
Using 71:8, 76:7, 81:2 .
utilized 7:17 .
.
.
< V > .
v. 56:19, 56:20, 56:23 .
vacuum-sealing 107:1 .
Valdez 93:15, 94:4, 94:5,
    94:10 .
Valdez-garcia 57:4, 64:13,
    65:25, 66:5, 70:9, 70:23,
    71:12, 72:21, 77:6, 80:2,
    96:4, 101:7, 102:3, 102:6,
    102:10, 102:20, 102:22,
    103:5, 104:17, 107:13,

109:15, 110:6 .
value 85:16, 93:13 .
various 69:25 .
vast 108:13 .
Vega 106:7 .
vehicle 7:11, 8:22, 9:4, 46:5,
    46:6, 46:13, 73:18, 76:11,
    90:18, 94:18, 97:16, 97:22,
    103:23 .
vehicles 103:13 .
verdict 56:7, 67:12, 67:13, 84:9,
    87:25, 88:1, 111:4 .
verge 27:11, 30:4 .
version 25:25, 27:10 .
versus 4:23, 93:23 .
vest 8:5 .
Victoria 1:38 .
video 12:7, 12:9, 23:16, 23:17,
    73:8, 73:14, 94:25, 95:2 .
view 60:25, 61:3, 62:2 .
viewed 102:20 .
viewing 56:14 .
violent 11:18 .
Virginia 64:7, 107:18 .
voice 28:5 .
voices 24:25 .
VOLUME 1:12 .
voluntariness 19:17, 19:18,
    19:24 .
vs 1:8 .
.
.
< W > .
W. 1:49 .
wages 79:18 .
wait 9:16, 61:5, 61:9,
    112:22 .
waited 70:18, 70:19 .
Wal-mart 44:24, 44:25, 70:5,
    70:18, 73:6, 73:11, 73:21,
    76:1, 76:14, 77:6, 77:13,
    77:14, 77:23, 77:25, 78:1,
    78:2, 78:5, 80:1, 81:17,
    81:20, 109:2 .
walking 8:7 .
wanted 14:22, 35:1, 65:15, 92:6,
    92:8 .
wants 26:2, 59:10, 93:1,
    99:21 .
warrant 9:12, 14:15, 19:7,

19:12, 19:13, 19:15, 19:20,
    20:2, 20:7, 20:11, 20:12,
    25:18, 39:16, 39:19, 39:22,
    40:7, 91:1 .
WARWICK 1:28, 2:6, 10:8,
    12:17, 16:8, 16:10, 17:12,
    18:20, 19:8, 20:9, 30:14,
    32:5, 34:21, 37:20, 38:20,
    41:6, 41:21, 43:23, 44:1,
    48:23, 51:15, 51:18, 51:19,
    51:21, 52:18, 52:25, 53:6,
    53:16, 53:21, 54:2, 55:6,
    61:2, 62:5, 62:7, 62:19,
    62:21, 66:15, 91:15, 94:21,
    100:14, 100:20, 100:21,
    100:24, 111:6, 113:1, 113:3,
    113:5, 113:8, 113:9, 115:9,
    115:33 .
watch 103:2 .
watched 77:17, 77:20, 78:4,
    78:5, 78:6, 78:7, 78:8,
    86:19 .
watching 9:2, 78:3 .
wavelength 62:13 .
ways 17:22, 18:3, 84:23,
    105:20 .
weapon 8:18 .
wear 8:5 .
wearing 8:10 .
wedding 65:14, 81:11,
    81:12 .
weeds 76:5 .
week 5:21, 20:14, 57:16, 103:2,
    112:21 .
weeks 107:14, 112:4 .
weight 21:1, 84:24, 92:22 .
weighted 86:9 .
welcome 68:23, 113:15 .
West 71:1, 107:11 .
whatever 9:17, 18:7, 51:9,
    97:11, 100:14, 111:15 .
whatsoever 31:23 .
wheel 76:3 .
whether 41:12, 42:6, 52:7,
    52:11, 52:19, 53:2, 57:6,
    58:10, 59:5, 59:10, 61:6,
    68:9, 68:25, 69:3, 73:3,
    74:13, 76:2, 104:24, 104:25,
    110:9 .
whim 20:4 .

**White** 7:20, 9:6, 9:9, 9:11, 9:12, 9:15, 25:20, 45:3, 55:16, 71:6, 71:7, 73:10, 75:6, 81:22, 87:8, 94:18, 95:7, 95:9, 99:13, 103:1 .

**whoever** 7:13 .

**whole** 20:23, 24:16, 26:21, 42:4, 98:14 .

**width** 24:1 .

**wife** 13:8 .

**will** 12:19, 12:22, 13:2, 13:8, 23:9, 29:12, 51:16, 56:10, 56:12, 58:11, 58:13, 58:14, 58:16, 58:18, 59:1, 63:8, 63:11, 63:17, 67:7, 72:5, 74:21, 78:15, 83:14, 84:15, 84:22, 90:5, 110:23, 110:24, 111:14, 111:16, 111:17, 111:21, 111:23, 111:24, 112:1, 112:2, 112:6, 112:7, 112:8, 112:11, 113:5, 113:12, 113:13 .

**willfully** 68:6, 68:10, 74:14, 74:24, 87:22, 103:16 .

**willing** 13:9, 14:8, 65:9, 99:18, 99:19 .

**willingly** 96:13, 96:25, 97:5, 97:11, 98:19 .

**Wilson** 56:23 .

**win** 29:14 .

**window** 10:15 .

**winter** 64:11 .

**wires** 33:13 .

**wish** 59:12, 60:5 .

**Within** 28:12, 49:5 .

**Without** 5:3, 5:20, 20:23, 37:24, 60:2, 65:5 .

**witnessed** 46:11 .

**witnesses** 54:5, 54:14, 60:15, 71:24, 72:6, 72:8, 72:9, 72:10, 73:19, 76:2, 93:16, 93:22, 98:22, 101:7 .

**woman** 106:6 .

**Wood** 76:15, 77:1, 94:24, 95:22 .

**word** 25:21, 33:18, 73:2, 85:23, 86:17, 94:13 .

**words** 4:10, 22:23, 35:17, 37:25, 81:2, 81:4, 90:22, 93:19, 108:16, 108:24, 109:22 .

**work** 3:23, 5:21, 21:21, 21:24, 22:2, 22:4, 22:22, 87:12, 98:16, 110:19, 113:13 .

**worked** 3:7, 31:14, 110:16 .

**working** 29:21, 99:5 .

**working.** 29:22 .

**Works** 100:16, 111:10 .

**worth** 92:24 .

**wow** 107:24 .

**wrap** 70:4, 71:16, 74:4, 74:7, 107:10 .

**wrapped** 69:19, 70:4, 74:6, 74:7 .

**wrists** 34:13 .

**written** 87:2 .

**wrongdoing** 106:25 .

.

.

**< Y >** .

**year** 3:14, 84:6 .

**years** 3:6, 18:2, 26:20, 33:12, 112:20 .

**years.** 92:11 .

**yes-or-no** 37:23, 49:25, 51:22, 51:25 .

**Yes.** 14:7, 28:23, 34:6, 35:19, 37:6, 37:11, 49:22 .

**yesterday** 16:11, 54:18, 61:24, 113:8 .

**You-all** 5:19, 55:18, 61:24, 62:17, 112:10, 112:14, 113:11 .

**young** 92:4 .

**yourself** 29:13, 69:2, 72:12, 72:15, 72:20, 72:24, 77:10, 97:11, 101:8, 103:17, 104:17, 112:24 .

.

.

**< Z >** .

**zip** 79:2 .